UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,              .
                                       .
      Plaintiff,                       . No. 12-CR-3429-WQH
                                       .
          v.                           . March 26, 2013
                                       .
TERENCE J. BONNER,                     . 9:30 a.m.
                                       .
      Defendant.                       . San Diego, California
. . . . . . . . . . . . . . . . . . .  .


          EXCERPTED TRANSCRIPT OF EVIDENTIARY HEARING
             BEFORE THE HONORABLE WILLIAM Q. HAYES
                UNITED STATES DISTRICT JUDGE
                     (Testimony only)

APPEARANCES:

FOR THE PLAINTIFF:          UNITED STATES ATTORNEY'S OFFICE
                            BY:  ROBERT S. HUIE, ESQ.
                                 W. MARK CONOVER, ESQ.
                            880 FRONT STREET, ROOM 6293
                            SAN DIEGO, CALIFORNIA  92101

FOR THE DEFENDANT:          IREDALE & YOO, APC
                            BY: EUGENE G. IREDALE, ESQ.
                            105 WEST F STREET, FOURTH FLOOR
                            SAN DIEGO, CALIFORNIA 92101




Court Reporter:          Melinda S. Setterman, RPR, CRR
                         USDC Clerk's Office
                         333 West Broadway, Room 420
                         San Diego, California, 92101
                         melinda_setterman@casd.uscourts.gov

Reported by Stenotype, Transcribed by Computer

INDEX

TESTIMONY:

WITNESS:              EXAMINATION BY:                    PAGE:

Edmund Estrada
                      Direct Exam by Mr. Huie...............4
                      Cross Exam by Mr. Iredale............27

Rebecca Phenicie
                      Direct Exam by Mr. Iredale...........46
                      Cross Exam by Mr. Huie...............86
                      Redirect Exam by Mr. Iredale.........88

Carolyn Novinskey
                      Direct Exam by Mr. Iredale...........90

Devin Rocky Porter
                      Direct Exam by Mr. Iredale...........96

Terence Bonner
                      Direct Exam by Mr. Iredale..........103
                      Cross Exam by Mr. Huie..............110

                          *  *  *  *

SAN DIEGO, CALIFORNIA, MARCH 26, 2013 9:30 A.M.

* * * *

THE CLERK:  Number one on calendar, case 12-CR-3429, United States of America vs Terence J. Bonner, on for evidentiary hearing.

MR. HUIE:  Good morning, Your Honor.  Robert Huie for the United States.

THE COURT:  Good morning.

MR. IREDALE:  Eugene Iredale for Mr. Bonner, who is present before Your Honor on bond.

THE COURT:  Good morning.  All right.  Counsel, we're here for evidentiary hearing.

Mr. Huie, do you have any witnesses you would like to present?

MR. HUIE:  I do.  The United States calls Special Agent Edmund Estrada.

MR. IREDALE:  Your Honor, at this point may I move to exclude the balance of witnesses?

THE COURT:  All right.  And so any other agents who are going to testify in this proceeding, if they'll step outside until they have completed their testimony, other than if you have a case agent.  The case agent can remain, if you have one case agent to assist you during the hearing.

MR. HUIE:  Thank you, Your Honor.  May the record reflect that --

(Oath administered.)

MR. HUIE:  Your Honor, our case agent, Rebecca Phenicie, is remaining in the courtroom, and the three witnesses Mr. Iredale called have stepped outside.

THE COURT:  Thank you.

THE CLERK:  Please state your full name for the record and spell your last name.

THE WITNESS:  Edmund Estrada, E-S-T-R-A-D-A.

EDMUND ESTRADA,

SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. HUIE:

Q.   Good morning, Special Agent Estrada.

A.   Good morning.

Q.   Sir, who do you work for?

A.   I work for the US Customs and Border Protection, Office of Internal Affairs.

Q.   And what is your job with CBP IA?

A.   Special Agent.

Q.   Can you walk us briefly through your employment with CBP and history within law enforcement?

A.   Yes.  From December 1991 to April 1996 I was a Customs inspector with the former US Customs Service.  From April 1996 to September 2001 I was a Special Agent with the former Immigration and Naturalization Service.  From September 2001 to

March 2003 I was a Special Agent with the former US Customs Service.  From March 2003 to July 2008 I was a Special Agent with Immigration and Customs Enforcement.

From July 2008 to November 2009 I was a Special Agent with Homeland Security, Office of Inspector General.  And from November 2009 to present I am a special agent with Customs and Border Protection, Office of Internal Affairs.

Q.  Sir, let me see if I can summarize that.  You have been in law enforcement since 1991; correct?

A.  Correct.

Q.  And a special agent with one office or another since 1996; correct?

A.  Correct.

Q.  And you've been with CBP IA since 2009?

A.  Correct.

Q.  What did you do before 1991?

A.  Before 1991 I was active military with the US Navy.

Q.  In the course of your experience, 17 years as special agent, have you had the opportunity to execute search warrants before?

A.  Yes, I have.

Q.  Can you give us a ballpark of how many search warrants you participated in executing?

A.  Over a dozen.

Q.  And, Special Agent Estrada, were you participating in the

search of an address, a residence on Primrose Drive in Campo on March 9th, 2012?

A.   Yes, I was.

Q.   About how many agents were part of the search team on that occasion?

A.   Approximately 10.

Q.   In advance of the search that day were you given a copy of the actual search warrant?

A.   Yes, I was.

Q.   And did you review that warrant?

A.   Yes, I did.

Q.   Did you review the attachments to the warrant that describe what agents were authorized to seize that day?

A.   Yes.

Q.   Were you aware of a date limitation on the Attachment B to that warrant?

A.   Yes.

Q.   Do you remember what the date limitation is?

A.   2004 to the present date of the search warrant.

Q.   Now, sir, in advance of executing the search on that day, did you have a role in doing any sort of research on the subject premises?

A.   Yes.  I was tasked with researching Mr. And Mrs. Bonner by name to see if they had any weapons registered to their -- to themselves.

Q.   What did you do to carry out that research?

A.   I conducted queries of the California Law Enforcement Telecommunications System, commonly known as CLETS, ran the searches by name, by name and date of birth, several variations thereof in order to obtain any registered weapons that came back to them, and I did locate several.

Q.   Sir, why were you doing that research?

A.   It is common to do that type of research in preparation for a search warrant.  You want to know if there is the potential for weapons in the house and the location you are going to search.

Q.   And you said that you found some hits in the database.  Can you describe in a little more detail what it is that you found?

A.   I found approximately a dozen, 13 weapons that came back registered to Mr. Bonner.  Some had older registration dates, but they still reflected that Mr. Bonner was the registered owner of approximately a dozen weapons.

Q.   What did you do with the research that you conducted?

A.   I went ahead and did some additional research with the National Crime Information Center, NCIC as it is commonly known, to ensure that the weapons had not been reported stolen and therefore could still be registered to Mr. Bonner.

     I took the information that corresponded to the weapons, manufacture, model, serial number, caliber, et cetera, and transposed that information onto a document and just basically

concised it so that it could be a document that could be passed out to the other search warrant members.

I also conducted queries of the Internet, just general queries of weapons, to obtain images that would be close to what the weapons were, just to give the agents an idea of what potentially they'll encounter and if they are searching what they would be looking for.

Q.   The document that you created, did you, in fact, distribute that to other members of the search team?

A.   Yes.

Q.   Have you reviewed Government's Exhibit 1 for identification in advance to the hearing today?

A.   Yes, I have.

Q.   And is that a true and accurate copy of the research document that you made along with a cover e-mail to it?

A.   Yes.  The document I viewed before was Exhibit 1 is a true copy of what I created and the e-mail.

MR. HUIE:  Move to admit Exhibit 1, Your Honor.

THE COURT:  Any objection?

MR. IREDALE:  None, Your Honor.

THE COURT:  One is received.

(Exhibit Number 1 was admitted into evidence.)

Q.   BY MR. HUIE:  So I would like to start, sir, with the first page of the exhibit.  Calling your attention to the bottom half of the page, is that an e-mail from you to Special Agent

Phenicie attaching the list of weapons?

A.   I'm sorry.  I was trying to raise it.  I don't know if there is a stand to raise it to view it.

Q.   I don't think it does.

THE COURT:  You can push it.  You should be able to push the bottom.

THE WITNESS:  Okay.  It does, actually.  Thank you.

I'm sorry, sir.  Can you repeat the question?

Q.   BY MR. HUIE:  Yes.  Calling your attention to the bottom half of the page, is this an e-mail that you sent to Special Agent Phenicie attaching a list of weapons?

A.   Yes, sir, it is.

Q.   Calling your attention to the second and then the third page of the document, is this the list of weapons that you put together?

A.   Yes, it is.

Q.   And you testified that these pictures were pictures that you found on the Internet to match up to the weapons' descriptions?

A.   Correct.

Q.   Looking at the second page, are there a total of 13 weapons that you found?

A.   That is correct.

Q.   And all these were currently registered to Mr. Bonner?

A.   Yes.  They still came back as Mr. Bonner being the

registered owner of the weapons.

Q.   And none of them had been reported stolen from him according to law enforcement databases?

A.   Correct.

Q.   In now, sir, in reviewing this list of weapons that you found, did you have concerns about any of the weapons in particular?

A.   The higher caliber ones, the .357s listed on here under "caliber" at the very top of each separate listing, the .44 magnum, the .45 caliber, those are all heavy caliber weapons.

Even though we wear tactical equipment, fully resistant equipment, still the impact of something like this is -- can still be harmful.

The one that I was primarily concerned about was the number one listing on there, the list of caliber has a .223 round.  I am not a weapons expert, but my understanding is that type of round could penetrate a bullet-resistant vest.

Q.   Now, you referred to bullet-resistant clothing and a bullet-resistant vest.  What kind of protection do you wear when you go to execute a search?

A.   Normally we wear what we call tactical equipment. Primarily it is the bullet-resistant vest.  It covers our torso, our upper torso.  It doesn't cover your arms or neck area or above it, just basically protects the vital organs. And there is usually an additional what they call a trauma

plate for the vital organs in the middle.

We'll wear equipment or clothing that clearly represents that we're law enforcement.  We'll usually be identified in the back as "police" or "law enforcement."  Similar in the front of it a badge is exposed so that there is no question that we're law enforcement.

Q.  Any protection for your face or head or brain?

A.  No, not that we've been issued, no.

Q.  And I think you testified that this information was circulated to the team in advance of the warrant being executed?

A.  That's correct, sir.

Q.  Now, let's talk about the actual date of the warrant, March 9th of 2012.  Around what time of day did the search warrant get started?

A.  Approximately 8:00 AM.

Q.  Were you assigned a particular role at the outset of the search?

A.  Yes.  I was assigned to the perimeter.

Q.  Can you please explain what that means?

A.  Perimeter is just basically the exterior.  My responsibility was the exterior of the house and the surrounding property.  While there is an assigned entry team which would physically go into the house at the beginning of the search warrant, my responsibility was to basically ensure

nobody left the premises, the house, the property, or attempted to flee, or that anybody approached it as well while the entry was till taking place.  So my responsibility was just basically watch over the exterior of the house and the surrounding property.

Q.   And what did you do in that regard?

A.   I'm sorry?

Q.   What did you do in carrying out your duties on the perimeter?

A.   Basically when we all were positioned in the front of the house initially and we went to our respective role, so I walked towards the back of the house and off to the side and positioned myself in a location where I could see two of the walls in the back corner of the house, the side and back, as well as keep a visual on the property because it was like a -- what I believed was an empty lot behind Mr. Bonner's residence, so to make sure no neighbors, people were coming to the household or nobody was leaving the house.

Q.   What happened next?

A.   Once the entry team secured the house and ensured that everything was safe, then my next role was assigned as photographer for the search team.

Q.   How did you come to know that the house was secure?

A.   We were told that -- basically somebody came out of the house and announced to everybody else that the house was secure

and that told us basically that everybody was safe at that point to go ahead and leave our assigned initial perimeter, in my case, the perimeter position and now continue with my next role, which was the photographer.

Q.   So in your role as photographer, what was it that you did?

A.   I initially was to basically memorialize the -- as evidence was collected and so forth, but right at the beginning was to take images of the house prior to commencement of the search.

So after the house was secure, I went in and took photographs of every angle possible, just to show what the condition of the house was prior to search beginning.

Q.   So your first job as photographer is to catalogue the state of all rooms, and going forward, I think you said, you would photograph evidence as it is found?

A.   Correct.   Once I completed -- in fact, the search did not start until after I completed the photographs of the way -- the condition of the house prior to commencement of the physical search.

So once I completed that, then the search began.   I was still assigned as photographer, so as an item is found they call me to the item.   There is a locater label that is a yellow locater label that was filled out by the person who found it, and that is placed alongside the information obtained -- the evidence, close to the location where it is at.

And I basically take a photograph of where it is located to

memorialize where it is being found.  At the same time I kept a written photo log, and on the -- I am a -- the one that created the number system for it.  So Entry Number One in the photo log corresponded to Photograph Number One that I took, and I entered a brief description of the item being photographed or seized, and then I basically kept track of the photos and the log for each corresponding room.

Q.  So as a photographer were you assigned to stay in a particular room throughout the duration of the search?

A.  Not a particular room.  It was wherever information -- evidence was being found.  If it was a two -- it was a two-story home, if I am upstairs and somebody says something was found downstairs, I would go downstairs.

So I had individual pages for the individual rooms, and if I had to go from Room A to, let's say, Room F, then I went to the corresponding page, and that became the next picture in sequence, so --

Q.  Did have you a chance to see how the search was being executed throughout the house in your role as photographer?

A.  Yes.  Because I was walking throughout the house as I was being called to take photographs, I was seeing how the search was being conducted.

