UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,             .
                                      .
        Plaintiff,                    . No. 12-CR-3429-WQH
                                      .
            v.                        . April 30, 2013
                                      .
TERENCE J. BONNER,                    . 9:34 a.m.
                                      .
        Defendant.                    . San Diego, California
. . . . . . . . . . . . . . . . . .   .


            TRANSCRIPT OF EVIDENTIARY HEARING, Vol. 1
    (Re: Suppress Evidence Obtained as a Result of Warrant)
            BEFORE THE HONORABLE WILLIAM Q. HAYES
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                          BY:  ROBERT S. HUIE, ESQ.
                               W. MARK CONOVER, ESQ.
                          880 FRONT STREET, ROOM 6293
                          SAN DIEGO, CALIFORNIA 92101

FOR THE DEFENDANT:        IREDALE & YOO, APC
                          BY:  EUGENE G. IREDALE, ESQ.
                          105 WEST F STREET, FOURTH FLOOR
                          SAN DIEGO, CALIFORNIA 92101



Court Reporter:           Melinda S. Setterman, RPR, CRR
                          USDC Clerk's Office
                          333 West Broadway, Room 420
                          San Diego, California, 92101
                          melinda_setterman@casd.uscourts.gov

Reported by Stenotype, Transcribed by Computer

INDEX

TESTIMONY:

WITNESS:                EXAMINATION BY:                        PAGE:

Charles Richard Porth

                    Direct Exam by Mr. Huie...............10
                    Cross Exam by Mr. Iredale.............15
                    Redirect Exam by Mr. Huie............26
                    Recross Exam by Mr. Iredale..........26
                    Redirect Exam by Mr. Huie............27
                    Recross Exam by Mr. Iredale..........29

William Kenneth Townsend

                    Direct Exam by Mr. Conover...........33
                    Cross Exam by Mr. Iredale............40
                    Redirect Exam by Mr. Conover.........53
                    Recross Exam by Mr. Iredale..........58


                        *  *  *  *

SAN DIEGO, CALIFORNIA, APRIL 30, 2013 9:34 A.M.

* * * *

THE CLERK:  Number one on calendar, case 12-CR-3429, United States of America vs Terence Bonner, on for evidentiary hearing.

MR. IREDALE:  Good morning, Your Honor.  Eugene Iredale for Mr. Bonner.  He is present before Your Honor this morning on bond.

THE COURT:  Good morning.

MR. CONOVER:  Good morning, Your Honor.  Mark Conover and Rob Huie for the United States.

MR. HUIE:  Good morning.

THE COURT:  Good morning.

My understanding is that there are two examiners that are prepared to testify today.

MR. HUIE:  That's correct, Your Honor.

THE COURT:  There is a third that is unavailable for today.

MR. HUIE:  That's right, Your Honor.

THE COURT:  Do you have some other dates -- we can address it at the end of the hearing -- when the third examiner will be available?

MR. HUIE:  We do we have the general idea of availability.

THE COURT:  Why don't we call the first witness.

MR. HUIE:  Before we begin, can I make a preliminary statement to define the statements of what the facts are in this hearing?

THE COURT:  All right.

MR. HUIE:  The basis of this hearing is that in the course of this case we disclosed the fact that there had been access to these particular drives after the 120-day time period of July 7th, 2012, expired.  We disclosed that to the Court and to counsel, and as a result the defense filed a motion to suppress evidence gained after the 120 days, and the Court scheduled this hearing to address the circumstances under which that access had been made.

Mr. Conover and I had a chance yesterday to meet with these examiners that flew in from out of town, from Miami and Houston, and what we concluded is that we're not going to rely in any way on the work that these two examiners did outside the time period, and we informed the defense of that yesterday.

What we found, just to kind of get to the punch line, Your Honor, is that with the forensic evidence that was seized effectively it overloaded the circuits of Internal Affairs, which doesn't do a lot of this work.  It was farmed out to various agents across the country.

And in the course of doing that there were agents, including the two that we have brought here today, that had copies of the warrant but that were from jurisdictions where

there was no 120-day window.

And my office bears responsibility as well for not calling their attention specifically to deadlines. So the Court doesn't have to take our word for it, but the bottom line is good faith or not we're not going to be relying on the work that they did outside of the time period, post July 7th.

So we do have witnesses today, Your Honor, but it is our position that there is no disputed issue of material fact given that we don't intend to use that evidence at trial.

THE COURT: Mr. Iredale.

MR. IREDALE: Yes, Your Honor. And first of all, let me say I appreciate, number one, the candor and, secondly, I appreciate the concession. Unfortunately, legally it does not go enough, and it does not address the facts that we need to establish for some additional motions that are before the Court.

First of all, I want to inquire as to these analysts issues concerning not only the fact that they violated the search warrant's order concerning the time with which the analysis was to be completed but also the scope.

And it appears from at least one document that I've seen there was a deliberate directive given to them to violate the scope of the warrant as it existed from July the 7th to sometime in September when they stopped their analysis, because that also goes to the issue of whether there was flagrant

disregard for the warrant and the issue whether there was such overbreadth in the execution of the warrant that suppression of everything is required or justified.

The second issue has to do with this, There was another warrant that the Government obtained on the 21st of November.  Essentially, the Government went back to a magistrate judge, a third magistrate judge, who -- not the one who issued the first or the second set of warrants but a third magistrate judge and said, Well, we want now to seek a new warrant because we did an analysis that was outside the time period and we want to extend the scope of the warrant to analyze all the way back to 1993 and to analyze certain additional materials.

And we believe that that warrant itself and the application and the subsequent searches that have taken place after that were themselves the fruit of the violation that the Government has now conceded and that, therefore, the remedy that the Government proposes is actually insufficient for the violation that we think the evidence will establish, not only the one the Government concedes but a deliberate violation by the analysts of the scope of the warrant that they had in existence at the time and the use, if not in the substance of the application, at least as a motivating factor to obtain the new warrant which they obtained on the 21st of November.

Essentially, the Government is offering us a nugatory

remedy, something that is entirely insufficient to give us any assistance. Because in chatting with counsel to see if this matter could be resolved, they told me, Well, of course, we won't rely on that, but that doesn't preclude us from doing any additional analysis now subsequent with new analysts doing the same thing.

And if the new analysts do the same thing, well then, we'll just go ahead and use it, and while they may have a right to that position, I think in light of the specific facts that occurred which should be presented to the Court that that is not the appropriate remedy. The remedy goes beyond that.

The remedy goes to the issue of a deliberate violation of the scope of the warrant, which was done during this period of time, during which they were also beyond the period of time within which they had the permission of the Court to conduct the analysis and during which they sought no extension, even though they had the ability to do so.

It goes to the issue of the validity and the propriety of the warrant that was issued on the 21st of November. As a result, we contend of what they learned during this period of time, and it goes to the issue of exactly what evidence will be suppressed, and that cannot be answered I think in a vacuum, and we need to call the witnesses and establish the factual predicate for the legal arguments before the Court.

THE COURT: All right.

Mr. Huie.

MR. HUIE:  Thank you, Your Honor.  We're just trying to focus this hearing on the purpose for which it was noticed, recognizing that there may be later hearings in the case.  Some of the issues that Mr. Iredale raises, while he certainly has a right to litigate them, but we think is premature to address them today.

The reason being that we have a Court-imposed, agreed-to deadline of July 15th for turning over expert reports, and that would include expert reports of electronic evidence that we intend to use at trial.  That is two and a half months away, Your Honor, and we're not yet at the stage where we know who we're going to rely on other than these two, and what sort of evidence we want to have.