Q.  Let's talk about when you first -- you first made entry to the house after your work on the perimeter.  What, if anything, did you notice about the house as you walked in?

A.    I would say that the house was in disarray.  There was large piles of clothing, for example, in the back laundry room. Stacked on top of each other was what I would call an outdoor trash can in the kitchen area.  The dining room had boxes stacked off to the side.  There seemed to be quite a bit of dust throughout the house.

It was clear that -- it appeared that Mrs. Bonner had been sleeping on the downstairs sofa.  When I went upstairs the -- what I believe would be the master bedroom there were items on the floor to where I wasn't initially able to step on the existing carpet or towel, whatever was there.

I was actually stepping over items, stacks of boxes, clothing.  It was just not -- the house was just not organized.

Q.    Was the clutter you described or the disarray you described something that was in particular rooms or every room in the house?

A.    I would say pretty much in every room, it was disorganization.  Most of the rooms it was hard to get into to walk freely.  You had to maneuver through stacks of boxes or clothing to get through.

Q.    You mentioned dust.  Was there any animal hair that you noticed?

A.    Yes.  There appeared there was a dog in the house, and there appeared to be cat hair as well mixed in.  Myself and -- from walks from around the search -- most of the agents were

coughing.

Q. Now, have you had a chance to review Government's Exhibit 2 through 10 in advance of the hearing today?

A. Yes.

Q. And are each of those copies of photos that you took in your role as photographer on March 9th, 2012?

A. Yes.

Q. And do those photos truly and accurately depict what it was that you saw in the house on that day?

A. Yes.

MR. HUIE: Move to admit Exhibits 2 through 10, Your Honor.

THE COURT: Any objection?

MR. IREDALE: None, Your Honor.

THE COURT: Received.

(Exhibits Numbers 2 - 10 were admitted into evidence.)

MR. HUIE: Thank you.

Q. BY MR. HUIE: Now, Special Agent Estrada, I would like to show you some of the pictures and just have you briefly walk us through what is in it, and I'll direct you to some particular questions.

A. Yes, sir.

Q. Starting with Exhibit 2, what room in the house was this?

A. This is what we designated as Room A, and those are designations we provided -- we gave to each room just to keep

track of the rooms and corresponding photographs and so forth, so this is Room A.

Q.   I'm sorry.   What did it appear to you that Room A was?

A.   The master bedroom.

Q.   Looking at the state of things in Exhibit 2 is this the room as you found it on the morning of the search, or did CBP create this organization?

A.   This is the condition of the room at the time prior to commencement of the search warrant.  As I mentioned, this is the bedroom part of Room A, because Room A was basically separated by the divider on the left of the picture.

On the left of the picture, here, it is -- there was what we considered his office space and then his living area all in the same master bedroom, and this is part of the living area of the master bedroom.

Q.   So Room A appears to be a master bedroom that is divided in two parts by a piece of furniture, and on the other side of the furniture is what appears to be a home office?

A.   Correct.

Q.   Showing you Government's Exhibit 3, is this another depiction from another angle of Room A?

A.   Yes, it is.  The area we were previously looking at in Exhibit 2 is actually off to the left where the orange pumpkin is.  Looking at towards that wall on the left is the view from the previous photograph.  This is, again, Room A.  The box on

the lower left is kind of where his office begins, and these green boxes are -- you'll see them throughout the house. The -- slightly center to the left, you'll see the corner of his bed.  His sheets are sticking out just in the triangular form there to the -- kind of in the middle.

Q.  Sir, showing you Government's Exhibit 4, what is depicted here?

A.  This is a partial view of the -- what we designated as the home office.  It appears to be shelving or dresser on the top right here is -- kind of divides the living area of the master bedroom.  On the left of that is the office.

The boxes on the lower right-hand corner are some of the boxes that we had seen in the previous photograph just where you saw the beginning of the bed.

So this part here is to the left is his home office, and you can see his chair there.

Q.  Just to be clear, the green boxes that you see in Exhibit 4 and that we also saw in Exhibit 3, are those boxes that CBP brought in and loaded items into, or were those boxes that you found like that on the morning of the search?

A.  Those are boxes that we found on the morning of the search. Those boxes were already at the house.

Q.  Let's take a look at Exhibit 5.  Do you know where this photo was taken?

A.  Yes, sir.  These are shelves in the home office area, and

they would be -- they are not visible in the last photograph. This is basically what I would say the far left wall, as you are looking into his home office, and this is one of the shelves.

Q.   And it is a little hard to see on the copy, but is Exhibit 5 depicting a series of manila folders that are jammed into a file cabinet?

A.   Yes.  This is the way we found these manila envelopes here, manila envelopes.  You can see up here.  Up here is the label that we created that I call a "finder's label," so these envelopes here, these folders, are just the way they were shoved or stacked inside that one shelf.

Q.   All right.  So these four photos that we looked at all pertain to Room A.  I would like to ask you about another room. I am going to see if I can remove this.  There we go.

Okay.  What is depicted in Government's Exhibit 6?

A.   This is the room that was designated as Room F.  Room A was upstairs.  Room F was downstairs.  It was right to the entrance -- right across from the kitchen.  It appears to be a spare room, a -- potentially a bedroom.

This shows the entry into Room F, and it shows that -- it clearly depicts here that the boxes were all the way to the front of the room.  This is the entry to the room.

And, yes, the boxes were basically had covering the entire room itself from top to bottom, all the way to the back.

Q.   Let me show you Government's Exhibit 7.  What is depicted here, sir?

A.   This is, again, Room F.  I climbed from the entry to the top of the -- to the top of the stack of the boxes and took a picture all the way looking back toward the back of the room to show -- basically memorialize how the boxes were in the previous photograph, stacked approximately six high, and went all the way to the back of the room.

Q.   So looking at Exhibit 6 and referring to how high the stack of boxes is and then the view in Exhibit 7, looking at the breadth and the depth of the boxes, do you have a very rough estimate of how many these green boxes were located in Room F?

A.   Over 100 would be a guess.

Q.   Now, in your role as photographer did you have the occasion to see agents actually conducting a search of boxes within Room F?

A.   Yes.

Q.   And as you understood it, how was that search being conducted?

A.   Because there were searches going on throughout the house, meaning that the house was being searched all at one time, the idea was trying to be able to review, open up each box, and take a look at each one and try to ensure that the item information if they were the boxes going to be taken were within the scope of the warrant.

We had to basically try to find a way to go through every box but at the same time not necessarily take every box all the way out and basically empty out the entire room and put them back in.

So they were basically clearing out one row at a time and basically moving over the rows as they went through the boxes, and basically filling back space --  filling up the space behind them.

So they were opening up the boxes and going through the folders and trying to see whether or not any information appeared to be within the time frame, and if it wasn't the box was put back.

And out of this room here I believe only a dozen boxes were actually taken, so they went through all the boxes and only about a dozen were determined to be within the scope.

Q.  Let me show you Government's Exhibit 8.  Sir is this a photo of the dozen boxes that were seized from Room F and taken outside?

A.  Yes, that is correct.  The -- as the boxes were determined that they were going to be seized, then they were taken outside because, again, the rest of the house was still being searched, and to try to use, like, the living room or other areas would be interfering with the other processes going on, so as a box was determined to be seized, it was taken outside.

And these are the dozen boxes that were from Room F.  And

again, somebody is holding the finder's label in front as I took a photograph of the evidence.

Q.   Now, calling your attention to the writing on the two boxes on left that says "union receipts."  Do you see that?

A.   Yes, sir, I do.

Q.   Is that something that CBP wrote or was that writing on the boxes as they were found?

A.   That was already written on the boxes.  To my knowledge no information was written on any existing boxes that were in the house.  Anything that was -- all the information that is on these boxes that you see, "union receipts," that was already on the boxes.

Q.   Showing you Government's Exhibit 9, what is depicted here?

A.   This is actually the corner of the living room.  One of the nightstands is partially to the left.  You can see part of it. I am not sure what is in the kind of green bag there, but the black bag contained a laptop, and the dust on the boxes was indicative of what we found throughout the house.

Here you could see the spider webs and so forth clinging to the walls and the nightstand, but this is -- kind of represents what we saw throughout the house as far as dust level.

Q.   And, finally, Government's Exhibit 10, what is depicted in this photo?

A.   This is the room -- this is an upstairs bedroom.  It is the bedroom of the -- a room that appears to be a spare bedroom

across the hall way from Room A or the master bedroom, and this is the condition of the room when we first initiated the search warrant.

It is just the way that the boxes are stacked all the way from bottom to top.  And you can see more of the green boxes with the labels on the top right corner, and this is a difficult room.

Q.   Now, sir, recognizing that items were seized that day from a number of difficult rooms, is it accurate to say that most of the items that were seized, most of the documents, were either taken from Room A the bedroom, slash, home office that we saw or Room F, the room filled with boxes of documents?

A.   Yes.  Most of the -- most of the information taken was from Room A and Room F.

Q.   And you've talked a little bit about how the search was executed with regard to going through the boxes in Room F. Showing you Government's Exhibit 5, and this is the file cabinet from the home office with the manila folders.  What, if anything, did you observe how agents were executing the search with regard to these manila folders in the home office?

A.   Similar to when they were opening up the boxes and going through the manila envelopes in there was filtering through the envelopes, through the folders, to determine whether or not there was information that is pertinent that is within the scope of the search warrant.

So in this case here the folders are being taken off, and they were going through them to ensure that the information contained with them was within the scope of the search warrant, so in this case they were taking off the folders one by one or a couple at a time and going through them.

Q.   Was it your observation, sir, that agents were not only going through every folder but looking at every single piece of paper in every folder?

A.   I'm sorry.  Can you ask that again, sir?

Q.   Was it your observation that agents were going through every single piece of paper in the house on the morning of the search?

A.   I wouldn't say every single piece.  I think they were attempting to go through every single piece, and in that form they were going through the folders and ensuring that the information in there was within the scope.

I can't say that they were going through every single sheet of paper.  I think it would have taken quite awhile, due to the condition of the house and the amount of information present.

Q.   Let me ask you, how long did the search take in total?

A.   Approximately five hours.

Q.   And do you have any estimate how long the search would have taken if agents were to review every single piece of paper in the house?

MR. IREDALE:  Objection, calls for opinion and

conclusion, speculation.

THE COURT:  Overruled.  I'll allow the answer.

THE WITNESS:  To go through every single sheet of paper before leaving the house, I would say well over 24 hours.

Q.  BY MR. HUIE:  Sir, we spoke a little bit ago about weapons, the weapons research that you did in advance of the search.

At any time during the search that morning did you hear or learn anything else about the presence of weapons in the house?

A.  Yes.  I remember specifically Agent Phenicie passing out information that Mr. Bonner had been asked if there were weapons in the house, and that he confirmed there were and they were located upstairs.  But to my knowledge we looked for them -- to my knowledge no weapons were ever found.  We did find ammunition, but no weapons were ever located.

Q.  Agent Estrada, did you have any personal knowledge on the morning of the search of CBP IA providing a copy of the search warrant to Mr. Bonner himself?

A.  One more time, sir.

Q.  Did you have any personal knowledge of CBP IA providing a copy of the search warrant to Mr. Bonner?

A.  Yes.  I actually saw Agent Phenicie walk over to Mr. Bonner and provide him a copy of the search warrant and explain -- talk to him, explained if he had any questions, et cetera, but yes, I remember her walking over and actually providing the search warrant to Mr. Bonner.

Q.   At what point during the search did that happen?

A.   At the end of the search.  At the end of the search.

Q.   Sir, have you in your 17 years as a Special Agent ever been aware of a rule that says you must provide a copy of the search warrant at the beginning of a search?

A.   No.

Q.   And in your experience as an agent, have you ever participated in the search of a residence that was in the same state of disarray as the one that you searched on this morning?

A.   No.

Q.   Now, you talked earlier about coughing.  You observed other agents coughing during the search.  Did you experience any health effects that lasted beyond your physical presence?

        MR. IREDALE:  Excuse me.  That assumes facts not in evidence.  The witness did not testify to the coughing.

        THE COURT:  Just rephrase the question.

        MR. HUIE:  Yes, Your Honor.

Q.   BY MR. HUIE:  Sir, did you experience any health effects that extended beyond your physical presence in the house that morning?

A.   Yes.  During the actual search warrant I started coughing, and actually that cough lasted for approximately two weeks, to the point that I was coughing so strong that first week that I actually coughed up some blood.

        MR. HUIE:  Nothing further.  Thank you, Your Honor.

THE COURT: All right. Any cross examination, Mr. Iredale?

MR. IREDALE: Yes, Your Honor.

CROSS EXAMINATION

BY MR. IREDALE:

Q. It is Special Agent Estrada?

A. Yes, sir.

Q. As I understand it, at one point you worked for the Office of the Inspector General?

A. Yes, I did.

Q. Of the Department of Homeland Security?

A. Yes, sir.

Q. And the OIG is specifically the lead agency for criminal investigations within DHS; is that correct?

MR. HUIE: Your Honor, I object as to this being outside the scope of today's evidentiary hearing.

THE COURT: It does seem to be outside the scope, Mr. Iredale. This hearing is really focusing on the search warrant -- execution of search warrant. Is this evidence you are seeking to introduce with regard to the authorization issue?

MR. IREDALE: Just it was touched upon, Your Honor, in the direct examination, and I was simply asking just briefly how it related to this particular case. If Your Honor feels it is beyond the scope --

THE COURT: I'll sustain the objection to that

particular question.

Q.   BY MR. IREDALE:   Now, you told us, I believe, that there was a meeting to prepare for the execution of the search warrant in this case?