And we recognize when we get to that stage there may be challenges to the reports.  There may be challenges to the warrant that resulted in them.  Those challenges will be made to the affidavit of Special Agent Phenicie that swore out that later warrant.

But as far as the purpose of the hearing today that is the circumstances of the post 120-days access, we don't think there is a disputed issue of fact because we're conceding that we're not going to rely on that material at trial or for having other people rely on it to offer evidence or their findings in evidence.

THE COURT:  Well, Mr. Iredale.

MR. IREDALE:  What I said I think still pertains, Your Honor.  Plus there is the practical issue.  There is the logistic issue that we have the agents, one from Miami and one I believe from Houston, who have come in from out of town.

And the Government's offer -- first of all, let me say this, I understand that some time constraints occur, and I don't mean this as a criticism, but I had written about a week and a half ago to counsel saying under the Federal Rules of Criminal Procedure when the Government calls a witness at a suppression hearing that Rule 26.2 pertains, and even though technically have the right to wait until the witness has testified, would you please give me the materials, especially if they are going to be substantial.

And counsel to their credit gave me as much as they could last night, but for example, this morning I got this additional sheath of documents just about five minutes ago.

The offer that the Government made to make this concession, which I think is actually very wise on their part because they are trying to avoid the full scope of what I think the legal remedy should be, did not come until last night at about 5:30 or 6:00.

And the agents are here.  I think we should take advantage of it.  I don't intend to unduly protract anything.  The issues I believe I can focus on and get to quickly, but I

do request that the Court permit the hearing to go forward so Your Honor will have the full universe of fact at the time that the Court is required to make the legal determinations that we've sought.

THE COURT:  I agree.  We'll go forward with the hearing, Mr. Huie.  I think that if we don't go forward today, I think more likely than not I would just be putting it off, and I think at some point the record is going to need it one way or the other, and so I think it is best just to go forward with it today as opposed to make a guess as to whether or not it is really going to be necessary or not, so why don't we start with the hearing.

MR. HUIE:  Understood, Your Honor.  The United States calls Richard Porth.

THE COURT:  Thank you, sir.

THE CLERK:  Please raise your right hand.

(Oath administered.)

THE WITNESS:  I do.

THE CLERK:  Please take the stand.  Please state your full name for the record and spell your last name.

THE WITNESS:  Charles Richard Porth the second, P-O-R-T-H.

CHARLES RICHARD PORTH,

SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. HUIE:

Q.   Good morning, Mr. Porth.

A.   Good morning.

Q.   Sir, for whom do you work?

A.   Customs and Border Protection Internal Affairs.

Q.   What do you do for CBP IA?

A.   I am a Special Agent.  I investigate the majority of time administrative issues dealing with employee misconduct.  At times I also participate in criminal investigations, also computer forensics.

Q.   How long have you been with CBP IA?

A.   Since 2007.

Q.   And can you walk us through your background briefly before 2007?

A.   I have a degree in computer science from Nicholls State in Louisiana.  I was a Border Patrol agent for approximately two years from '94 -- approximately '97, I believe, '96 exactly.  Secret Service agent for 11 years, and I've been with CBP IA since 2007.

Q.   Sir, you mentioned that part of your job involved computer forensics.  What sort of training have you had, other than your degree in computer science for computer forensics?

A.   With the Secret Service I was trained.  I was in their electronic crime specialist program.  In approximately 1999 I went to the Federal Law Enforcement Training Center for the

school at the time was called seized computer evidence recovery specialist.  It was -- I guess in English it would be computer forensic training for special agents.

And since that time I've -- my training didn't stop there. For many years I've attended additional schools.  I've also taught forensics at the Federal Law Enforcement Training Center, so since 1999 until 2006 or '07 I attended numerous computer forensic classes, and I believe I attended some again after 2008 or 2009.

Q.   Where are you based for work?

A.   Houston, Texas.

Q.   Now, I have questions for you, sir, that I am going to limit to on or about July 7th, 2012.

On or after July 7th, 2012, were you asked to do anything in relation to the criminal case against Terence Bonner?

A.   Yes, sir.

Q.   What were you asked to do?

A.   I was asked to investigate the image of Sony Vaio, I believe, laptop computer.

Q.   What time frame was this?

A.   What do you mean exactly?

Q.   That you were asked to do this?

A.   It was in July of, approximately, 2012.

Q.   And what instructions were you given in July of 2012 in regard to this laptop?

A.    Get it examined as soon as possible.

Q.    Now, had you done work on this matter prior to July 7th, 2012?

A.    Yes, I had.

Q.    Can you tell us a little more about when you were asked to do this work on the laptop, what the circumstances of you being asked to do the work?

A.    My understanding is Agent Everly was assigned that matter, but she hadn't completed it, and she was on vacation, and it was -- I guess it needed to be -- it was communicated to me that it needed to be done as soon as possible, can you get it done, you know, by my supervisor and the office.  He asked me to get it done, and I said yes, sir, and proceeded.

Q.    Is Agent Everly another examiner at the Houston office?

A.    She is also a computer forensic agent, yes, sir.

Q.    Now, when you took over this job, how far along was the work?

A.    I could see that Agent Everly had done a lot of work.  I didn't go into detail, you know.  I've been doing this since 1999.  I could see -- I've seen her work at her desk before knowing that she had been working on it.  I could see that she had done, you know, like I said, an awful lot of work.

      But I -- it is easier -- I made a judgment call to myself that it would be faster if I started completely over than to try to understand what she had done or processed, you know.  I

felt I would be faster at getting the job done as soon as possible by starting over.

Q.   How long did it take you to start and finish your analysis?

A.   Maybe a week, two weeks.

Q.   What time frame was it that you finished, also in July 2012?

A.   Yes, sir.

Q.   Now, sir, based on your work prior to getting this assignment, did you have a copy of the warrant in this case?

A.   I did.

Q.   Did you also have a copy of the procedures for electrically stored information?

A.   I did.

Q.   Did you review it?

A.   I reviewed them.  I browsed over them.  I know it is pretty thick, numerous pages, yes.

Q.   At the time that you did this work in July 2012, did you have a deadline in your mind for when work had to be completed on the images?

A.   The only thing that comes to mind is that as soon as possible.  I may have been told a date.  They, you know, said get it done, and yes, sir.  That is -- as soon as possible is what I know.

Q.   In the jurisdiction in which you typically work is there a standing requirement or a practice of a 120-day limit on the

time to access an original image?

A.   No.   It hasn't been my experience in the past, no.

Q.   Sir, did you by performing the job that you were asked to do intentionally violate any Court order or Court-imposed time limit?

A.   Absolutely not.

MR. HUIE:   Thank you, sir.

Thank you, Your Honor.

THE COURT:   Okay.   Mr. Iredale.

MR. IREDALE:   Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. IREDALE:

Q.   Mr. Porth, I think you work in Houston; is that true?

A.   Yes, sir.

Q.   Now, you told us that you were doing some work after Special Agent Everly had done an initial analysis?

A.   Correct.

Q.   But for whatever reason you felt that you should begin anew with your own analysis; is that correct?

A.   In order to complete -- to get the job done as soon as possible, yes, sir.

Q.   So in your work you didn't rely on her analysis which had been done before July.   You did your own analysis anew; is that correct?

A.   That's correct.

Q.   And you told us that it took a week or two?

A.   Well, I'll just -- I guess I could say the one thing that I did rely on her analysis was she made an image of the files that she received.  I used the image that she created, so the copy of the hard drive, if I believe you understand that, sir.