A.   Yes, sir.

Q.   And when did that meeting occur?

A.   I believe it was the day before the search warrant.

Q.   So the search warrant was executed, as I recall, on the 9th of March?

A.   Yes, sir.

Q.   And the meeting occurred on the 8th of March?

A.   I believe so.

Q.   At what time?

A.   I believe it was in the afternoon.

Q.   And where?

A.   The search warrant meeting, there was one that I participated in that was actually at the office itself, so the office of CBP.

Q.   And you suggest by your answer there may have been another meeting somewhere else?

A.   I do not know if there was another one.  I know there was -- before we did the search warrant itself that morning, we just went over a briefing one more time at the actual location where we met that morning.

Q.   Now, as I recall, there were actually 12 people from CBP

who were present at the search; am I correct in that?

A. You may be correct. I just remember approximately ten.

Q. Let's see if we can go over them. Arnt -- Special Agent Arnt, do you remember if he was there?

A. Yes, sir.

Q. Anderson?

A. Yes, sir.

Q. Special Agent Phenicie I believe was the case agent; is that true?

A. That's correct, sir.

Q. Special Agent Rocky Porter?

A. Yes, sir.

Q. And Special Agent Garvey?

A. I do not remember if he was present or not.

Q. There was yourself?

A. Yes, sir.

Q. Novinskey?

A. Yes, sir.

Q. And she is the special -- the Assistant Special Agent in charge, I believe?

A. One -- one of two, yes, sir.

Q. And there was Kim Paul?

A. Yes, sir.

Q. There was Special Agent Sourborn (phonetic); is that correct?

A.   Yes, I believe he was present.

Q.   And then there were three other agents.  There were two agents who were from Arizona; is that correct?  Do you remember that?

A.   That is correct.

Q.   There was a Special Agent Servine (phonetic) from Yuma?

A.   I do not remember the last name of the -- one of the two individuals from Arizona, but I do remember there were two.

Q.   Do you remember Special Agent Platt from Tucson?

A.   Yes, sir.

Q.   And were they both there to participate in the search?

A.   Yes, sir.

Q.   And did they participate in the search?

A.   They participated in the search in a forensic aspect.

Q.   So they were there to help with the computer?

A.   Correct.

Q.   And then there was an analyst named Julie Jusanes (phonetic) from the San Diego office; correct?

A.   Yes, sir.

Q.   And she was also with CBP?

A.   Yes, sir.

Q.   So you are not quite sure about Garvey, but the others you are sure they were all there?

A.   Yes, sir.

Q.   And you learned, I take it, that Mr. Bonner had himself

served as a Border Patrol agent for over 20 years?

A.   Yes, sir.

Q.   And that Mr. Bonner had been before he retired the president of the National Border Patrol Council?

A.   Yes, sir.

Q.   Did Mr. Bonner have any criminal record that you knew of?

A.   Not that I know of, sir.

Q.   Did Mr. Bonner have any record of any illegal acquisition of firearms?

A.   Not that I know of, sir.

Q.   Now, you are a law enforcement officer; is that true?

A.   Yes, sir.

Q.   Do you have firearms in your home?

A.   Just my issued weapon, sir.

Q.   You keep that in your home?

A.   Off duty, yes, sir.

Q.   And you were able to discover that Mr. Bonner had weapons registered in his name which you were able to locate by computer; is that true?

A.   That is correct, sir.

Q.   Now, at this meeting, the day before at the office, how many persons were present, best estimate?

A.   All those that are participating in the search warrant.

Q.   So 11 or 12 people?

A.   Yes, sir.

Q.   Including the Arizona agents?

A.   I do not recall if they were present.

Q.   Ms. Jusanes was she there?

A.   I believe so.

Q.   And who conducted the meeting?

A.   It would have been Agent Phenicie that would have conducted the meeting.

Q.   Did Agent Phenicie discuss that she had a search warrant, and did she distribute the search warrant?

A.   Yes.

Q.   To all of the people who were present?

A.   Yes.  Everybody was required to read it.

Q.   And when you went to the location the next day in Campo, California, to execute the warrant, did you have a copy of the warrant with you?

A.   Yes.

Q.   And did the other agents to your knowledge also have copies of the search warrant that was being executed with them?

A.   I believe they did.

Q.   So all of the agents who were in the search warrant party had a copy of the warrant which they were charged with executing; correct?

A.   I believe so.

Q.   Not just Ms. Phenicie but as far as you know, all of the agents, all of the persons who were in the search warrant party

had their own copy of the warrant?

A.    Let me correct, sir, not a copy of the entire warrant. What I remember was a copy of the items to be seized.

Q.    So it was a copy of Attachment B, the items to be seized?

A.    Correct.

Q.    And that's the only thing that you were given?

A.    Yes, sir.

Q.    Now, how long did this meeting last on the 8th of March, the day before, best estimate?

A.    Approximately a half hour.

Q.    During that meeting did Ms. Phenicie say that she would be charged with making contact with Mr. Bonner at some point?

A.    Did she -- well, if I remember correctly, she was the one that was going to make contact with Mr. Bonner and explain that there was a search warrant to be conducted.

    The entry team probably would be the first to actually make physical contact.

Q.    So the concept was -- the idea that was discussed at that meeting was that the entry team would enter into the house?

A.    Correct.

Q.    And they would do a protective sweep to make sure that there was nobody there who was any potential danger to the agents; right?

A.    Correct.

Q.    And they would make sure that if there were any guns out

and about they would be seized and put to the side or controlled?

A.   They would be controlled, correct.

Q.   And then the idea was after that brief protective sweep took place, Ms. Phenicie said she was going to give a copy of the search warrant to Mr. Bonner; correct?

A.   I don't remember specifically that she was going to give a copy of the search warrant.  I do remember something to the effect that she was the one who was going to explain to him why we were there.

Q.   Explain why you were there.  And she said I am not going to give him a copy of the search warrant?

A.   I do not remember her saying that she was or that she wasn't.

Q.   Now, you told us that you were with several federal agencies; am I correct?

A.   Yes, sir.

Q.   Including ICE?

A.   Yes, sir.

Q.   And it is your testimony that during that time you served in what areas of the country?

A.   Initially with US Customs as an inspector at the San Ysidro and Otay Mesa ports of entry; as a Special Agent with INS in Fresno, California; as a Special Agent with Customs, Irvine, California; as a Special Agent with ICE, Santa Ana, California;

with Homeland Security OIG, San Diego; and now with CBP, San Diego.

Q.   And that is the Ninth Circuit area; correct?

A.   Yes, sir.

Q.   Always in California?

A.   Yes.

Q.   And you've gone to training sessions, I take it, in learning how to execute search warrants?

A.   Correct.

Q.   How many during the time that you've been an agent, during your career?

A.   Every time I've gone to a new agency, I've either had a full academy or refresher academy.

Q.   And never you were taught under the law of the Ninth Circuit that it was required that you give a copy of the search warrant to the person whose home it is at the earliest possible opportunity?  You were never taught that?

A.   Not necessarily the earliest possible.  The way I remember it was basically you had to leave a copy of the search warrant behind.

Q.   My question is this, Were you ever taught that you were supposed to -- either at the outset or shortly after the outset of the search you were to give a copy of the search warrant to the person who was there, whose home it was?

A.   No, sir.  I don't remember having been told it had to be

either at the beginning or even at the earliest convenience, just that I remember you had to leave a copy of it behind.

Q. When was the last warrant that you executed before the one about which you testified?

A. Would have been approximately January 2008.

Q. And was that with CBP as well?

A. No, sir. That would have been with Immigration and Customs Enforcement out of Santa Ana.

Q. That would have been approximately four years before?

A. Yes, sir, approximately four years prior.

Q. Actually four years and two months?

A. Yes, sir.

Q. So this was the first warrant you had to execute in four years and two months; is that right?

A. Yes, sir, yes.

Q. Ever executed warrants with DEA agents?

A. With DEA, yes, sir, I have.

Q. And were you ever taught that the DEA procedure is not only to show a copy of the warrant but to read the warrant to the person whose home is being searched?

A. No, sir. In fact, I've conducted at least two search warrants -- at least two with DEA, and I've never seen them read the search warrant to anybody.

Q. Now, did you speak to Mr. Bonner yourself at any time?

A. I don't believe I did.

Q.   Did you remain outdoors for more than 50 percent of the time you were there?

A.   No, sir.  Most of the time I was inside taking photographs.

Q.   Were you armed?

A.   Yes, sir, I was.

Q.   What were you armed with?

A.   My issue weapon, which would be a .40 caliber weapon.

Q.   A .40 caliber weapon?

A.   Yes, sir.

Q.   A machine gun?

A.   No, sir, a handgun.

Q.   A handgun.  Were there agents there armed with M-4s?

A.   I believe there were.  There was at least one.  I believe there was one.

Q.   M-4 is a machine gun?

A.   A submachine gun, yes, sir.

Q.   A submachine gun.  Were all of the agents armed to your knowledge?

A.   The law enforcement agents, yes, sir.

Q.   How many rifles, best estimate?

A.   As I mentioned, I believe I saw one long gun.  I don't recall if there was more than one.

Q.   Did you see the entry into the home, sir?

A.   Not the physical entry, sir.  I saw them lining up, but I was perimeter so I was to the rear of the home.

Q.   Mr. Bonner offered no resistance of any kind?

A.   Not that I know of.

Q.   Opened the door?

A.   That I do not know, sir.

Q.   Now, to the best of your knowledge there was -- when you arrived you learned that there was one man, one woman, and one dog present there at the home?

A.   Eventually, I believe that, yes.  Eventually what I saw was one male, one female, and one animal.

Q.   The woman offered you no resistance?

A.   I'm sorry, sir?

Q.   The woman offered no resistance, didn't fight?

A.   Not that I know of, no, sir.

Q.   And I believe she left shortly after the entry of the officers into the home; is that true?

A.   Yes, sir.  I believe within 20 minutes or so she went to work.

Q.   On the dog, did it offer any resistance, armed or otherwise?

A.   No, sir.

Q.   Did you hear any of the agents say that Mr. Bonner was asking to see a copy of the warrant?

A.   No, sir.  I do not remember that.

Q.   Was he kept outside of his own house the entire time of the search?

A.   I believe he was, sir.

Q.   Was he kept handcuffed for over an hour at the beginning of the search?

A.   I remember him being handcuffed at the beginning.  I do not remember at what point he was uncuffed.

Q.   Now, at this meeting was there any discussion about who would be responsible for determining that the items seized were within the scope of the warrant that you were being given?

A.   Who would be responsible, I believe it was Agent Phenicie who had the final word on that, so I am -- that is the best of my knowledge, but I don't specifically remember one person saying I am responsible.

Q.   But in doing that, I take it, she instructed the agents as to the scope of the warrant; is that true?

A.   Yes, sir.

Q.   You were made aware of the scope of the warrant?

A.   Yes, sir.  We read the warrant, and I remember having a copy of the items to be seized as a reference.

Q.   And you remember that there were categories of documents that were to be seized; is that correct?

A.   That is correct.

Q.   And am I correct that you told me that there was a time limitation on the scope of the warrant?

A.   Yes, sir.

Q.   You told counsel, rather.  You told him from January 1st,

2004, to the present, which was the day of the execution of the warrant?

A.   That is correct, sir.

Q.   9 May 2012?

A.   Yes, sir.

Q.   So there was no question in your mind that the documents and items that were before January 1st of 2004 were not within the scope of the warrant; correct?

A.   For the most part, yes, sir.  Yes.

Q.   For the most part.  Well, for all parts the warrant specifically said that the categories of documents were categories to be seized for documents that were on or after the 1st of January 2004; correct?

A.   Correct, sir.  There just had been some examples of Mr. Bonner filing -- currently -- let's say to today, filing something that had documents or attachments that went back beyond 2004 or back further than 2004.

So if -- I would say that if the initial document on the cover was within the 2004 time range but the attachments were prior to, then that would be one document.

Q.   Well, did you find any such documents?

A.   I do not recall if -- I do not remember.  I do not remember anything specifically that fell into that category.

Q.   And as I understand it, you testified to us that with respect to the documents in Exhibit 5, you said that there were

files -- that you saw the agents going through the files one by one; correct?

A.   Correct, sir.

Q.   And your understanding of that was because you believed that they were -- might be trying to ensure that they didn't seize anything beyond the scope of the warrant; correct?

A.   Correct, sir.

MR. IREDALE:  May I approach the witness, Your Honor?

THE COURT:  Yes.

MR. IREDALE:  May I proffer an exhibit to the Court? This is Exhibit A. It has been shown to counsel.

Q.   BY MR. IREDALE:  And it is the exhibit that has on it "NBPC vouchers 1991" as the first file.

Now, let me just ask you, sir, this appears to be a copy of a manila folder similar to the ones shown in Exhibit 5; am I correct?

A.   Yes, sir.

Q.   Now, were you involved in reviewing the file titles at any point?

A.   After the search warrant, yes, sir.

Q.   Well, can you tell me what reason the vouchers from the year 1991 were seized by the agents?

MR. HUIE:  Your Honor, I object, lacks foundation as to this witness.

THE COURT:  Mr. Iredale, he didn't seize them.  What

would his basis be to say how they were seized?

MR. IREDALE:  You are correct, Your Honor.

Q.  BY MR. IREDALE:  Did any time -- at any time did you hear Agent Phenicie say, no, we can't seize these documents, they are more than 20 years in the past?

A.  Did I -- at any time during the search warrant did she say -- not those specific words.  I do remember her clarifying to some individuals, no, these are -- this is not what we're looking for.

So I do remember her being called and asked for her concurrence as to whether or not an item was to be taken.

Q.  Now, let me ask you this, when you saw the agents going through these files that you say were there, shown in Exhibit 5, you said you saw them going through each page; correct?

A.  I would say going -- trying to go through each page.  I think, due to the quantity of the items, it was not -- it wasn't possible to go through every single page on site.