Q.   Yes.  In other words, the analysis itself that you did was entirely anew; correct?  Is that true?

A.   Yeah, it is a point of view.  If you want to say processing the information that was on the hard drive.

Q.   The copying of the copy from the hard drive had already been done?

A.   Correct.

Q.   And so that was the part of Agent Everly's work which you used, that is to say you had available the copy which had been made?

A.   Yes, sir.

Q.   And as I understand it you dealt with one computer; is that correct?

A.   We're talking about the July?

Q.   Yes.

A.   Yes, sir.

Q.   Now, did you speak at any point with Special Agent Phenicie regarding the scope of the computer search that you are to do?

A.   I did.  I don't recall exactly when.  I've had numerous phone conversations with her.  It may have been prior to July

that I -- I know I probably spoke to her before then.

Q.   Did she tell you that there was a limit on the scope of the search that you were to conduct?

MR. HUIE:  Your Honor, I object as outside the scope of this hearing.

THE COURT:  Overruled.

BY MR. IREDALE:

Q.   Your answer, sir?

THE COURT:  You can answer.

THE WITNESS:  Okay.  Thank you.

She may have.  It is not one of those -- I -- I am unsure.

BY MR. IREDALE:

Q.   Well, fair enough.  Let me, if I could ask you a series of questions.  You did a search of this computer for certain kinds of information; is that true?

A.   Yes, sir.

Q.   The kind of information that you were looking for was what?

A.   Documents, probably airline reservations, credit card receipts, maybe phone bills, receipts, those types of items.

Q.   Was there a time limit on the items that you were looking for?

A.   What do you mean by "time limit" of?

Q.   In other words, items, for example, before or after 2004?

A.   I don't recall the date -- her telling me that

specifically. She may have. I don't recall that.

Q. In your search do you recall making the search query that you used to probe the computer information one that was time sensitive so that anything, for example, before a particular date, such as January 1st, 2004, would not be brought up by your search?

A. No, I did not, but I can kind of explain why that would be difficult to do. You would have to look in each item. Because when you write something to a hard drive, it may be written with that date on the hard drive, but it may be a credit card statement from 20 years ago, so you would have to open up the item to actually understand it.

You could also have something -- it is generally kind of hard to change dates that go back 20 years, but you wouldn't necessarily know that it was -- if I understand the crux of your question -- that it was outside of the warrant unless you went through each item, and there was an awful lot of information to go through.

Q. Forgive me. Let me put the question this way, You used what are called search protocols to analyze the computer data; correct?

A. I basically used what I saw, like if I was looking -- for example PDF documents, he stored a lot of receipts in PDFs -- I pulled all the PDFs. That would be the protocol there.

Q. Without respect to the time, the date on which the PDF for

instance was entered into the computer?

A.  That's fair.

Q.  So that if the PDF was entered in the computer in 1999, you would still pull it up?

A.  I probably would have pulled it up.

Q.  If the PDF was entered in 1996 you would have pulled it up?

A.  I don't believe that most of them were, but it could have happened, yes.

MR. IREDALE:  May I approach the witness, Your Honor?

THE COURT:  Yes.

BY MR. IREDALE:

Q.  And just for counsel's benefit I am going to show the application for the search warrant for the search of Mr. Bonner's home.

THE COURT:  Is that marked as an exhibit, counsel?

MR. IREDALE:  It is not, but I will do so if, Your Honor, would wish.

THE COURT:  Yes, please mark them.  Do you have an extra copy so you can do the examination from the podium?

MR. IREDALE:  I will get one.

THE COURT:  All right.

MR. IREDALE:  May I just trouble Your Honor for a moment, please?

THE COURT:  Yes.

MR. IREDALE:  And may I just ask this, does the Court

use 1, 2, 3 or A, B, C?

THE COURT:  A, B, C will be fine.

MR. IREDALE:  Let me, if I could give the witness what has been marked for identification as Exhibit A, which is page 2 through 21, beginning with the application for the search warrant dated 3/8/2012, and may I provide the Court a copy as well?

THE COURT:  All right.

BY MR. IREDALE:

Q.  You were provided a copy of the warrant I believe you told us?

A.  Yes, sir.

Q.  And you were provided a copy of the application and affidavit for the search warrant as well as; is that true?

A.  Yes, sir.

Q.  And you told us that you read them but not very closely?

A.  That's -- yes, sir.  I browsed over it.

Q.  You browsed over them?

A.  Yes.

Q.  Let me ask you, if I can refer you on Exhibit A, page 20 of 21, the section that says "items to be seized," do you have that in front of you?

A.  Yes, sir.

Q.  Is this something that you browsed over as well?

A.  Yes, sir.

Q.   Now, with respect to the protocols that you used to search, did you have a list of items that had been given to you by Special Agent Phenicie that she was interested in having you search for?

A.   I probably called her and discussed what -- I usually make that a practice to talk to the agent.

Q.   And do you recall what specifically she told you with respect to what she would like you to look into the computer data for?

A.   Yeah.  Pretty much what is on this page, but bank records, travel records, credit card statements, et cetera.

Q.   But you told us in your analysis you put no time limit on that search; correct?

A.   No, sir.

Q.   Now, let me ask you, you see that Exhibit B also has --

A.   Are you talking about Attachment B?

Q.   Attachment B, yes.

A.   Yes.

Q.   On page two of that attachment, page 21 of 21 of the document itself, did you read the second page as well of Attachment B?

A.   You are talking about where it starts with number six?

Q.   Correct.

A.   Again, I browsed over it.

Q.   Well, did you browse over the part that says, "This

authorization includes the search of electronic data to include deleted data, remnant data, and slack space.  The seizure and search will be conducted in accordance with the procedures of for electrically stored information provided in the affidavit submitted in support of this warrant"?  Did you browse that portion as well?

A.   Where do you see that exactly so I can --

Q.   Sure.  It is the third paragraph -- actually, the first paragraph after section six.

A.   Okay.

Q.   "This authorization," did you see that?

A.   I see it now, yes, sir.

Q.   And that was given to you, I take it, by Special Agent Phenicie?

A.   Yeah.  I received it by e-mail, yes, sir.

Q.   And did she tell you that there was 120-day limit that was set by the Court for the analysis to be done on the computer data after the seizure date?  Did she tell you that?

A.   I -- I don't recall she did or not.  I had -- I had numerous phone conversations with her.  Probably prior to the July examination.  This would have been in, I don't know, maybe March of the same year when I did a separate computer, and that is where I had the copy of this warrant.

I got that one done -- assigned and done within the time frame, so maybe she had told me during that time.

Q.   Well, forgive me.  I don't mean to press you or to be unfair to you.  Do you remember her telling you whether there was a time limit within which you had to do your analysis?

A.   I don't remember either way whether she did or did not.

Q.   All right.  How many phone calls did you have with her all totals, best estimate?

A.   I am -- that is little hazy, five to ten maybe.

Q.   Let me ask you if I could refer you now to the same exhibit that you have in front of you and ask you to go to the section that says, "Procedures for electrically stored information," beginning on page nine.  Actually, forgive me.  That is 11 of 21 of the document that you have.  So it says at the top "11 of 21."

A.   Okay.  I am there.

Q.   Is this a section that you reviewed as well?

A.   I would have browsed over it.

Q.   Well, now I need to ask you some questions in that regard. When you say, "I would have browsed over it," does that mean that you simply glanced over it and didn't read every word?

A.   That is fair, yes, sir.

Q.   And I take it that means that you didn't see that the procedure that was suggested by Special Agent Phenicie herself in her declaration said that the analysis would be done within 120 days?

A.   I'm sorry.  Repeat the question just so I can answer you

correctly.