Q.  But you saw them -- for instance, they were able to look at the title of the file, and then you saw them after looking at the title go through the contents, did you not?

A.  Yes, sir.  I did not know where the specific folder that you handed me, the one labeled Exhibit A, was located.  I did not know which agent seized it or how they were reviewing it.  I do remember seeing the agents going through the folders to

try to ensure that the information was within the scope, and I know that because I was the photographer on the search.

Where this specific folder was located, that I do not know, and I don't know which agent was reviewing the folder.

Q.   Which agent kept track of where the particular documents were seized?

A.   Which agents kept track of where it was seized, I was the photographer, so if somebody said we have something in the office to be seized, then I would go and take a photograph of it, along with, as I mentioned, the yellow finder's label.

Q.   Well, the documents in Exhibit A that I've given to you, do you know where they were seized from?

A.   No, sir.  I do not.

Q.   Now, you said that the home of Mr. Bonner was in disarray?

A.   Yes, sir.

Q.   There was dust?

A.   Yes, sir.

Q.   And you said that you even contracted a disease of some kind that caused you to cough blood two weeks later; is that right?

A.   I do not if I contracted a disease or -- what I said was that from the day of the search warrant to approximately two weeks later I was coughing, and it was not what I would call a regular cough.  I did state that first weekend the cough was strong enough to where I coughed up some blood.

Q.   And you attribute that to the unhealthful climate inside Mr. Bonner's home?

A.   That and the evidence itself because I assisted in the boxes and so forth, and so, yes, I would because there was -- after looking over some of the items I was basically covered in hair.

Q.   You would not consider the conditions inside to be palatial then?

A.   Can you define palatial?

Q.   Yes.  Opulent, rich, elegant, showing somebody who had an extraordinary fondness for fine things and good living?

A.   In my opinion, no, sir.

Q.   No.  As a matter of fact the opposite; correct?

A.   The condition of the house, as I stated, I believe that it was in disarray, just clutter.

Q.   Well, more than clutter.  You suggested it was unsanitary; correct?

A.   In my opinion, yes, sir.

Q.   Were any photographs taken of the condition of the house in which you left it after the search?

A.   No, sir.

        MR. IREDALE:  Thank you so much, Special Agent Estrada.  That's all I have.

        THE COURT:  Are you moving Exhibit A into evidence?

        MR. IREDALE:  Not at this point.  I'll go through

another witness.

THE COURT:  All right.  Any redirect, Mr. Huie?

MR. HUIE:  No.  Thank you, Your Honor.

THE COURT:  May the witness be excused?

MR. HUIE:  Yes, for the United States.

THE COURT:  You may step down, sir.

And you don't intend to call this witness, Mr. Iredale?  He may be excused?

MR. IREDALE:  I do not.

THE COURT:  You can step down, sir.  You can leave it right on the counter there.

MR. HUIE:  Your Honor, we have no further witnesses.

THE COURT:  Thank you.

Mr. Iredale, any witnesses?

MR. IREDALE:  Yes, Your Honor.  Special Agent Phenicie.

THE COURT:  All right.

(Oath administered.)

THE WITNESS:  Yes, I do.

THE CLERK:  Please take the stand.  Please state your full name for the record and spell your last name.

THE WITNESS:  Rebecca Lynn Hawkins Phenicie.  Phenicie is P-H-E-N-I-C-I-E.

REBECCA HAWKINS PHENICIE,

SWORN, TESTIFIED AS FOLLOWS:

<u>DIRECT EXAMINATION</u>

BY MR. IREDALE:

Q.   Ms. Phenicie, as I understand it, you previously were with the Drug Enforcement Administration?

A.   That's correct.

Q.   For 23 years, I believe?

A.   Approximately 23.

Q.   Of which 12 you served as a supervisor?

A.   That's correct.

Q.   I believe you said in your affidavit head of an office?

A.   The Carlsbad resident office.

Q.   And so you are familiar with the Drug Enforcement Administration agent's manual, are you not?

A.   Yes.

Q.   And that manual contained, among other things, procedures that are to be used by DEA agents in executing search warrants?

A.   Yes.

Q.   And you were familiar with it as it existed in 2002, of course?

A.   That would not be my last recollection 2002.  I was with DEA up until 2003 -- 2008, so there were many changes going on all the time.

Q.   Well, let me ask you if you are familiar with the special agent's manual that sets forth the search procedures that are involved in the execution of a DEA warrant?

May I approach the witness, Your Honor?

THE COURT:  Yes.

MR. IREDALE:  If I could also proffer a copy of the exhibit to the Court.  This has been marked as Exhibit E.

May I approach the witness?

Q.  BY MR. IREDALE:  Showing you E, you are familiar with the DEA agents manual; am I correct?

A.  Yes.

Q.  And this was a version that was in effect when you were still with DEA before August of 2008.

A.  Okay.

Q.  You are familiar with that they have a section on search procedures, are you not?

A.  Yes.

Q.  And you reviewed this section before, have you not?

A.  That particular one, depending on how old it was, how long ago I reviewed it, I can't give you the particulars.

Q.  Well, let me ask you under "search procedures" there is something on page 361 that I have here, and it says "search procedures"; am I correct?

A.  Yes.

Q.  "Thoroughness is the primary consideration when a search is being conducted.  However, agents will not unnecessarily damage or destroy property while conducting a search."  It provides that, yes?

A.   Yes.

Q.   And you are familiar with that principle?

A.   Yes.

Q.   It also discusses, among other things, how each occupant should be initially dealt with upon entry.  In orderly fashion each occupant should be completely identified and frisked for weapons.  That is a common practice, is it not?

A.   Yes.

Q.   And I believe it is a practice that you engaged in on the 9th of March, you or your fellow agents; correct?

A.   Yes, myself or the fellow agents.

Q.   Female occupants should be searched by female agent or police woman.  Common practice; true?

A.   Yes.

Q.   If no female agent or police woman is available, only a cursory search of the female officer -- occupant may be performed.  Females not thoroughly searched should be guarded closely to avoid the possibility of them drawing concealed weapons or destroying evidence.  Common to many law enforcement agencies; is that fair to say?

A.   Yes.

Q.   It is the supervising agent's responsibility to read and/or explain the search warrant to the responsible occupant.  That is what it provides in the DEA manual in the agency for which you served in for 23 years; correct, ma'am?

A.   Ask the question again.

Q.   Yes.  The manual provides it is the supervising agent's responsibility to read and/or explain the search warrant to the responsible occupant?

A.   That may have been the case at the date of that, but when I left DEA that was not in the manual.

Q.   You left in 2008?

A.   Yes.

Q.   And you swear that that was not in the manual?

A.   I am pretty sure that that particular sentence wasn't in there.

Q.   Well, a sentence or a sentence like that was in the manual, was it not?

A.   Okay.

Q.   Well, I don't want to -- I don't want to testify.  It is not my province, but I have the right to press you.

A.   Okay.

Q.   When was the last time that you looked at the DEA manual, a DEA manual of any kind?

A.   The whole DEA manual it has been five years.

Q.   When was the last time that you checked for this sentence or this issue regarding the proper execution of a search warrant?

A.   Yesterday.

Q.   And when you looked yesterday where did you look?

A.   I looked under that particular section, 6653, and the latest manual doesn't have that.

Q.   When you were with DEA it had this language.  In 2002 you were with DEA, were you not?

A.   Yes.

Q.   Well, I will represent to you that this is from the 2002 manual.

A.   Where does it say that is 2002?

Q.   Well, ma'am.  I'll get you a copy.

A.   Okay.

Q.   Are you telling me that in the current manual it says that the agent is not required to -- the supervising agent is not required to provide a copy of the warrant to the person whose house is being searched?

A.   I did not see that.  I did not see that they were required to read it.  We were required to leave a copy, and we were required to leave an inventory of the items seized.

Q.   Well, I don't want to quarrel with you, but do you happen to have with you here the copy that you reviewed yesterday?

A.   No, I do not.

Q.   Where is that?

A.   In my office.

Q.   When did you review it?

A.   Yesterday.

Q.   Now, when you were with DEA did you adhere to this

provision, It is the supervising agent's responsibility to read or explain the warrant to the responsible occupant?

A.   Many times a supervisor would.  Many times a team leader would, if it was delegated to a team leader or the case agent.

Q.   And that was at the beginning or close to the beginning of the search; is that correct?

A.   There was no time specified there.

MR. HUIE:  I'm sorry, Your Honor, to interrupt. Respectfully could I ask Mr. Iredale to resume the podium.

THE COURT:  That is a fair question.  The witness has a copy.  If you would do the questioning from the podium.

MR. IREDALE:  All right.

Q.   BY MR. IREDALE:  Now, Special Agency Phenicie, the paragraph after that talks about after the search or frisk of the occupants of the house, correct, paragraph C?

A.   Yes, sir.  I am reading it.

Q.   So the paragraph that talks about the agent showing a copy or reading a copy of the search warrant and explaining it to the person whose house it is comes after the initial entry and frisk and before some additional preliminary steps that take place prior to the search; correct?

A.   If you'll give me a second to read this and then reask the question, I would appreciate it.

Q.   Well, I can make it simple.  Would you read the two sentences that occur immediately after it says, "that the agent

is to read and explain the search warrant to the occupant of the home"?

A.   "After searching all of the occupants for weapons, direct them to a previously searched area.  Determine from the occupants if there are any valuable articles, money, jewelry, et cetera, anywhere on the premises."

Q.   And so it is clear, is it not, that the sequence is you come into the house, you frisk the occupants, you notify the person whose home it is or who is the proper person of the search warrant, and you read the search warrant and explain it, and then you have everyone there get into a group and ask them if they have valuables before you commence the search; correct?

A.   No.   There is not a -- necessarily a proper sequence. These are guidelines.

Q.   Ma'am, I don't mean to argue with you.  With respect to what is provided in the manual, that is the sequence in the manual, is it not?

A.   They are in A, B, and C, yes.  It doesn't mean that you necessarily have to do it in that particular order.

Q.   Were you ever taught that you were not supposed to give a search warrant to the person whose home you were searching?

A.   No.

Q.   Now, were you ever taught that the law of the Ninth Circuit requires that the agents executing a federal search warrant give a copy at the earliest opportunity of the home whose being

searched?

A.   I was not taught that specifically.  The two things that we were taught that you had to leave a copy of the warrant there and you had to leave an inventory.  That is the only thing I've ever been taught.

Q.   When you say you haven't been taught that specifically, when was the last time that you took any training in execution of search warrants?

A.   I can't even begin to guess.  It was on-going through DEA.

Q.   Well, forgive me.  I don't want you to guess, but have you taken any training in the execution of search warrants in the last three years?

A.   No.

Q.   Last four years?

A.   No.

Q.   Last five years?

A.   Possibly.

Q.   And do you remember anything you learned in the last ten years concerning the execution of search warrants?

A.   Do I remember anything?

Q.   Yes.

A.   I am sure I do.

Q.   Well, do you remember any specific thing from any seminar that you took?

A.   I remember when we were doing search warrants that the

primary thing on the rule was to make sure there was a copy

left of the search warrant and a copy of the inventory.

Q.   Please, forgive me.  I was talking now about the issue of

training.  From time to time in the DEA did you have training?

A.   Uh-huh, yes.

Q.   Yes.  Discussions about what the law requires?

A.   Occasionally, yes.

Q.   Discussions about what the law of the Ninth Circuit

required with respect to the execution of search warrants?

A.   Yes.

Q.   When was the last time you had such training by the DEA?

A.   I don't recall.

Q.   Well, did they give you any training in what you should do

with respect to serving a copy of the warrant that you

executing and when that should be done?

     Did they give you any specific training on that after the

year 2004?

A.   Not that I recall.

Q.   None?

A.   No.

Q.   There were no bulletins distributed to you by anyone

concerning a decision called Gantt, G-A-N-T-T, by the Court?

A.   The first time I heard of Gantt was through your motion.

Q.   Yet, nonetheless, as I understand it, you intended to give

Mr. Bonner a copy of the warrant shortly after you entered his

home; correct?

A.   Yes.

Q.   And was that because you planned to do that because that was a good thing to do in your mind?

A.   Well, it was something that I needed to do, and I wanted to get it done, but I got distracted.

Q.   Well, before we get to your distraction, let's talk about your plans.  First of all, you had a meeting the day before?

A.   Yes.

Q.   You conducted the meeting; is that true?

A.   Yes.

Q.   And were there, in fact, 12 agents who were there at the meeting?

A.   All the people that you gave names to a little bit ago were there, and I believe my management was there in addition.

Q.   And your management is who?

A.   I think it was Kathryn Butterfield.  I believe she was there.

Q.   All right.  And was there a discussion at this meeting about who would give Mr. Bonner a copy of the warrant?

A.   No.

Q.   Was there a distribution of the warrant itself to all of the people who were present?

A.   Yes.

Q.   And was that the warrant or the attachment only to the

warrant?

A.   The whole thing.  I made multiple copies and distributed them to everybody and told everything they needed to read it.

Q.   All right.  And were they allowed to keep -- the agents at the meeting, were they allowed to keep the warrant copies that they had?

A.   I did not collect them again.

Q.   So they had them when they left, as far as you know?

A.   I would hope, so but that was the day before.

Q.   The purpose of distributing that from your point of view so they would familiarize themselves with the warrant?

A.   Yes.

Q.   And that was the warrant itself that was signed by the magistrate together with Attachment A and Attachment B?

A.   Yes, including my affidavit.

Q.   And your affidavit was included as well?

A.   Yes.

Q.   Is that true?

A.   Yes.  I made copies of all that.

Q.   And so all 12 there were given copies of that; correct?

A.   I don't know if I made 12.  I think I probably made 10 and then I handed them out in the room.

Q.   All right.  So 10 were distributed?

A.   That is an estimate.

Q.   Yes.  And they were not told that they should throw them

away or get rid of them.  They were permitted to bring them to the search warrant if they so chose; correct?