Q.   Yes.   Let me refer you, if I could, to page 16 of 21.

A.   Okay.   I am there, sir.

Q.   You see that, line four, "The personnel conducting the identification and extraction of data will complete the analysis within 120 days of the date of seizure pursuant to this warrant absent further application to this Court"?

A.   I see that.

Q.   Did you read that or in your browsing did you skip over that part?

A.   I don't recall, and again, it could have been covered in a conversation in March or whenever I had those conversations. It has been a little while, so --

Q.   Were you ever notified by any of the prosecutors in the case that there was a time limit which had to be adhered to or if that time limit couldn't be adhered to because of the press of business that they could go back to the magistrate judge and make an application for an extension of the time?   Were you ever told that by the prosecutors in the case?

A.   Nobody told me any of that, sir.

Q.   Ms. Phenicie never told you that?

A.   If -- if I had thought that there would have been a problem, I would have communicated that to her myself, I guess.

Q.   Now, Special Agent Porth, did you complete a computer forensic report in this matter?

A.   We're talking about the July exam, yes, sir.

Q.   Yes.   And as I think you told us that analysis commenced on July the 12th of 2012?

A.   That's what my report says, yes, sir.

Q.   And you told us that it took between a week and two weeks; is that correct?

A.   Yes, sir.

Q.   And you forwarded then your report to Special Agent Phenicie when it was completed?

A.   Yes, sir.

Q.   Did you discuss with her what you had found in your analysis?

A.   I may have.

Q.   Well, when you say you "may have," other than what you have in your report did you talk to her at any time on the telephone to tell her what you had found in doing the analysis that you did in July of 2012?

A.   I probably did.   I don't -- probably just to tell -- to report that this is what I extracted and it is coming to you in a hard drive because it is so much.

Q.   And you forwarded the hard drive to her as well?

A.   Correct.

Q.   So she would have been able to review that; is that correct?

A.   Yes, sir.

MR. IREDALE:  Special Agent Porth, that is all I have. Thank you so much.  I take it that -- well, that is all.  Thank you.

THE COURT:  Any redirect, counsel?

MR. HUIE:  Yes.  Thank you.

#### REDIRECT EXAMINATION

BY MR. HUIE:

Q.   Special Agent Porth, just to be clear, the work that you performed in July of 2012 you said that was on one Sony laptop?

A.   That's what I recall, yes.

Q.   So the work you had done previous to that in March was on different devices?

A.   Yes, sir.

Q.   And in July you were working on that laptop because you were jumping in to pick up the ball for another forensic examiner?

A.   That's correct.

MR. HUIE:  Thank you, sir.  Nothing further.

MR. IREDALE:  Just very briefly, Your Honor, within this scope.

#### RECROSS EXAMINATION

BY MR. IREDALE:

Q.   You mentioned that you did work in March.  With respect to that work in March you said essentially the analysis involved the same kind of work.  Did I understand that properly?

A.   My understanding, yes.

Q.   And likewise, the search -- the scope of the search was the same, that is, there was no restriction on the date of the information you were searching for; correct?

A.   You mean did I try to -- did I filter by an exact date or whatever?

Q.   Yes.

A.   And I would say I probably did not.  It doesn't mean that I -- I violated it or anything knowingly, just --

Q.   You didn't use a protocol that would cut it off by that date?

A.   Yes.

Q.   Correct?

A.   Yes, sir.

        MR. IREDALE:  Thank you.

        MR. HUIE:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. HUIE:

Q.   Special Agent Porth, let's talk for just a minute about the date and searching by the date.  I think you said when you were being questioned by Mr. Iredale that one of the challenges with a search was that there are multiple dates for any given file; is that correct?

A.   That is correct.

Q.   And I think you expressed a concern that using a particular

date like 2004 may be overinclusive as to what is seized; is that right?

A.   I could give you examples where a file could have been created in the '90s, but depending on how you write it, because there is many different ways -- I won't bore you or the Court -- depending how you copy, move, paste it from drive to drive, you may get different results of what the date will show in what is called the directory or whatever.

And inside the file -- the file was created in 1990, inside of it, you wouldn't know that until you opened it up.  It will say one date on the hard drive, but the date that it was created or month, year, would be a different date on the inside.

You know, being -- trying to follow the scope of the warrant, you would have to look at every -- every item, file, you know, to yes, no, does this meet or does not meet the criteria of the warrant would be -- if I am communicating that correctly or to your understanding.

Q.   And, sir, when you went about finding what data was within your view of the scope of the warrant, did that process involve at any time opening files and looking at them and determining whether they were within a relevant time period?

A.   No.  It was more the content or the type.  If I saw a folder containing credit card receipts, I might look at one or two, but there will be, you know, many -- in just that

particular folder of credit card receipts, so I would not open every one because there was just so much information that was asked to be pulled out.

Because for me unless -- since I am not the case agent, I wouldn't necessarily understand what is relevant. And -- especially in a -- here, a fraud case, a credit card statement doesn't necessarily look, you know, even to an investigator that there is something, you know, relevant, you know.

I wouldn't know the individual details. I would leave that to the case agent to review and say, yeah, this one is important, or -- you know. I was just trying to get the material that she could review.

MR. HUIE: Thank you, sir.

RECROSS EXAMINATION

BY MR. IREDALE:

Q. Special Agent Porth, as I understand your testimony, essentially the time had nothing to do with the analysis that you did because you needed to look at every document that fell within the category; is that correct?

A. I could -- I don't recall that the date to me was -- it didn't -- I don't recall that the date being a limit to me only because I was unaware or ignorant of it.

Q. Okay. In other words, you were not told that there was a scope limitation related to time in which documents related beginning the 1st of January 2004 and forward to the date of

the warrant?  You weren't told that?

A.   If I was told, I didn't remember it.  That could just as well be on me.

Q.   So I appreciate that.  In other words, that particular document in the -- that particular limitation in the warrant you were unaware of, and therefore, it had nothing to do with the conduct that you did in searching the computers; correct?

A.   I don't understand that one.  I'm sorry.

Q.   In other words, if there was a limitation of time, you were unaware of it, you told us?

A.   That would -- it wasn't on my mind when I was doing the search.

Q.   And therefore, you searched it without regard to any particular limitation of time which may have been specified; correct?

A.   I wasn't limiting myself by time.

Q.   That's all right.  Now, let me ask you a question, if a document was created in 1999 and last accessed in 1999, you can tell with a fair degree of certainty that that document does not relate to anything past 1999; correct?

A.   No.  I wouldn't say that is fair.  When dealing with date and times on computers, I -- you want to look at each individual item, and it could be very time consuming, I guess, a case-by-case basis.

     If you want to speak in generalities, yes, sometimes -- I

am going to give you a wiggly answer, but time is a thing with computers you have to be careful with.

Q.   I take your point.  In other words, there can be times when computers erroneously record the time; correct?

A.   They record what they are told to do.  You have to interpret it correctly or to the best of your ability.

Q.   There may be a virus that could throw off the computer's time?

A.   I haven't seen that.

Q.   But generally speaking, if you look in a computer and it says that the document was created in 1999 and last accessed in 1999 and there is no other indication that there is anything wrong with the other dates in the computer, you can tell with a fair degree of certainty that document was from 1999; right?

A.   If all the facts match up, I would -- I would always -- you know, this and this would lead me to conclude that is probably true.

Q.   But in any event, because of your understanding of the parameters of your job, the scope of your job, you had to basically look at all of the documents, whether they were before a particular date or after; correct?

A.   I was looking for the documents is what I -- is really what I was doing.  I was looking for the documents that -- speaking with Agent Phenicie what she -- would be helpful in the case.

Q.   I take your point.  Looking for the documents without

respect to any particular date that might be on the document; correct?  Yes?