A.   Yes, or back to their office, whatever they chose to do.

Q.   Now, in your own mind did you plan when you entered into the house and encountered -- you believed you encountered Mr. Bonner to give him a copy of the warrant?

A.   I planned to give him a copy of the warrant.  I didn't have a particular time planned.

Q.   Well, you wrote a declaration in this case; correct?

A.   Yes.

Q.   It was truthful and correct when you wrote it?

A.   Yes.

Q.   Truthful and correct today?

A.   Yes.

Q.   As you entered into the house you say you heard Mr. Bonner being led outside by an agent?

A.   I didn't hear him.  I saw him being led outside by an agent.

Q.   Well, did you hear him ask the agent to see a copy of the warrant?

A.   No.  He asked me.

Q.   He turn to you and asked?

A.   Yes.

Q.   He asked you?

A.   Yes.

Q.   He said, May I see a copy of the warrant?

A.   No, he didn't say, May I see a copy of the warrant?  He said, Do you have a copy the of the warrant?  I said, Yes, I do, but you have to wait right here until the dust settles because we were still making the entry and the protective sweep.

Q.   You said he has to wait until the dust settles; right?

A.   Something like that, along that line.

Q.   And I guess he had a dusty house and the dust didn't settle until five and a half hours?

A.   Unfortunately it did take longer than we anticipated.

Q.   So no question within one minute of the knocking on the door and the announcement that there would be a warrant Mr. Bonner was on his way out of the house in custody and asking to see a copy of the warrant?

A.   Yes.

Q.   And you told him I will show you a copy of the warrant?

A.   Yes.

Q.   You promised him that?

A.   Yes.

Q.   And you didn't desire to cause him to have any additional anxiety because you refused to give him a copy of the warrant; right?

A.   Not at all.

Q.   By the way, whose decision was it that he remain not only

outside his house but handcuffed?

A. We -- I made the decision when we did the ops that we were going to handcuff Mr. Bonner in the beginning, as we do in all cases. Just because Mr. Bonner is a former Border Patrol agent doesn't mean that we are going to give him special treatment.

Q. Excuse me, ma'am. I didn't ask if he was a former Border Patrol agent or if he got special treatment.

Whose decision was it to handcuff him?

A. Mine.

Q. Your decision?

A. Yes.

Q. Whose decision was it to have him handcuffed for an hour or more?

A. We weren't -- I personally was not aware of that the time was going by to an hour.

Q. Do you know how long he was handcuffed?

A. I am estimating approximately an hour.

Q. Now, the home was entered at 8:00 AM?

A. Yes.

Q. And the search was concluded at 1:30 PM?

A. Approximately.

Q. You gave the warrant and the return to Mr. Bonner at 1:30 PM?

A. Well, actually a little bit before that, but we left at 1:30.

Q.   Two minutes before you left you gave it to him?

A.   I wouldn't say two minutes, because I took the time to talk to him about it.

Q.   What did you say to Mr. Bonner, ma'am?

A.   I told him that this was a copy of the warrant and these were the items that were seized and that we were there looking for documents, and I also pointed -- started going down the list of the inventory.  I told him I didn't have -- we didn't take anything that was a high-value item, that we had taken his laptop.

     And when I got to the laptop he said, I thought you weren't going to take that, and he said that is why he provided the password for it under the understanding that the laptop would be left, and I said, Well, apparently they couldn't finish what they were doing here.

Q.   By the way, you took, I believe, some 35 electronic items; is that true?

A.   Yes.

Q.   And that included four computers?

A.   Yes.

Q.   Three laptops and a desk top?

A.   Yes.

Q.   20 hard drives?

A.   Yes.

Q.   Eight floppy disks?

A.    Yes.

Q.    Two USBs?

A.    The flash drives?

Q.    Flash drives, yes.

A.    Yes.

Q.    And a smart phone?

A.    Yes.

Q.    I believe 20 boxes of materials; correct?

A.    We took about 18 and a half boxes of documents, and then we did put some of the electronic stuff in the other half of the box, yes.

Q.    Now, ma'am, you said that you recalled Mr. Bonner looking at you and asking you for a warrant?

A.    Yes.  He was being led to the left of me by Mr. --

Q.    Porter?

A.    -- Porter.  Yes, thank you.  And he saw me coming up at that point, and he said, "Do you have a copy of the warrant?"

Q.    Did you identify yourself to him as the case agent?

A.    No.

Q.    Did anybody in your presence identify you as the case agent?

A.    Not to my knowledge, no.

Q.    Let me ask you if -- you may have misunderstood that he was asking Mr. Porter for the warrant as opposed to yourself?

A.    Well, I answered him, and I told him that I had a copy of

it.

Q.   And when you answered him and you told him you had a copy, you did have a copy?

A.   Yes.  I had it in a blue envelope with his name on it, so I had it ready for him.

Q.   So you had it ready to give to him?

A.   Yes, but we were making entry.

Q.   Yes.  But the entry was then made; correct?

A.   Yes.

Q.   And then the entry was made and a protective sweep was made, yes?

A.   Yes.

Q.   And then after the protective sweep was made the search began?

A.   No.  Then I was going with Mr. Estrada to make sure I put the signs up on the rooms, and I was trying to make sure that we took pictures and nothing else was touched before we started our search, so that took us about 45 minutes.

Q.   So it is now about 8:45 AM?

A.   Yes.

Q.   Yes.  Mr. Bonner is outside the house?

A.   Yes.

Q.   Mr. Bonner is still handcuffed?

A.   Yes.

Q.   Mr. Bonner doesn't have the warrant?

A.  No.

Q.  You have the warrant?

A.  Yes, I do.

Q.  You promised to give him the warrant?

A.  Yes.

Q.  But you haven't given him the warrant?

A.  Not at that time.

Q.  Not at that time you had to put up the signs so that Mr. Estrada could take the photographs?

A.  Yes, I assisted with that.

Q.  Then did the search begin at that time?

A.  The search probably started around nine-ish.

Q.  And did you direct the agents what areas you wanted them to search?

A.  Yes.

Q.  And at that point having now directed the agents what areas you wanted them to search, did you go outside to speak to Mr. Bonner to give him a copy of the warrant?

A.  I went outside and spoke to Mr. Bonner, but I didn't give him a copy of the warrant at that time.  I don't remember the exact timing of events.  His wife I had to talk to her first.

Q.  You talked to his wife?

A.  Yes.

Q.  And she said she was going to go to work?

A.  Yes.

Q. And she left the house?

A. Yes.

Q. And now there was only Mr. Bonner and the dog?

A. Yes.

Q. Cali?

A. Yes.

Q. And so Mr. Bonner is still outside the house?

A. Yes.

Q. Still handcuffed?

A. Yes.

Q. And when you went out and spoke to him did you give him a copy of the warrant?

A. No.

Q. You spoke to him three more times that day, did you not?

A. I think I spoke to him at least three times, yes.

Q. And the second time you spoke to him after that, did you give him a copy of the warrant?

A. No.

Q. The third time did you give him a copy of the warrant?

A. No.

Q. There was a fourth time. Did you give him a copy of the warrant?

A. What is the fourth time. Can you give me the particulars?

Q. Well, you said -- you said -- you said in your warrant that you wanted to make him comfortable, words to that effect, and

so you offered him a blanket; right?

A.   Yes.   It was a little chilly that morning.

Q.   So you wanted to make sure he wasn't cold as he was outside in his handcuffs; right?

A.   Yes.

Q.   So you wanted to offer him a blanket?

A.   Yes.

Q.   Did you offer him a blanket and a warrant?

A.   No.   We were not finished with the house inside, getting it set.

Q.   So at a later time you brought some cough drops for Mr. Bonner; is that correct?

A.   I went outside and asked him if he needed anything, and at that time he was not in handcuffs, and he said he needed cough drops, and I asked him where, and I went to go get them and got them.

Q.   And what time is it now with the cough drops, was it 11:00 in the morning?

A.   I don't know.

Q.   10:00.   You don't remember?

A.   I don't have any recollection.   The morning was a long time.

Q.   And did you give him the warrant with the cough drops?

A.   No, I did not.

Q.   And then you wanted to offer him granola bars; is that

true?

A.   Yes.

Q.   And you offered him granola bars, not once but twice?

A.   Well, in the same conversation.

Q.   When you offered him granola bars did you give him a copy of the warrant?

A.   No.   Unfortunately he didn't ask.

Q.   Well, in your mind he had to ask twice to you?

A.   No.   But it would have -- with everything going on in the search warrant at the time, if he would have asked then, I would have been happy to give it to him.

Q.   By the way, in none of those conversations did you identify yourself as the case agent to him; correct?

A.   I don't believe I did.

Q.   Now, the other agents -- didn't Agent Porter tell you Mr. Bonner is asking for a copy of the search warrant?  Didn't he convey that to you?

A.   I remember him coming in when I was talking to his wife and saying that he wanted and I said okay.

Q.   Just a second.  Let me make sure.  You may have deleted something.  I want to make sure we get it clear.

During the time that you were talking to Mr. Bonner's wife, within about half an hour or 45 minutes of the entry to the house, correct, Agent Porter came in and told you that Mr. Bonner had asked him for a copy of the search warrant and

that Mr. Bonner wanted to see a copy of the warrant; correct?

A.   Yes.   But I don't remember the exact time.   You are putting time in there, and I can't tell you for sure, but it was sometime with either right when I was finishing with Mrs. Bonner or right after she left he came in.

Q.   All right.   Well, when did Mrs. Bonner leave?   Give us your best estimate.

A.   Within about 20 minutes of us making entry.

Q.   Okay.   So now you perceive that Mr. Bonner asked you directly for a copy of the warrant upon the entry into the house at that point; correct?

A.   Yes.

Q.   And now Special Agent Porter has come in, and your understanding is Porter was out there with Mr. Bonner; right?

A.   Yes.

Q.   And he says words to the effect of Mr. Bonner is asking for the warrant, he wants to see the warrant; correct?

A.   Something along those lines.

Q.   But you were busy talking to the wife, so you put that off; is that right?

A.   I don't know if I had just finished with her or what I was doing, but it was around that time period.

Q.   So you were too busy at that point to give the warrant to Mr. Bonner?

A.   Unfortunately, yes.

Q.   Now, did you give your copy of the warrant to Special Agent Porter and say, Here, give him this copy?

A.   No, I did not.

Q.   Did you say to Agent Porter, Hey, I gave you guys copies yesterday, why don't you give him your copy, let him read it?

A.   Are you asking me a question?

Q.   Yes.

A.   I didn't tell them that, no.

Q.   Did you say to any of the other agents who were there, Hey, does anybody have an extra copy of the warrant to go out and give to Mr. Bonner?

A.   No, I did not.

Q.   Well, later that day you heard from yet another agent that Mr. Bonner was still asking to see the warrant, didn't you?

A.   No.

Q.   Didn't you hear from Special Agent Novinskey that Mr. Bonner was talking to her and to another man about requesting the warrant, that he said, again, that he wanted to see a copy of the warrant?

A.   No, I don't recall that.

Q.   Ms. Novinskey never told you that?

A.   I don't recall her asking me.

Q.   Let me ask you this, You had a couple of people whose primary job was computer IT work; correct?

A.   Yes.

Q.   Were they the agents from Arizona?

A.   Yes.

Q.   Platt, and Servine?

A.   Yes.

Q.   Was one of them gray haired?

A.   Yes.

Q.   Which one was that, Platt?

A.   Platt.

Q.   Do you remember at any time Platt or Novinskey coming to you and saying they had been talking to Mr. Bonner about getting a password from him and he said he would give the password but he wanted to see the warrant?

A.   No.  I have no recollection of a conversation like that.

Q.   And your testimony is that the search warrant ended at 1:30; correct?

A.   Approximately 1:30.

Q.   And immediately before you left that was when you had your conversation with Mr. Bonner to give him a copy of the warrant and the return; is that true?

A.   Yes.

Q.   But it was not your intention, you swear, to refuse him a copy of the warrant until the end of the search; correct?

A.   No, that was not my intention.  I didn't have a time.  I knew I was going to give it to him.  I knew I wasn't going to do it during the beginning sweep, and I did give it to him at

the end before we left.

Q.   Yes.  But it was not your intention to refuse him a copy until the end of the search; is that right?

A.   That's correct.

Q.   That is what you swore to in your declaration?

A.   Yes.

Q.   Was it true?

A.   Yes.  I just said yes.

Q.   You just forgot?

A.   Well, toward the end, yeah, I forgot.  I was --

Q.   You became busy doing other things?

A.   Yes.

Q.   And even though Special Agent Porter reminded you, you forgot after he reminded you, right?

A.   Yes.  That is true.

Q.   Now, you filed a declaration as well concerning the assignment of the case to you in December of 2009; is that correct?

A.   That is correct.

Q.   Who had the case before you?

        MR. HUIE:  Object, Your Honor, outside the scope.

        THE COURT:  What is the relevance of that, Mr. Iredale?

        MR. IREDALE:  It was in her declaration that was submitted to the Court, and I have some questions regarding --

THE COURT:  Does that go to the authorization?  How does it relate to the search warrant?  How does it relate to the execution of the search warrant?

MR. IREDALE:  The execution, it does not.

THE COURT:  I'll sustain the objection.

MR. IREDALE:  May I approach the witness, Your Honor?

THE COURT:  Yes.

Q.  BY MR. IREDALE:  You have before you Exhibit A.  Now, you were the agent who was responsible ultimately for determining what was going to be taken from the home; is that correct?

A.  That's correct.

Q.  And you were here during Agent Estrada's testimony concerning their review of certain of the files in one of the rooms?