A.  Yes.

Q.  And I take it that in your work after you completed your analysis, you downloaded all of the documents that you found fit within those categories that she asked you to search for, and then you forwarded them all to her?

A.  Yes, sir.

Q.  On the disk?

A.  Yes, sir.

Q.  Special Agent Porth, now admit it, San Diego is nicer than Houston, isn't it?

A.  I like them both.

MR. IREDALE:  A squiggly but diplomatic answer.

No further questions.

THE COURT:  Anything further, counsel?

MR. HUIE:  No, Your Honor.

THE COURT:  May the witness be excused?

MR. HUIE:  Yes, from the United States.

MR. IREDALE:  Yes.

THE COURT:  You may step down.  Thank you, agent.

MR. CONOVER:  The United States calls Special Agent Kenneth Townsend to the stand.

THE COURT:  All right.

THE CLERK:  Please raise your right hand.

(Oath administered.)

THE WITNESS:  I do.

THE CLERK:  Please take the stand.  Please state your full name for the record and spell your last name.

THE WITNESS:  William Kenneth Townsend, T-O-W-N-S-E-N-D.

THE COURT:  You can begin, counsel.

MR. CONOVER:  Thank you, Your Honor.

WILLIAM KENNETH TOWNSEND,

SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. CONOVER:

Q.  Agent Townsend, how are you employed?

A.  I'm sorry, sir.

Q.  How are you employed?

A.  Currently with the United States Customs and Border Protection.

Q.  How long have you been with Customs and Border Protection?

A.  Approximately three and a half years.

Q.  What did you do prior to that?

A.  I was a Special Agent for the United States Secret Service.

Q.  How long were you with the Secret Service?

A.  Approximately seven years.

Q.  In your training at the Secret Service and your training at Customs and Border Protection have you received any training in

computer forensics?

A.   Yes, sir.

Q.   What is your current title with Customs and Border Protection?

A.   Special Agent.

Q.   Okay.  Do you do a significant amount of your work dealing with computer examination?

A.   Yes, sir.

Q.   Could you describe the training you've received to become a computer forensics examiner?

A.   I travelled for about a year and a half back and forth to Virginia to guidance software and access data -- like a guided missle -- guidance software, did that for about a year and a half, received training through both of those corporate trainers.

Q.   All right.  Where are you located?

A.   Fort Lauderdale, Florida, in a city called Mira Mar.

Q.   Is that covered by the Ninth Circuit jurisdiction?

A.   No, sir.

Q.   When were you first asked to do work related to this case, United States vs Mr. Bonner?

A.   I think that was on March 27th of 2012 on or about the date.

Q.   Approximately the end of March 2012?

A.   Yes, sir.

Q.   How did you receive the information about this case?

A.   Via e-mail.

Q.   Who was that e-mail from?

A.   Our coordinator, Sidney Younger.

Q.   What were you asked to do?

A.   We were told that a case had been worked out -- was in the process of being worked in San Diego and that we were going to receive images -- forensic images and that we would complete forensic examination of those images.

Q.   Did you receive forensic images?

A.   Yes, sir, I did.

Q.   And did you begin work on forensic images?

A.   Yes, sir.

Q.   Did you receive a copy of a search warrant related to those forensic images?

A.   Yes, sir, I did.

Q.   Did you review that search warrant?

A.   Yes, sir.

Q.   Did you review the portion of the search warrant entitled Attachment B that discussed the parameters of the search?

A.   Yes.

Q.   Did you review the date and time frame for that -- the parameters of that search?

A.   Yes.

Q.   What did you understand that to be?

A.   45 days to discover if evidence was found on any of the images that I had, 120 days to complete the examination.

Q.   So you also reviewed the procedures for electrically stored evidence?

A.   Yes, sir.

Q.   And you understood there was a 45-day time period?

A.   Yes, sir.

Q.   You understood that there was a 120-day time period?

A.   Yes, sir.

Q.   Did you also understand that you were to search for certain items related to evidence of the crimes alleged?

A.   Yes, sir.

Q.   Did you understand in that search that you were limited to a date range for those documents?

A.   Yes, sir.

Q.   What did you understand that date range to be?

A.   2004 forward.

Q.   During your search did you limit your search to searching for items related to the alleged crimes that were mentioned in Attachment B?

A.   Yes, sir.

Q.   Did you limit your search to 2004 forward?

A.   Yes, sir.

Q.   Did you have conversations with Agent Phenicie regarding what items you were to be searching for?

A.   Yes, sir.

Q.   Did you have difficulty during the process of searching these devices with completing your tasks?

A.   Yes, sir.

Q.   What were those difficulties?

A.   We had software issues.  We had hardware issues with the forensic machines that we were using, as well as other things that were determined during the examination, serial numbers, et cetera.

Q.   Was that in part related to the volume of data that you were required to search?

A.   Yes, sir.

Q.   How would you describe that volume of data?

A.   Immense, tremendous, more than my machine could handle.

Q.   Did you hear of other forensic examiners having similar problems examining other electronic media related to this case?

A.   Yes, sir.

Q.   Had you heard from Agent Phenicie that they were obtaining extensions to allow more time?

A.   Yes, sir.

Q.   Did you understand those extensions to allow you more time to complete your analysis?

A.   Yes, sir.

Q.   Was that from conversations that you had related to having received the extensions?

A.   Yes, sir.

Q.   Did you continue your analysis up until approximately September of 2012?

A.   Yes, sir.

Q.   In September were you asked to come to San Diego related to a forensic examination?

A.   Yes, sir.

Q.   Were you tasked with to do when you arrived here in San Diego?

A.   My job, once I arrived here, was to look at the examinations that had been conducted by the other examiners, conduct an analysis on that, and assist the lead case agent Rebecca in determining how this information could be used for the case.

Q.   Did you obtain any software that you wanted to see if it would be -- assist you for your examination of -- in this case?

A.   Yes, sir.

Q.   Did you run that new software on any of the original images in this case?

A.   Yes, sir.

Q.   Was it required to use the original image rather than a segregated image?

A.   Yes, sir.

Q.   And did you request anything from the Regional Computer Forensics Lab here in San Diego?

A.   Yes, sir.

Q.   What request did you make?

A.   They had several images that we had provided them earlier, and I wanted copies of those.

Q.   And did they provide you with any information in response to your request?

A.   They asked us why we were requesting them.  We told them that we needed them to, you know, complete our examination.  They concern -- their concern that was brought to my attention was, You can't touch those; they are outside the 120 days.

Q.   Was that the first time that you became aware that there may be an issue with going beyond the 120 days?

A.   Yes, sir.

Q.   At that point did you speak to the case agent about this concern?

A.   Yes, for clarification on whether we were past it.

Q.   Did you then speak with individuals at the United States Attorney's Office regarding having potentially gone beyond the 120 days?

A.   Yes, sir.

Q.   What were you told?

A.   To cease and desist with any activity of the case until we obtain another warrant.

Q.   Did it become clear that you were reviewing the original images rather than the segregated images that you originally

did?

A.   Yes, sir.

Q.   Did you stop all work at that point?

A.   Yes, sir.

Q.   Had you become aware of the 120-day violation prior to that point, what would you had done?

A.   We would have stopped work.

Q.   You would have stopped work why?

A.   It is unethical, and it is outside the scope of the warrant.

Q.   At any point would in this case or any case would you have intentionally gone beyond the scope of the warrant?

A.   No, sir.

        MR. CONOVER:  Nothing further, Your Honor.

        THE COURT:  Mr. Iredale.