A.  Yes.

Q.  And did you perceive as well that the agents were looking at the titles for the files and then at least going through some of the documents within the files?

A.  Yes.

Q.  Exhibit A shows us some of the files that were seized.  Am I correct in that?

A.  That's correct.

Q.  I would like, if we could, to go through the particular items that were seized.  Could you tell us what the title on the first -- on the top folder is?

A.    "NBPC vouchers 1991."

Q.    Correct me if I am wrong, but the scope of the search warrant specifically limited the seizures to documents on or after 1 January 2004; correct?

A.    That's correct.

Q.    And there was no question about that; correct?

A.    Correct.

Q.    But that was seized; correct?

A.    Yes.  I recognized this.  This came from one of the boxes in Room F, downstairs, where we seized the whole box, and these were commingled with vouchers that were current and was within the scope of the warrant.

Q.    Forgive me, ma'am, but you went through at least, I take it, you could have gone through each one of the files that were seized to ensure that what was in the file pertained to the title; correct?

A.    I didn't have time to look and pull out every single file folder in the boxes that were preboxed downstairs.

Q.    Well, let me ask you this, What is the second document?

A.    Says, "1992 NBPC vouchers."

Q.    Do you see that before you seized it?

A.    No, I did not.

Q.    You just saw it was in a box?

A.    It was a box that said "vouchers," and I was going through the front and it appeared to contain the scope of the warrant,

which were vouchers for the union during the time period.

These were at the back of the box.  I didn't see those until afterwards, and then I set them aside.

Q.  You set them aside?

A.  Yes.

Q.  When did you set them aside?

A.  When I first went through the box after the search warrant.

Q.  And did you realize that they were beyond the scope of the warrant at that time?

A.  Yes, I did.

Q.  Could I ask you -- we don't need to go each and every one, but would you mind looking at the headings of all of those, and tell me if, in fact, the files were, in fact, beyond the scope of the warrant?

A.  The next one is "1993 NBPC vouchers," and yes, it is outside the scope.  "1994 NBPC vouchers," outside the scope.

MR. HUIE:  I object to the question somewhat belatedly as calling for a legal conclusion.

THE COURT:  Well, I'll overrule the objection.

MR. IREDALE:  Thank you.

Q.  BY MR. IREDALE:  Please continue.

A.  Which one did I just read?

Q.  1993?

A.  "1995 NBPC vouchers."

Q.  Beyond the scope?

A.   Beyond the scope.  "1996 NBPC vouchers," outside the time period.  "1997 NBPC vouchers," outside the time period; "1998 NBPC vouchers," outside the time period.

You want me to keep going?

Q.   Yes, ma'am.

A.   "1999 American Express," outside the time period; "NBPC vouchers 1999," outside the time period; "2000 miscellaneous receipts," outside the time period; "FY '86 government vouchers," outside the time period; "FY '87 government vouchers," outside the time period; "FY '88 government vouchers," outside the time period; "FY '89 government vouchers," outside the time period; "FY '92 government vouchers," outside the time period; "FY '91 government vouchers," outside the time period; "FY '92 government vouchers," outside the time period; "FY '93 government vouchers," outside the time period; "FY '94 government vouchers," outside the time period; "FY '95 government vouchers," outside the time period; "FY '96 government vouchers," outside the time period; "FY '97 government vouchers," outside the time period; "FY '98 government vouchers," outside the time period; "FY '99 government vouchers," outside the time period; "FY 2000 government vouchers," outside the time period; "TJB 1995 appraisal," outside the time period.

MR. IREDALE:  May I approach the witness, Your Honor?

THE COURT: Yes.

Q. BY MR. IREDALE: Let me show you Exhibit B, ma'am, and ask with respect to Exhibit B if you would do the same. First of all, let me ask you, Were those also files that were seized during the course of the warrant?

A. Yes. These appear to be vouchers in boxes that were commingled in stuff from Room F.

Q. And you seized all of those?

A. Yes. I -- I took them, and when I found them, I set them aside.

Q. And let me just ask you to look through them and ask, You would agree with me that the documents representing Exhibit B are all outside the time period and the scope of the warrant?

A. It appears that they were all outside the time period, but I quite frankly don't recognize some of these folders --

Q. All right.

A. -- as part of those that we seized or kept.

MR. IREDALE: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. BY MR. IREDALE: Let me show you Exhibit C, if I might, ma'am. Do you recognize the handwriting on Exhibit C?

A. Yes, I do.

Q. Whose handwriting is that?

A. That is mine.

MR. IREDALE: I would move C into evidence, Your

Honor.

THE COURT:  Any objection?

MR. HUIE:  No, Your Honor.

THE COURT:  All right.  C is received.

(Exhibit Number C was admitted into evidence.)

Q.  BY MR. IREDALE:  Now, certain of the documents that you received that were outside the warrant you returned to Mr. Bonner at a later time; is that true?

A.  Yes.  I was going through them boxes at time, and when I first came across them I was putting them in a box to be returned.

And then there was some question about some of them, so I put stickies on them and set them aside and told the US Attorney's Office.

Q.  And one of the things that you set stickies on, was it the NBPC voucher for 2003?

A.  That's correct.

Q.  2003 is before 2004.  We can agree to that?

A.  Yes, it is outside the time period.

Q.  And you've written on here "pre2004 to be returned"?

A.  That's correct.

Q.  That is your writing?

A.  Yes.

Q.  Did you return those documents to Mr. Bonner?

A.  No.

Q.  The next document says "AM EX," "2-AM EX."  Is that a document that you retained?

A.  Probably.  I just don't recognize it off the top of my head.

Q.  All right.  There is something here the third page of Exhibit C says "2001, 2003, AT&T credit card business."  The side of the file is labelled "AT&T Universal Card," and it says "to be returned."  Is that your handwriting?

A.  Yes, it is.

Q.  Was that document returned?

A.  No.  It was set aside with the rest of them.

Q.  With the rest of them?

A.  The things that were outside of the time period I set them aside.

Q.  And kept them?

A.  Yes.

Q.  Didn't return them?

A.  Well, I kept them at the US Attorney's Office because they were outside the time period.

Q.  And who in the US Attorney's Office kept them, if you know?

A.  The paralegal.

Q.  And that has not been returned to this day?

A.  No.

Q.  Let's look at the next one.  This says, "mostly pre2004, to be returned."  Is that your handwriting?

A.  Yes, it is.

Q.  And that was as a result of your review that you did of the documents inside the file?

A.  Yes.

Q.  And were those documents returned?

A.  No.

Q.  When did you write that, best recollection?

A.  In the fall, early fall, maybe September, October.

Q.  2012?

A.  Yes, my best guess.

Q.  Next document on the side says "American Express," and I believe this is your printing, is it not?

A.  Yes, it is.

Q.  "To be returned"?

A.  Yes.

Q.  Was it returned?

A.  No.

Q.  Here is something, "AM EX 2001 2003, SW," which I take it means search warrant?

A.  That's correct.

Q.  2001 to 2003 it is before 2004.  We don't have a dispute about that?

A.  No.

Q.  Beyond the scope?

A.  Yes.

Q.   It says, "to be returned"?

A.   Yes.

Q.   You wrote "to be returned" about the same time as you did on the other documents?

A.   Yes.

Q.   Was it returned?

A.   No.

Q.   Was it retained?

A.   Yes.

Q.   Was it reviewed?

A.   No.  I haven't reviewed these, other than looking at the outside labels and to see what is inside I have not.

Q.   Same thing with the next document, 2001, 2003.  The next document says, United Visa, 2003 and before, SW.  You wrote here "pre2004, to be returned"?

A.   That's correct.

Q.   Was it returned?

A.   No.

Q.   Did somebody tell you not to return it?

A.   Yes.

Q.   Who told you not to return it?

A.   The -- Mr. Conover told me to set them aside and we'll get another warrant.

Q.   But they were seized initially beyond the scope of the first warrant; right?

A.   They were commingled with boxes of other things that were within the scope, and we couldn't go through every single piece of paper in there.

Q.   Forgive me, ma'am.  My question was this, They were seized and they were beyond the scope of the warrant in the first instance, for whatever reason; correct?

A.   For whatever reason.

Q.   And before December you had a chance to go through everything and review the documents to determine that many of the things seized had been beyond the scope of the warrant; correct?

A.   Could you restate that?

Q.   Yes.  You made a review of the documents that were seized before the end of December of 2012?

A.   Are you talking about all the search warrant documents?

Q.   Yes.

A.   I went through all the -- I reviewed all the documents that we were using for discovery.  The ones had this on them and the ones that were set aside I have not reviewed them.

Q.   And they were set aside so that they could be returned because they had been seized beyond the scope; correct?

A.   Yes.

Q.   And you made that determination in September, October; correct?

A.   Yes.

Q. But they were nevertheless not returned but retained?

A. That's correct.

Q. There is a document, "Mileage Plus First Card, pre2004, to be returned." Your language as well?

A. Yes.

Q. "American Express, 2001 2002, end of year statements"?

A. Actually, that writing on the top is not mine. That is Mr. Estrada's, I believe.

Q. That is Mr. Estrada's?

A. I think it is. I can't see the whole thing.

Q. Forgive me. Can you see it now?

A. Yes. I believe that is Mr. Estrada's writing. Mine is the little yellow stickie that says "search warrant."

Q. And it says, "in box in Room F, pre2004, to be returned"?

A. That's correct.

Q. And you had made the decision with respect to which documents were pre2004 and to be returned sometime in September of last year?

A. Yes. I probably finished making that determination then, but I was doing it on-going after the search warrant.

Q. And were any documents returned to Mr. Bonner after you made the determination in September that they were beyond the scope but before an application for a search warrant in December of that same year 2012?

A. Let me make sure I understand you correctly. I returned

documents to Mr. Bonner prior to September.  I did not return documents to him after that.

And what is the rest of the question?

Q.   And the question is, After you made the determination in September that those -- certain of the documents were beyond the scope of the warrant, they were retained in the US Attorney's Office and not returned to Mr. Bonner?

A.   That's correct.

Q.   For a period of some months before the Government got a search warrant from a magistrate judge for those documents?

A.   That's correct.

MR. IREDALE:  Your Honor, I see it is 11:10.  Would this be a convenient point to take a brief recess?

THE COURT:  We will.  Have you finished with the witness?

MR. IREDALE:  I have not, but I have about five minutes more, and I just want to make sure I am covering everything.

THE COURT:  All right.  We'll take a short ten-minute break.

MR. IREDALE:  Thank you.

(Recess ensued from 11:08 a.m. to:  11:20 a.m.)

THE COURT:  Any additional questions, Mr. Iredale?

MR. IREDALE:  Yes, Your Honor.

Q.   BY MR. IREDALE:  Special Agent Phenicie, you have before

you Exhibit D, which is a Xerox of a yellow page, a yellow sheet of small paper?

A.   Yes.

Q.   Is the handwriting on that yours?

A.   Yes, it is.

Q.   And it reads, "outside of time period, search warrant, home office"?

A.   That's correct.

Q.   Now, could you tell me was there a stack of documents that you determined had been seized outside the warrant that were turned over to the US Attorney's Office?

A.   It was a process, because it took me months to go through the boxes.  When I first started going through the boxes, I was labeling things like this and putting them in the back of those boxes.

I didn't have them just separated.  I had them in the back of the boxes.  I turned over the boxes to the US Attorney's Office paralegal for scanning and discovery purposes.  Some of them were in the back.

When I saw that she was scanning even those that I put the note on there that they were outside the scope, I started then putting all the segregated commingled stuff in its own box.  So there is a whole box that is outside the scope that was set aside at her office.

Q.   And that was turned over to the US Attorney's Office?

A.   Yes.

Q.   Sometime before September of last year?

A.   I am assuming so.  I -- the time period of when I was doing all that is kind of fuzzy, but I know I was doing it as a process.  I started in April and going on through.

Q.   Now, up to some certain point you had been returning those items, even the paper items that were seized outside the scope to Mr. Bonner; correct?

A.   Yes.  I returned paper documents to him at least twice, maybe three times.

Q.   But there is this certain amount in the box that you reviewed, found to be outside the scope of the warrant, but nonetheless those were not returned to him; is that correct?

A.   No.  We were planning on getting another warrant.

Q.   So they were retained for a period of two or three months?

A.   Yes.

Q.   Now, by the way, when you dealt with Mr. Bonner on the 9th of March, he was polite to you?

A.   Yes, he was.

Q.   He was not vulgar in any way with you?

A.   No.

Q.   He was respectful?

A.   Yes.

Q.   Now, I have one more issue concerning the scope of the analysis of the items that were seized, and that has to do with

the computer records.  As I understand it, the computer media, hard drives and the computers, were turned over to several forensic analysts; is that true?

A.   In the very beginning they were turned over to one, Mr. Platt -- or Mr. Platt took custody of them, and then he parsed them out to several forensic analysts.

Q.   Now, did you give Mr. Platt a copy of the warrant that had been signed by the magistrate judge on the 8th of March?

A.   Yes, I did.

Q.   Did you give to any of the other later forensic analysts copies of the warrant that had been signed by the magistrate judge on the 8th of March?

A.   Yes, I did.

Q.   And did that include a copy of your affidavit as well?

A.   Yes, it did.

Q.   And your affidavit set forth that within 120 days of the seizure the computer review and analysis would be complete absent further permission of the Court; is that correct?

A.   That's correct.

Q.   And that date would have been the 7th of July of 2012; correct?

A.   Yes.

Q.   Nonetheless, the analysis continued without an application having been made to the magistrate judge for an extension of the time period for analysis; correct?

A.    That's correct.

Q.    And not only did it take place for a week or for a month but for over two months it took place; correct?

A.    Yes.

Q.    And during that time which analysts were doing the review of the computers which was outside the ambit of the procedures that were set forth both in your affidavit and incorporated by reference into the warrant?