        MR. IREDALE:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. IREDALE:

Q.   Mr. Townsend, do you have before you an exhibit which is marked Exhibit A?

A.   No, sir.

        MR. CONOVER:  It is on the desk there, I believe, on the podium, Mr. Iredale.

        MR. IREDALE:  Thank you.

        May I approach the witness, please, Your Honor?

BY MR. IREDALE:

Q.   Now, when do you recall, Mr. Townsend, first being contacted to do some work regarding this matter?

A.   February 15th, I think we were at -- we are asked that somebody may need to come assist San Diego with a case.  We weren't told what it was, that just they may need assistance.

Q.   When you say "February 15th," February 15th of 2012?

A.   Yes, sir.

Q.   Did you come to San Diego in February of 2012?

A.   No, sir.

Q.   At some point you were asked then to do some work on -- and -- let me withdraw that question.

     Let me ask this, Was the initial thing that you were asked to do to participate in a search warrant itself, the execution of a search warrant at a home?

A.   We did not know the circumstances of what we were being asked, only that they needed volunteers.

Q.   And for whatever reason you were not able to make it for the execution of the search warrant?

A.   Correct.

Q.   Then you became involved in doing an analysis of some of the copies of items that had been seized during the execution of that warrant?

A.   Yes, sir.

Q.   And that began in the latter part of March, the last couple

days of March, and continued through May of 2012?

A.   It began the latter part of March.  The analysis continued through September.

Q.   Did you complete a report that had as a head, "Exam dates March 29th, 2012, through May"?

A.   It is possible.  I don't have that information in front of me.

Q.   Just for the purpose of refreshing your recollection --

     May I approach the witness, Your Honor?

          THE COURT:  Yes.

          THE WITNESS:  That is my report.  I believe that is a draft.

BY MR. IREDALE:

Q.   So you did a draft report that had to do with a portion of the analysis about which you've testified that was completed between March 29th of 2012 and May of 2012?

A.   Yes, sir.  During that time period we were having hardware issues, so that may be why the date has not been updated on that.  It is a draft, and we had hardware issues.  It slows down.  But there was information developed during that time period.

Q.   When you say "hardware issues," hardware issues with your own computers?

A.   The forensic computers, yes, sir.

Q.   This is the case of the shoemaker's son who has no shoes?

A.   I don't understand.

Q.   No.  Forget it.  In other words, you yourself had some problems on the computers on which you type your reports?

A.   No, sir.  Those computers are forensic computers.  Those reports are generated by the forensic software.

That information that I usually type, either on that computer or another computer, and that -- in that case I believe you are talking about the date being May.  It is just a case of me not updating the date on it because, again, it is a draft.

Q.   Now, with respect, sir, to work that you get, were you given a copy of the search warrant and the affidavit for the search warrant before you began your forensic analysis?

A.   Yes, sir.

Q.   Were you asked to read that report?

A.   I was not.  I was not asked.  I did it on my own volition.

Q.   You read the warrant?

A.   Yes, sir.

Q.   You read the affidavit?

A.   Yes, sir.

Q.   Did you read them closely?

A.   Yes, sir.

Q.   And you mentioned in your testimony that you were aware that there was a 120-day deadline from the date of seizure for the completion of the work; is that true?

A.   Yes.

Q.   And you knew that the date of seizure was on the 9th of March or thereabouts of 2012?

A.   Yes, sir.

Q.   And so tell me if I am wrong, but 120 days from that date would have been the 7th of July; is that correct?

A.   I don't know.  I didn't calculate it.

Q.   Now, did you say to us that you were told by Special Agent Phenicie that an extension had been obtained for certain other examiners to do an examination?

A.   I don't believe I mentioned that earlier.

Q.   No.  You mentioned "extension" when counsel was asking you questions, did you not?  An extension had been obtained?

A.   I don't recall.  I don't remember the testimony.

Q.   That you gave?

A.   Just five minutes ago?

Q.   Yes?

A.   Yes, sir.  I don't recall that.

Q.   Okay.  Well, you knew, did you not, that nobody had sought or obtained an extension of the 120-day deadline, did you not?

A.   I did not know that anyone had obtained an extension. There was discussion about an extension being obtained.

Q.   When you say "there was a discussion," discussion with whom?

A.   The lead agent, Phenicie.

Q.  And you?

A.  Yes, sir.

Q.  And she said that she was aware that an extension needed to be obtained or words to that effect?

A.  There was some discussion about whether -- I wasn't discussing whether it needed to be extended.  I was just merely asking, Hey, what is the status of this?  And I was told there is an extension that had been granted.

Q.  All right.  And did she tell that you that that extension had to do with the time within which the computer media could be initially imaged?

A.  No, sir.

Q.  Did she tell that you the extension was with respect to the time within which the analysis had to be completed or another request for extension filed?

A.  No, sir.

Q.  So there was some talk about an extension, but you really don't recall any details of it; is that correct?

A.  Yes, sir.

Q.  And you were never told that with respect to the 120 days that an extension had been granted by the Court; is that correct?

A.  An -- no, correct.

Q.  Now, you were asked some questions about the scope of the warrant by counsel for the Government?

A.   Yes, sir.

Q.   And as I understand it, you read the particular items that were sought to be seized before you began your analysis?

A.   Yes, sir.

Q.   And you were aware of the time limitation on the scope of the search?

A.   Yes, sir.

Q.   And in your search that you did, you attempted to adhere to that limitation I take it?

A.   Yes, sir.

Q.   So you weren't looking all the way back to 1992 or 1993. You were trying to focus the protocol for the search to pick up those documents which were within the search warrant on or after the 1st of January 2004; is that true?

A.   Yes, sir.

Q.   And so you were well aware of the scope of the search and attempted to make sure that you conformed to it?

A.   Yes, sir.

Q.   Correct.  But with respect to that 120-day deadline, did you at any point call Special Agent Phenicie and say, It is past July the 11th -- or past July the 7th, did you get an extension?

A.   No, sir.

Q.   Did you calendar that date on your calendar so that you would know the time period within which your analysis needed to

be completed under the terms of the warrant?

A.   No, sir.

Q.   Now, is it true that at some point Special Agent Phenicie told you that the US Attorney's Office wanted you to conduct an examination outside the scope of the original warrant?

A.   No, sir.

Q.   Let me put the question again.  Is it true that Special Agent Phenicie told you that the US Attorney's Office wanted forensic agents to conduct additional examination outside the scope of the original warrant?

A.   No, sir.

          MR. CONOVER:  Objection, asked and answered.

          THE COURT:  Sustained.

BY MR. IREDALE:

Q.   You wrote a report in this case?

A.   I'm sorry?

Q.   You wrote a report?

A.   Yes.

Q.   When you wrote the report, I take it you were trying to be truthful?

A.   Yes, sir.

Q.   And you were truthful in the report?

A.   Yes, sir.

Q.   Did you write in your report --

          May I approach the witness, Your Honor --

THE COURT: Yes.

MR. IREDALE: -- just for this purpose?

BY MR. IREDALE:

Q. "Subsequent to the preliminary examination of these forensic copies, Special Agent Phenicie advised that the United States Attorney's Office requested forensic agents to conduct additional examination outside the scope of the additional warrant, with respect to dates and times associated with pornographic images and videos from 2004 forward."

Is that what you wrote in your report?

A. Yes, sir. I would like to also state that is a draft report, and there was a discussion regarding the pornographic images. I didn't understand the warrant, and we had a discussion about what it is we were after, not images but dates and time stamps.

Q. Well, there is no mention of your being permitted to search for pornographic images in the warrant that you have before you; correct?