MR. HUIE:  Your Honor, I object.  We're going to have a separate hearing on the electronic evidence.  If Mr. Iredale wants to ask --

MR. IREDALE:  Actually, that's fine.  That's fine.  I thought I could do it here and save time.  Counsel is correct, and I can defer that to a later time.

THE COURT:  All right.

MR. IREDALE:  Given that I have no further questions, I would move Exhibit D into evidence, if I might.

THE COURT:  Any objection?

MR. HUIE:  No objection.

THE COURT:  Received.

(Exhibit Number D was admitted into evidence.)

THE COURT:  Any questions, counsel?

MR. HUIE:  Just a few, Your Honor.  Thank you.

                    CROSS EXAMINATION

BY MR. HUIE:

Q.  Special Agent Phenicie, about what volume of documents approximately was seized from Mr. Bonner's home on March 9th?

A.  We seized approximately 18 and a half boxes of paper documents on that day from his house.

Q.  And you testified that some quantity of documents were returned to him or to his attorney at some point?

A.  Yes, that's true.

Q.  About what amount approximately was returned?

A.  13 to 14 boxes of documents were returned to him.

Q.  What was the time frame in which those documents were returned?

A.  I returned some items in, I believe, April, July, and August.  I -- as I went through the boxes, I returned items to him as soon as I could.

Q.  Now, the exhibits you looked through Defense Exhibits A, B, and C that have the photocopies of manila folders, do you know whether those folders are copies of materials that were returned or not?

A.  Well, when Mr. Iredale asked me if these were not returned, I said they were not returned.  But during the break I was looking through them, and I will not argue that these were seized and commingled in the boxes, but some of these files I returned.  They are not all of the things that were set aside.

Q.  So you can't tell by looking at them right now precisely which were returned and which have not been returned yet?

A.   I have very strong suspicions on several of them, but I would have to verify my list.  But, for example, "arbitration award Keith Bailey, 8/17/92," I would not have kept that.

MR. HUIE:  Nothing further.  Thank you.

THE COURT:  Mr. Iredale, any recross?

MR. IREDALE:  Yes, just to clarify.

REDIRECT EXAMINATION

BY MR. IREDALE:

Q.   So some 14 boxes were -- 13 to 14 boxes you say were returned to Mr. Bonner by the end of August?

A.   Yes.

Q.   And that was because those 13 to 14 contained items that were seized that were beyond the scope of the warrant; right?

A.   No, no.  They were things that I had duplicates of.  I had grand jury information related to credit cards.  I had information from the union itself, from grand jury subpoenas.  He kept two or three copies of everything, and so there were duplicates, and there was no reason to keep some of the stuff.

Q.   Now, with respect to the items that you reviewed that were retained in this box at the US Attorney's Office, to your knowledge is the box still there?

A.   Is the box still at the US Attorney's Office, no.  They asked me to come pick it up.  It is in our evidence room.

Q.   Are the documents -- my framing of the question was infelicitous.  The documents in the box, are they still in the

box?  The documents that you reviewed that were beyond the scope of the warrant --

A.   Yes, they are in the box.

Q.   They are still in that box?

A.   Yes.

Q.   So we can tell with certainty what documents you reviewed were retained between September and December that you had determined were clearly beyond the scope; correct?

A.   Yes.

Q.   Because you have that box?

A.   Yes.

          MR. IREDALE:  Okay.  That's all.

          THE COURT:  Any additional questions?

          MR. HUIE:  No, Your Honor.  Thank you.

          THE COURT:  You may step down.

          Please call your next witness.

          MR. IREDALE:  Agent Novinskey.

          THE CLERK:  Please raise your right hand.

     (Oath administered.)

          THE WITNESS:  I do.

          THE CLERK:  Please take the stand.  Please state your full name for the record and spell your last name.

          THE WITNESS:  Carolyn Novinskey, N-O-V-I-N-S-K-E-Y.

                    CAROLYN NOVINSKEY,

               SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. IREDALE:

Q.   And it is Special Agent Novinskey?

A.   That's correct.

Q.   You are an employee of the CBP?

A.   No, sir.  I am with Homeland Security Investigations.

Q.   How long have you been with Homeland Security Investigations?

A.   I transferred back in May of last year.

Q.   So in March of last year you were with CBP?

A.   That's correct.

Q.   And as of that time how long had you been working with Customs and Border Protection IA, Internal Affairs?

A.   Approximately five years, I believe.

Q.   And you, I believe, in March had the title of ASAC Assistant Special Agent in Charge?

A.   That's correct.

Q.   For the San Diego office?

A.   That's correct.

Q.   And you, I believe, were Ms. Phenicie's supervisor in March of last year?

A.   That's correct.

Q.   Did you have some involvement in the investigation of Mr. Bonner's case?

A.   I did.

Q.   When did it commence?

A.   I don't remember the date that the investigation began.

Q.   Did you have a hand in it from its inception?

A.   I wasn't investigating the case.  I was assigning the case -- a case would come into my queue, and I would assign it to an agent.

Q.   Fair enough.  Let me ask you this, Were you involved in the search warrant that was executed in Mr. Bonner's house?

A.   Yes, I was.

Q.   And do you remember that that occurred in March of last year?

A.   Yes, sir.

Q.   March the 9th of last year?

A.   Yes.

Q.   Before the search warrant was executed there was a meeting of the agents who were going to be involved in it?

A.   That's correct, a briefing.

Q.   That took place here in San Diego?

A.   That's correct.

Q.   And how long did the meeting last, best estimate?

A.   I don't know which meeting you are referring to.  There was a pre -- there was a briefing nearby, and then there was a meeting at the office.  It depends which meeting you are speaking of, sir.

Q.   Fair enough.  Let me be more precise in the question.

There was a meeting the day before?

A.   That's correct.

Q.   That was a meeting in the office?

A.   Correct.

Q.   And then there was a meeting nearby Mr. Bonner's home in Campo, California?

A.   That's correct.

Q.   And that was immediately before the search was executed?

A.   Correct.

Q.   Let's talk about the day before.  How long did that meeting last?

A.   I would guess maybe 30 minutes.

Q.   The agents who were going to be executing the warrant were all there?

A.   Yes.

Q.   And a copy of the warrant and a copy of the affidavit for the warrant was distributed at the meeting by Special Agent Phenicie?

A.   I believe so.  That would be the protocol.

Q.   Were you given a copy?

A.   I read the warrant.  I read the affidavit.

Q.   I appreciate that.  Forgive me.  My question is a little difficult.  Were you given a copy at the meeting?

A.   I don't recall.

Q.   Did you have a copy with you when you went to the search

warrant site the next day?

A.   I did not, no.

Q.   Now, before you were at CBP you told us that you were with Homeland Security Investigations?

A.   That's correct.

Q.   How long were you there?

A.   I started with the old US Customs Service in 1987, and I've been with US Customs Service or ICE -- it switched names after the merge -- that entire time, except for the time I went to CBP.

Q.   You've been involved in executing search warrants?

A.   Yes, sir.

Q.   Have you ever denied someone who requested a copy of the warrant whose home it was a copy of the warrant?

A.   No, sir.

Q.   And are you taught that you are to give a copy of the warrant to the person whose home is being searched?

A.   I am a taught that you are to leave a copy of the warrant at the residence prior to departure.

Q.   When were you taught that?

A.   At the academy in 1987.

Q.   In 1987.  And after the training in the academy in 1987 you were never taught anything in the contrary?

A.   No, sir.

Q.   You've been in California, doing work in California for how

Q.   long?

A.   Since August of 1988.

Q.   Working for various federal agencies?

A.   For two.

Q.   For two?

A.   Essentially two.

Q.   His and CBP in one form or another?

A.   That's correct.

Q.   And you were never taught that the law of the Federal Circuit in which you were working required that you give over a copy of the warrant to the person who owned the home or who was present in the home as shortly after entry as is reasonably possible?  You were never taught that?

A.   No, sir.

Q.   At any time?

A.   No, sir.

Q.   Now, you were present and spoke with Mr. Bonner at some point during the search on the 9th.  Do you recall that?

A.   I do.

Q.   And I believe you were present with a tall, gray-haired gentleman named Mr. Platt.  Do you recall that?

A.   Yes.

Q.   Mr. Bonner asked you and Mr. Platt if he could see a copy of the search warrant for his home?

A.   I don't recall that.

Q.   You don't recall him asking that to you?

A.   No.

Q.   Or to Mr. Platt?

A.   No.

Q.   What were you discussing with him?

A.   I recall two conversations that I had with Mr. Bonner.  I asked if he wanted a granola bar.  He said no, he had his own.  And prior to departing there was a key that we tried to locate.  We located it, and I advised Mr. Bonner which key we would be taking to assist Mr. Platt with the forensics of the computer.

Q.   You don't recall Mr. Platt asking Mr. Bonner for a password to a computer?

A.   No.

Q.   You don't recall Mr. Bonner saying he would give the password but he wanted to see a copy of the warrant or words to that effect?

A.   No.

Q.   Are you sure of that?

A.   Absolutely.

Q.   Did you write any reports, ma'am?

A.   No.

          MR. IREDALE:  That's all I have.  No further questions.

          THE COURT:  Any cross examination?

          MR. HUIE:  No, Your Honor.  Thank you.

THE COURT:  All right.  You may step down.  Thank you.

Please call your next witness.

MR. IREDALE:  Rocky Porter.  Agent Rocky Porter.

THE CLERK:  Please raise your right hand.

(Oath administered.)

THE WITNESS:  I do.

THE CLERK:  Please take the stand.  Please state your full name for the record and spell your last name.

THE WITNESS:  My name is Devin Rocky Porter, P-O-R-T-E-R.

DEVIN ROCKY PORTER,

SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. IREDALE:

Q.   And it is Special Agent Porter, I believe?

A.   Correct.

Q.   You were employed by Customs and Border Protection Internal Affairs in March of last year, I believe?

A.   Yes.

Q.   How long have you been a federal agent?

A.   I am in my 22nd year.

Q.   And what agencies have you worked with?

A.   I started out with the United States Customs Service, and then I worked for US Immigration and Customs Enforcement, both of them Office of Investigations; and then US Customs Border

Protection, Office of Internal Affairs.

Q.   Now, you were involved in the execution of a warrant at Mr. Bonner's home on March the 9th of 2012?

A.   Yes.

Q.   Can you tell me when you first came into contact with Mr. Bonner?

A.   He answered the door, and the person that knocked on the door basically passed him to me.

Q.   Grabbed him and passed him over to you?

A.   Well, yeah, he put his hands on him and asked him to come outside, and he handed him over to me.

Q.   And what did you do?

A.   I handcuffed him.

Q.   Did Mr. Bonner resist you in any way?

A.   No.

Q.   Was he polite in his demeanor?

A.   Yes.

Q.   Was he polite throughout?

A.   Yes.

Q.   Was he ever threatening with you?

A.   No.

Q.   Belligerent?

A.   No.

Q.   Now, after with you handcuffed Mr. Bonner you took him outside the house?

A.   No.

Q.   You -- what did you do with him?

A.   We were already outside.

Q.   You took him to another location after you handcuffed him?

A.   Yes.

Q.   Where did you take him?

A.   Let's see.  The first -- the first -- we moved him -- if you are facing to the house, we moved him to the right, which is just right around where he parks his cars.  I guess it would be his driveway.

Q.   Now, at some point Mr. Bonner asked you, Special Agent Porter, if he could see a copy of the search warrant for his home?

A.   He didn't ask me.  He made a statement about the search warrant.

Q.   The statement he made was, I would like to see one, or words onto that effect?

A.   He said, "I want to see a copy of the warrant."

Q.   Now, by the way, you had been at a meeting the day before, had you not, concerning the procedures to be used in executing the search warrant?

A.   I believe so, yes.

Q.   And had the case agent at that meeting said that she would be the person responsible for giving Mr. Bonner a copy of the warrant?

A.   I don't remember if that was discussed or not who was going to actually give the copy to Mr. Bonner.

Q.   Did you have a copy of the warrant, by the way?

A.   Did I have a copy?

Q.   Yes.

A.   No.

Q.   Did any of the other agents to your knowledge have a copy of the warrant?

A.   I don't know what the other agents had.

Q.   Were you given a copy of the warrant the day before?

A.   Was I given a copy?

Q.   Yes.

A.   I don't remember.  I don't remember if I was given a copy or not.

Q.   Do you remember if you reviewed a copy of the items to be seized at any point the day before?

A.   I don't remember.

Q.   Now, after Mr. Bonner said, I want to see a warrant, or I want to see the warrant --

A.   Uh-huh.

Q.   -- what did you say?

A.   I said he would be provided with a copy of the warrant.

Q.   What did he say then?

A.   He didn't say anything.

Q.   Now, how long was he handcuffed thereafter, about an hour

and a half?

A.   I don't remember the time frame.  To be honest with you, I don't remember the time frame.

Q.   Who unhandcuffed him, do you know?

A.   I did.

Q.   Was it your decision or someone else's?

A.   I asked the case agent if it was all right to take the handcuffs off.

Q.   Now, at any point did you ask the case agent for a copy of the search warrant?

A.   No.

Q.   Did you tell the case agent Mr. Bonner had been asking for a copy of the search warrant?

A.   I told the case agent he made a statement about wanting to see the search warrant.

Q.   What did the case agent say to you?

A.   She said -- I don't remember exactly but it was -- she acknowledged that I told her, but she was extremely busy at the time, so I don't remember exactly what her words were.

Q.   You don't remember if she said, I'll deal with it later, or words to that effect?

A.   I don't remember.  All I remember is she said something about how -- that she was busy at the time, and that was about it.  I walked out.