A. That is correct, sir.

Q. And so --

A. That is why I addressed the issue with the agent.

Q. Well, when you wrote this report, at least did you believe that what you were writing was true?

A. I sought clarification, and that is a draft, again. I put that together, but I sought clarification for what I was asked

to do.

Q.  Do you have a final report after this draft?

A.  I do not, sir.

Q.  So the only thing that is in writing and in existence right now concerning this conversation that you had with Special Agent Phenicie is the document that I have?

A.  I believe so, sir.

Q.  And so when you wrote this, I take it it would have been sometime in May?

A.  I don't know.

Q.  The time period you told us that is on your draft report is ending in May.  You said you weren't able to update that yet.

A.  It very well could have been.  I work on these things -- as I am doing the examination, I work on the report a little bit and go back and forth.  That is why it is a draft.  It hasn't been proof and finalized.

Q.  So Special Agent Phenicie at some point called you; is that true?

A.  Yes, sir.

Q.  Spoke to you on the phone?

A.  Yes, sir.

Q.  And said that she had talked to the Assistant US Attorneys in the case?

A.  Yes.

Q.  Did she say which one or ones she had spoken to?

A.   No, sir.

Q.   Did she say that they had decided that they had wanted you to conduct an examination outside of the scope of the additional -- of the original warrant?

A.   No, sir.

Q.   Well, that is what you wrote in your report; am I correct?

A.   Yes, sir.

Q.   So when you wrote in your report that you were asked to conduct additional examination outside the scope of the original warrant, when you wrote that down did you believe you were writing something truthful?

A.   I was looking to clarify the scope.

Q.   When you wrote it down in your report, your draft report, did you believe you were writing something that is true when you said that you were being asked to conduct additional examination outside the scope of the original warrant?

A.   At that time I believed it was outside the scope.  That is why I sought clarification.

Q.   And the clarification that you sought was through Agent Phenicie?

A.   The first time that I learned about the pornographic images was from an agent in Arizona who had spoken with Agent Phenicie.  Once the information came to me and I found out it was more in relation to dates and times as it was so much as images, I called Agent Phenicie to discuss dates and times with

her.

Q.   And did the subject matter of the fact of images --
pornographic images being outside the scope of the warrant come
up in your discussion with Special Agent Phenicie?

A.   I don't recall specifically saying they were outside the
scope of the warrant.

Q.   Well, you had read the warrant; correct?

A.   Yes, sir.

Q.   And you at least were aware of the categories of
information set forth in the warrant?

A.   Yes, sir.

Q.   It was clear to you upon that reading that there is no
mention of pornographic images?

A.   Yes, sir.

Q.   And so did you say to Special Agent Phenicie, I don't see
where it is in this warrant that I am permitted to search for
times and dates associated with pornographic images and videos?

A.   I don't recall the exact conversation.  My conversation
probably centered more about why are we searching for
pornographic images?  It is not in the warrant.

Q.   And Phenicie's response was what?

A.   We're looking for time and date stamps because I don't need
the pictures; I need dates; I need times, et cetera; it has
nothing to do with the photos.

Q.   Now, can you tell me after the -- well, did you tell her

that there was no mention of pornographic images and times and dates associated with pornographic images in the search warrant?  Did you raise that?

A.   I don't recall the specific conversation.  We did have a conversation about why we were looking for adult pornography, and I needed clarification why we were looking for that.  It is not listed in the warrant specifically.

Q.   And did she give you to understand that it had been authorized or approved by the prosecutors in the case?

A.   I was to understand that because of the dates and times that is what the focus was and that it was approved for us to continue searching for those images containing dates and times relevant to the case.

Q.   Approved by the prosecutors, although to your reading, at least, not in the warrant itself; correct?

A.   Correct.

Q.   But based on that you went beyond your reading of the scope of the warrant and did the analysis you were asked to do?

A.   I followed the direction of the US Attorney and the lead agent in the case.

Q.   Of course.  Having raised this issue and preserved in your draft report at least your belief about what the warrant in fact called for; correct?

A.   Correct.

Q.   Now, may I discuss with you the work that you did after the

7th of July?

A.   Sure.

Q.   Can you tell me how many computers you were involved in analyzing after July the 7th?

A.   I would say six images.

Q.   Six images?

A.   Yes, sir.

Q.   Total of six of them?

A.   Yes, sir.

Q.   That was it?

A.   There was -- there would have been three more, so that would have been nine after July.

Q.   Any other work that you did?

A.   No, sir.

        MR. IREDALE:  Thank you so much.  That is all I have. I appreciate it.

        THE COURT:  Any redirect, counsel?

        MR. CONOVER:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. CONOVER:

Q.   Agent Townsend, with regard to the statement of your draft report regarding outside the scope, is that your verbiage?  Did you come up with the idea that the adult images you thought were outside the scope; is that correct?

A.   Yes, sir.

Q.   And when you spoke to Agent Phenicie did she tell you that she, in fact, believed that it was within the scope of the warrant?

A.   Yes, sir.

MR. IREDALE:  Objection, leading.

THE COURT:  It is a bit leading, counsel, and so --

MR. CONOVER:  I'll rephrase, Your Honor.

THE COURT:  Please rephrase.

BY MR. CONOVER:

Q.   What did Agent Phenicie tell you about her belief about whether or not the adult pornography was within or without the scope of the warrant?

A.   It was within the scope.

Q.   And did she explain to you why she believed it was within the scope?

A.   Yes, sir.

Q.   Normally when you do a search of hard drives and you find adult pornography, is that anything that you warrant to focus on?

A.   No, sir.

Q.   In fact, had you ever focused on it before?

A.   No, sir.

Q.   Before was it something that you pushed aside as not relevant?

A.   In this type of case, yes.

Q.   And was it unusual for you to be asked to focus on the dates and times of which someone would have been accessing adult pornography?

A.   It is not -- it is not unusual to be asked about dates and times for a variety of reasons.  In this particular instance, I was asked to look at the dates and times regarding the images because they were relevant.

Q.   And once you understood the purpose of determining the dates and times of the adult pornography and how that related to the Attachment B, did you then change your conclusion as to whether or not that did fall within the scope of Attachment B?

A.   Absolutely.  After consulting with Agent Phenicie who was in direct contact with the US Attorney's Office, it was explained to me that this was authorized and this is the reason why.

Q.   And did you understand that the search was to determine the times in which an individual was accessing the pornography, not the fact that it was pornography itself?

A.   Yes, correct.

Q.   And the statement that you put in your report that Agent Phenicie had asked you to do something outside the scope, did Agent Phenicie ever use the words "outside the scope"?

A.   No, sir.

Q.   That was your conclusion of what she was asking you to do?

A.   Yes, sir.

Q.   And then after you had analyzed that conclusion, did you change that conclusion?

A.   I changed the conclusion and continued with the examination.  However, the draft report apparently was never updated.

Q.   Right.  It was just a draft report?

A.   It was a draft.

Q.   And you never finalized the report?

A.   No, sir.

Q.   Because you were asked to stop all work?

A.   Correct.

MR. IREDALE:  That would be leading as well.

THE COURT:  Sustained.

BY MR. CONOVER:

Q.   Were you asked to stop all work?

A.   Yes.

Q.   Why were you asked to stop all work?

A.   The scope of the warrant had been exceeded and determined it had been exceeded, and we were waiting on another warrant and to stop.

Q.   From the time that you started work on these drives and until the time that you stopped work, did you ever believe you were working on these warrants outside the scope?

A.   No, sir.

Q.   Did you -- and when the 120 days had passed, why did you

believe that you were not outside the scope?

A.   I did not realize the 120 days had passed, and there had been previous discussion that there had been an extension of the warrant.

Q.   Were you under the assumption --

MR. IREDALE:  Leading, going to be leading.