Q.   Well, did she give you a copy of anything to give to him?

A.   No.

Q.   Did you offer to take a copy of the warrant to him since you were already --

A.   No.  She was in the middle of doing something, so I just informed her of his -- of what he said, and then walked out.

Q.   And you informed her of what he said early on in the search, within the first half hour?

A.   I don't remember the time frame.  It took the entry team awhile to clear the house, and that was one of the reasons his handcuffs were on him, so it would have had to have been after the house was made safe by the entry team.

Q.   So would it be fair to say within an hour or so of the original entry you told the case agent that he had asked for a warrant or said he wanted to see a copy of the warrant?

A.   I believe it was about the same time that I asked to -- asked if it was all right to take the handcuffs off, which was after the entry tame made the house safe.  I don't know the time frame.

Q.   Was it in the morning at least?

A.   Yes.

Q.   How long was Mr. Bonner kept outside the house?

A.   For the most part the entire time the search warrant was being executed.

Q.   And I believe that was about five and a half hours.

A.   Probably.

Q.   Yes.  And then you departed there about 1:30 PM?

A.   That sounds close to the time, yes.

Q.   Did Mr. Bonner ever give you any hassles or grief or complaints other than asking to see a copy of the warrant?

A.   He didn't really -- no, no.  He asked for things, which we accommodated him, or I accommodated him as much as I could. When he got hot, we moved to the shade.  When we got cold, we moved to the sun.  When he wanted water, we got him water. Whatever he needed, aside from that he was -- he was wasn't belligerent or anything.

Q.   He was a perfect gentleman?

A.   Yes.

Q.   The only thing he wanted to -- well, the only -- the only request that you weren't able to accommodate was to give him a copy of the search warrant that authorized the search of his home?

A.   Me personally?

Q.   Yes.  You weren't able to give him that, were you?

A.   I didn't offer to give it to him.  I informed the case agent that he made a statement that he would like to see the warrant.

          MR. IREDALE:  All right.  Thank you so much, Mr. Porter.  That's all I have.

          THE COURT:  Any questions?

          MR. HUIE:  No.  Thank you.

THE COURT:  All right.  You may step down.  Thank you, sir.

Any additional witnesses, Mr. Iredale?

MR. IREDALE:  Yes, Your Honor.  We'll call Mr. Bonner.

THE COURT:  All right.

THE CLERK:  Please raise your right hand.

(Oath administered.)

THE WITNESS:  I do.

THE CLERK:  Please take the stand.  Please state your full name for the record and spell your last name.

THE WITNESS:  Terence John Bonner, B-O-N-N-E-R.

TERENCE JOHN BONNER,

SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. IREDALE:

Q.  Mr. Bonner, how old are you?

A.  59.

Q.  Were you a Border Patrol agent at one point?

A.  I was for 32 years, from 1978 to 2010.

Q.  And when did you leave the Border Patrol?

A.  The last day of May of 2010.

Q.  Were you at one point the president of the National Border Patrol Council?

A.  I was, for 22 years.

Q.  And during what period of time was that?

A.   From 1989 to 2011.

Q.   Now, let me draw your attention, if I could, to March the 9th of last year.  At that point where were you living?

A.   Campo, California.

Q.   And how long had you lived at the house there in Campo, California?

A.   In that house since early 1989.

Q.   Can you tell me whether something unusual happened that morning?

A.   Yes.  I was sitting upstairs in my office and heard my dog barking very loudly and a loud pounding on my door.

Q.   Did you do anything after you heard the pounding on your door?

A.   Yes.  I quickly went downstairs and tried to calm my dog down, but the pounding was very loud, and I could hear voices on the other side, and I could distinguish two words, "police," and "warrant."

Q.   What did you do after you distinguished those two words?

A.   I peered out through the window, which is a door that has a half-moon stained glass window in the top portion, so I was up on my tiptoes looking out, and I noticed there was a group of people wearing blue jackets, carrying weapons.

Q.   Did you see what kind of weapons they were carrying?

A.   Handguns, and I observed at that point at least one rifle, which was all I could tell from looking out at that moment.

Q.   Did you open your door?

A.   I did.  First I put my dog between -- I got in front of my dog, so she wouldn't lunge out, because I did not want her to be harmed, and then I opened the door a crack, and the person pushed the door open, and the first thing I said was, "Don't harm the dog."

Q.   What happened next?

A.   Somebody grabbed me and pulled me out of my house, and I was turned around and handcuffed.

Q.   After you were handcuffed can you describe to us the events that occurred?

A.   I was -- I don't recall if I was handcuffed while I was still on my porch or after I had been led off the porch, but they emptied out my pockets, faced me against the wall of my house, looking into -- at the front of my house which was a window with the blinds drawn.  Very shortly after that I asked to see a copy of the warrant.

Q.   Were your handcuffs cuffed in front of you or behind you?

A.   Behind me.

Q.   And when you were stood to face your home, how far were you from the wall of the home?

A.   No more than a couple feet.

Q.   You asked to see the warrant you said?

A.   I did.

Q.   What words do you recall using?

A.   To the best of my recollection it was something along the lines of, I would like to see a copy of the warrant.

Q.   Now why did you want to see a copy of the warrant?

A.   There had been an exchange the previous day between -- it was phone messages back and forth with the Assistant US Attorney Conover and Rebecca Phenicie.  There were probably 10 or 12 messages back and forth, so I was extremely apprehensive about the nature of the warrant.  Was this a search warrant, an arrest warrant, both?

Q.   Now, after you said that you wanted to see the warrant or asked for the warrant, what happened next?

A.   I was informed that that would be up to the case agent as to when I was allowed to see a copy of the warrant.

Q.   Who informed you of that?

A.   That would have been Agent Porter.

Q.   Did he tell you who the case agent was?

A.   No, he did not.

Q.   Did you know that Agent Phenicie was the case agent at that point?

A.   I did not.

Q.   Did you know that she was the case agent at any point that day?

A.   No.  No one told me that.

Q.   Did she identify herself at any point to you that day -- at any point as a case agent?

A.   No, she did not.

Q.   Now, how long did you remain handcuffed?

A.   About an hour and a half.

Q.   Could you describe the handcuffs on your wrists and whether they were uncomfortable, comfortable?

A.   Uncomfortable, and I asked Agent Porter three different times to loosen them.  He complied the first two times, and the third time he said that they were loose enough.

Q.   Now, by the way, did you have a chance at some point to see the appearance of the agents who were there to execute the warrant and what they were wearing?

A.   Yes.  Most of them were wearing civilian attire, blue jeans or in some cases khaki-colored pants, polo shirts, and some kept their raid jackets on, and as the day wore on some of them took them off.

Q.   Did you see at any point a battering ram?

A.   I did.

Q.   What is that?

A.   It is a big steel pipe, probably about 10 to 12 inches in diameter with a -- this was commercial quality with a handle welded onto it and a flat piece on the front, and it is used for knocking down doors.

Q.   Can you give me an estimate as to how long you were kept outside your home?

A.   The entire day with the exception of a very brief period

where I was allowed to go inside and use the restroom, and even at that the door to the bathroom was left partially open.

Q.   Now, as I understand it your wife was in the home in the morning?

A.   She was.  In fact, the first thing that they asked me was if anyone else was in the house, and I informed them that my wife was in the shower.

Q.   Can you tell me how long your wife remained in the area?

A.   She was probably there close to an hour, maybe 45 minutes.

Q.   And she then left to go to work?

A.   Yes, she did.

Q.   Now, did there come a time when you brought up the subject of the warrant for a second time?

A.   There did.

Q.   Can you tell me about when that was, best recollection?

A.   I don't recall if I was still handcuffed at that point, but I recall that a gentleman with gray or white hair came out and told me that he was a computer specialist and he needed the password to my computer.

And I said the computer is on, why do you need a password? He said, Well, we need it to image the contents, and if you don't give me the password, I won't be able to conduct the imaging on site.

And Special Agent in Charge Novinskey -- although I did not know her name at the time -- was there with him, and I

hesitated, and she said, This is not a negotiation, and even if it were, you don't have any bargaining power.

So I gave him the password to the computer, but I also asked for a copy of the warrant.

Q.   And what was the response you gave after you asked for the copy of the warrant?

A.   I was told by Ms. Novinskey that that would be up to the case agent as to when I would be provided with a copy of the warrant.

Q.   Now, were you at some point finally given a copy of the warrant?

A.   I was just before they left.  Agent Phenicie gave me a copy of the warrant.

Q.   They left at approximately what time?

A.   It was approximately 1:30.

Q.   And at approximately what time did Agent Phenicie give you the warrant?

A.   I would say no more than five minutes before they left.

Q.   Now, did the request that you made for a warrant have to do with a desire on your part to find out what was going on?

A.   Oh, absolutely.  I was very concerned that it was an arrest warrant.  I was completely uncertain.  Is this an arrest warrant?  Is this a search warrant?  What are you searching for?  And nothing was ever explained to me.

MR. IREDALE:  I have no further questions.  Thank you.

THE COURT:  Any cross examination, counsel?

MR. HUIE:  Yes, Your Honor.

CROSS EXAMINATION

BY MR. HUIE:

Q.  Good morning, Mr. Bonner.

A.  Good morning.

Q.  Sir, as of March 9th, 2012, did you have any weapons at your residence?

A.  I did.

Q.  How many weapons did you have?

A.  Oh, I don't recall exactly, but probably in the neighborhood of 18.

Q.  And were those pistols and long guns?

A.  A combination, yes.

Q.  And I take it all those pistols would have been registered?

A.  Yes.

Q.  Now, where in your house did you keep your weapons?

A.  In the upstairs.

Q.  Where in the upstairs?

A.  Some of them were in a safe, and others were in a closet.

Q.  So all the weapons would either be in a gun safe or in a closet?

A.  I believe so.

Q.  Did you have any conversation with any of the agents on the morning of the search about the fact that you had weapons?

A.   I was asked where the weapons were.  I was not asked if I had weapons.  They asked -- I believe it was Ms. Phenicie asked for the location of the weapons, and I hesitated, and she said, We're not going to seize your weapons, and I just said, They are upstairs.

Q.   Did you give the agents any further information about the location of the weapons?

A.   No.

Q.   Did you give them any further information about the quantity of the weapons you had?

A.   They did not ask.

Q.   But you didn't give them any further information?

A.   No.

Q.   Now, during that morning I think you testified that you asked Special Agent Porter to loosen your cuffs, and two of those occasions he complied with your request; correct?

A.   That's correct.

Q.   But a third he didn't; correct?

A.   Correct.

Q.   And you were given the opportunity to use the restroom when you needed to; correct?

A.   I asked twice, actually.  The second time that I asked, I was informed that they were wrapping things up and that they would be leaving within a half hour.

Q.   Did they, in fact, leave shortly after that second request?

A.   It was within that ballpark, yes.

Q.   So the first request they did accommodate?

A.   Yes.

Q.   You were offered water by the agents; correct?

A.   I was, yes.

Q.   And you were offered granola bars?

A.   Yes.

Q.   And the agents provided you with cough drops?

A.   Upon my request.

Q.   Did the agents also bring you a blanket at your request?

A.   I did not request a blanket.  They asked if I wanted a blanket because it was chilly and the wind was blowing quite strongly, and I refused their request -- or the offer.  I'm sorry.

Q.   Are you aware, sir, that among the items that were seized from your house on March 9th were some electronic evidence?

A.   I am aware of that, yes.

Q.   Among the electronic evidence there were some computers as well as some hard drives.  Are you aware of that?

A.   I am aware of that.

Q.   In fact, there were 20 hard drives that were seized from your evidence that day; correct?

A.   That sounds about right.

Q.   Now, with regard to those hard drives that you had at your home, did those hard drives belong to you?

MR. IREDALE:  Your Honor, I am going to object on the grounds of Rule 104 on the Federal Rules of Evidence that says by taking the witness on a preliminary matter such as the admissibility to evidence, the defendant does not subject himself to cross examination on issues relevant to the case in chief.  This is beyond the scope.

THE COURT:  What is the relevance as to that?

MR. HUIE:  It really goes to the issue of standing, Your Honor.

THE COURT:  On just the --

MR. HUIE:  On the electronics.

THE COURT:  -- on some of the media?

I'll sustain the objection at this point.  That might be a subject further down the road.

Are you talking about the standing with respect to particular pieces of media?

MR. HUIE:  It is standing to determine whether Mr. Bonner is the owner of the electronic media and the data on the media seized.

THE COURT:  There were 20 pieces of media taken?

MR. IREDALE:  Yes.  The Government has not raised standing in any of its papers, Your Honor.  This is really I don't mean to be pejorative.  But it appears to me that this seems to be covert preliminary cross examination as opposed to any legitimate attempt to raise the issue of standing, which

has not been raised in any government papers.

THE COURT:  With respect to the media, I don't recall that the standing issue has ever been raised in a pleading yet.

Are you making that argument that he doesn't have standing to contest the seizure of particular items?

MR. HUIE:  Well, Your Honor.  It hasn't been raised, but it is our view that it is the defendant's burden to show standing, and we would like to determine with regard to the electronic media, some of which we believe were paid for by the union, whether it is Mr. Bonner's view whether it is his or somebody else's.

THE COURT:  At this point I'll sustain the objection to that question.

MR. HUIE:  Nothing further, sir.  Thank you.

THE COURT:  Thank you.  You may step down.

Any additional witnesses, Mr. Iredale?

MR. IREDALE:  None, Your Honor.  Thank you.

(The requested portion of the proceedings concluded at 12:01 p.m.)

---o0o---

C-E-R-T-I-F-I-C-A-T-I-O-N


        I hereby certify that I am a duly appointed, qualified and acting official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

        DATED:  April 4, 2013, at San Diego, California.


                                /s/ Melinda S. Setterman
                                _____
                                Melinda S. Setterman,
                                Registered Professional Reporter
                                Certified Realtime Reporter