BY MR. CONOVER:

Q.   Were you operating under an assumption related to what had occurred regarding the 120 days?

MR. IREDALE:  Leading.

THE COURT:  I'll overrule that.

THE WITNESS:  Yes.

BY MR. CONOVER:

Q.   What was the assumption?

A.   The assumption was that we had gotten an extension based on the conversation with the case agent.

Q.   You were asked to work on six images; is that correct?

A.   Yes, sir.

Q.   And you worked on those six images up until the time that you were told to stop all work?

A.   Yes, sir.

Q.   You mentioned three other images?

A.   Yes, sir.

Q.   What did you do on the those images?

A.   Those were operating systems, and once further discussion

with the case agent had determined that we were again looking for dates and times of relevant activity, we ran this test software that I brought to test it, to see if it would assist in determining dates and times for the Internet traffic on those.

Q.   Was that in September of 2012?

A.   Yes, sir.

Q.   When you came out here?

A.   Yes, sir.

Q.   To the extent of your work on those three images, was it simply running the test software to see if it would work?

A.   Yes, sir.

Q.   Did you actually do any analysis with that test software?

A.   Yes.

Q.   But then did you stop the work once you had run to see if it would actually appropriately work on that software?

A.   Yes, sir.

Q.   And so did you complete any analysis with regards to those three items?

A.   No, sir.

Q.   So you simply tested the software?

A.   Yes, sir.

        MR. CONOVER:  Nothing further.

        THE COURT:  Mr. Iredale.

        MR. IREDALE:  Yes.

RECROSS EXAMINATION

BY MR. IREDALE:

Q.   Mr. Townsend -- or Special Agent Townsend, when you speak about "images," by the way, you are talking about the imaged computer data, which can have thousands or millions of pieces of data within it?

A.   Correct.

Q.   So in other words, you used the images, but the word "image" you meant to mean not a single image like a picture but the imaged hardware -- software or hardware device, the computer data device that had been copied in its entirety?

A.   Right.  It would be the hard drive out of whatever piece of evidence that it was that had a forensic image taken.

Q.   And as I understand it, you did some work on nine separate images?

A.   Yes, sir.

Q.   And six of those images, did you do an analysis of six of those computer data images?

A.   Six of the images that we were looked at came off of portable media storage.  Three of those came off of operating systems from computers.

Q.   And can you to tell me, you did a complete analysis of those?

A.   I did a complete -- I never finished my analysis of the six or the three.

Q.   You did a partial analysis?

A.   I did a test on the three, and I did a partial analysis on the six.

Q.   During the time period between July the 7th and when you were told to stop working, how many hours did you spend working on this case, best estimate?

A.   From July 7th forward?

Q.   Yes.

A.   I have no idea, sir.  I spent some long hours on it.

Q.   Would it be fair to say a couple hundred hours?

A.   I couldn't quantify.  I don't know.  I know I spent many, many hours because of the hardware failures.

Q.   Now, during that time period between the 7th of July and sometime in mid-September, you had many conversations with the case agent I take it?

A.   Yes, sir.

Q.   Shared with her what you were finding during the course of your analysis?

A.   Yes, sir.

Q.   Told her what you were seeing during the course of your analysis?

A.   Yes, sir.

Q.   With respect to pornographic images, as well as with respect to documents and other items; correct?

A.   Yes, sir.

Q.   And by the way, with respect to that, you said, as I understand it, you were asked to focus on the issue of dates and times with respect to pornographic images?

A.   Dates and times, period, in all instances, because, again, we were talking about the scope of the warrant, 2004.

Q.   Let me ask you a question, when somebody is downloading something from the Internet can they be working on another window or portion of their computer on a second item?

A.   Absolutely.

Q.   That is quite common?

A.   Yes, sir.

Q.   So the fact that you are, for instance, downloading pornography from the Internet does not mean that you can't be at the very same time on a different window typing a memo for business; correct?

A.   Yes, sir.

Q.   All right.  Do you have any notes regarding the information that you were conveying to Special Agent Phenicie during this time period from July the 7th until mid-September?

A.   There is some e-mails.

Q.   And they've been turned over as far as you know?

A.   As far as I know.

Q.   And did she use your information, if you know, to obtain a new warrant later on in November of 2012?

        MR. CONOVER:  Objection, calls for speculation.

THE COURT:  That would be speculative, Mr. Iredale. How would he possibly --

MR. IREDALE:  Let me rephrase the question.  I take the objection.

BY MR. IREDALE:

Q.  Did she tell you she would need some information from you in order to obtain a new warrant?

A.  I don't -- I don't believe so, sir.

Q.  Did you see the new warrant application in November?

A.  No, sir.

Q.  Were you asked to do any work after you stopped your analysis in mid-September 2012?

A.  No, sir, just turn over my notes and -- for discovery.

Q.  Now, you were not the case agent in this case?

A.  No, sir.

Q.  I take it that you were relying on the case agent to give you guidance with respect to any deadlines that were imposed by the warrant?

A.  Yes, sir.

Q.  You were trusting that you would be given accurate information by the case agent?

A.  Yes, sir.

Q.  And you relied on the case agent's action or inaction in that regard regarding your own conduct; is that correct?

A.  Absolutely.  I had discussions numerous times.

Q.   At any point did she say, Look, I wrote the affidavit that suggested these computer procedures, and I said to the magistrate judge there should be a 120-day deadline absent a request for further extension?  Did she ever tell you that?

A.   I don't recall a conversation about that.

Q.   Had she told you, Hey, the 120 days is up, stop, you would have stopped; right?

A.   Absolutely.

Q.   Because you were sensitive, of course, to the scope of the warrant?

A.   Yes, sir.

Q.   And to the restrictions that were imposed by the warrant on your conduct?

A.   Yes, sir.  The ethics behind the whole warrant is, is that if you are told to stop, you stop, you don't go outside the scope.

Q.   And likewise, if you have the warrant and it says something, you are supposed to conform your conduct to what the Court order says?

A.   Yes, sir.

Q.   Yes.  Thank you so much.

A.   Yes, sir.

MR. IREDALE:  I have no further questions for Mr. Townsend.

MR. CONOVER:  Nothing further.

THE COURT: May the witness be excused?

MR. CONOVER: Yes.

MR. IREDALE: Yes, Your Honor.

THE COURT: You may step down, agent. Thank you, sir.

All right. Counsel, there is one additional examiner that could not be with us today; is that right?

MR. HUIE: There is, Your Honor. Her name is Special Agent Karen Everly. She is out of Houston. We were informed last week that her husband is in a catastrophic medical situation. She believed him to be near death. I think his condition has improved, but he's hospitalized in intensive care, and I think the best estimate is that he will be out in two to three weeks, if all goes well.

So to the extent that there is a further hearing for her, we respectfully ask for a month or more.

THE COURT: How about May 30th at 1:30?

MR. IREDALE: That will be fine with us, Your Honor.

MR. HUIE: That is fine. Thank you, Your Honor.

THE COURT: So we'll schedule it for May 30th at 1:30. So we'll see you back for the continuation of the hearing.

MR. IREDALE: Thank you very much.

MR. HUIE: Thank you.

MR. CONOVER: Thank you, Your Honor.

THE COURT: You're welcome.

(Proceedings concluded at 10:53 a.m.)

---oOo---

C-E-R-T-I-F-I-C-A-T-I-O-N

I hereby certify that I am a duly appointed, qualified and acting official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

DATED:  May 8, 2013, at San Diego, California.

/s/ Melinda S. Setterman
_____
Melinda S. Setterman,
Registered Professional Reporter
Certified Realtime Reporter