UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,                    .
                                             .
        Plaintiff,                           . No. 12-CR-3429-WQH
                                             .
            v.                               . June 26, 2013
                                             .
TERENCE J. BONNER,                           . 10:00 a.m.
                                             .
        Defendant.                           . San Diego, California
. . . . . . . . . . . . . . . . . . .  .


TRANSCRIPT OF EVIDENTIARY HEARING, Vol. 2
(Re: Suppress Evidence Obtained as a Result of Warrant)
BEFORE THE HONORABLE WILLIAM Q. HAYES
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                          BY:  ROBERT S. HUIE, ESQ.
                               W. MARK CONOVER, ESQ.
                          880 FRONT STREET, ROOM 6293
                          SAN DIEGO, CALIFORNIA 92101

FOR THE DEFENDANT:        IREDALE & YOO, APC
                          BY:  EUGENE G. IREDALE, ESQ.
                          105 WEST F STREET, FOURTH FLOOR
                          SAN DIEGO, CALIFORNIA 92101




Court Reporter:           Melinda S. Setterman, RPR, CRR
                          USDC Clerk's Office
                          333 West Broadway, Room 420
                          San Diego, California, 92101
                          melinda_setterman@casd.uscourts.gov

Reported by Stenotype, Transcribed by Computer

INDEX

TESTIMONY:

WITNESS:                    EXAMINATION BY:                        PAGE:

Kerin Eberle

Direct Exam by Mr. Conover............4
Cross Exam by Mr. Iredale.............14
Redirect Exam by Mr. Conover.........32
Recross Exam by Mr. Iredale..........34

* * * *

SAN DIEGO, CALIFORNIA, JUNE 26, 2013, 10:00 A.M.

* * * *

THE CLERK:  Number two, case 12-CR-3429, United States of America vs Terence Bonner on for evidentiary hearing.

MR. CONOVER:  Good morning, Your Honor.  Mark Conover and Robert Huie for the United States.

THE COURT:  Good morning.

MR. IREDALE:  Good morning, Your Honor.  Eugene Iredale for Mr. Bonner, who is present before Your Honor in custody.

THE COURT:  All right.  Out of custody.

MR. IREDALE:  I'm sorry.  I have a bad cold.  He is on bond.

THE COURT:  Okay.  Thank you.  Counsel, the matter is on for the continuation of the evidentiary hearing.  Is there one additional witness today?

MR. CONOVER:  Yes, Your Honor.

THE COURT:  All right.  Do you want to call the witness?

MR. CONOVER:  Yes, Your Honor.  The United States calls Kerin Eberle to the stand.

THE CLERK:  Please raise your right hand.

(Oath administered.)

THE WITNESS:  I do.

THE CLERK:  Please take the stand.  Please state your

full name for the record and spell your last name.

THE WITNESS:  Kerin Blair Eberle Farrell.  Eberle is E-B-E-R-L-E.

THE COURT:  You may continue.

MR. CONOVER:  Thank you, Your Honor.

KERIN EBERLE,

SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. CONOVER:

Q.  Ms. Eberle, where you employed?

A.  Customs and Border --

THE REPORTER:  Wait, wait.

THE COURT:  Speak a little bit slower.

THE WITNESS:  Customs and Border Protection, Office of Internal Affairs, Houston Field Office.

BY MR. CONOVER:

Q.  Could you please describe briefly your background and your training and experience that you received prior to coming to work at Customs and Border Protection Internal Affairs.

A.  Yes, sir.  I attained Elon College in North Carolina where I double majored in biology and psychology; double minored, in chemistry and computers.

I joined the Food and Drug Administration in 1988 where I became a Special Agent with their office of criminal investigations.  There I did white collar fraud cases, drug

diversion, investigational new device exemption, fraud cases, and a variety of other cases through August of 2007, at which point I took the appointment at Customs and Border Protection in Houston.

Q.   How long were you with FDA?

A.   18 years, 8 months.

Q.   And you came to work for CBP-IA in 2007?

A.   Yes.

Q.   You've worked there since?

A.   Yes.

Q.   Can you describe any training and experience that you have received at CBP-IA regarding your current position as a forensic examiner?

A.   I have attended in-service training for all computer forensic examination specialists for the Department of Homeland Security.  I have attended a variety of classes offered by Guidance Software, the manufacturer of EnCase forensic software.

Q.   How many years of experience do you have dealing with forensic examinations?

A.   I took my first class in computer forensic examinations in 1990, so this would be 22 years, 23 years.

Q.   Thank you.  As part of your job duties do you regularly review search warrants and conduct and carry out searches of electronic data?

A.   Yes, I do.

Q.   In February of 2012 did you first become aware of an investigation into an individual by the name of Mr. Terence Bonner?

A.   I did not know the subject of the case.  I did know that there was a search warrant that would be executed in California and that computers were likely to be involved.

Q.   Okay.  When did you first receive any sort of tasking regarding this case?

A.   In March of that year.

Q.   March of 2012?

A.   Yes.

Q.   And how did you receive that information?

A.   I was tasked with examining three laptop computers by e-mail.  The e-mail was sent by Sidney Younger, Special Agent and Digital Electronic Forensics program coordinator out of Washington.

Q.   All right.  And you were asked to analyze three laptops; is that correct?

A.   Yes.

Q.   Was one a Dell?

A.   A Dell, yes.

Q.   Was one a Vaio?

A.   Yes.

Q.   And was one a Compaq?

A.   Yes.

Q.   And prior to receiving the images for those laptops, did you receive an e-mail with a search warrant?

A.   Yes.

Q.   Was that a search warrant for Mr. Bonner's home?

A.   Yes.

Q.   And did you review that search warrant?

A.   Yes.

Q.   Did you read the entire warrant?

A.   Yes, I did.

Q.   Did you read the protocol section describing the electronic protocol procedures?

A.   Yes, I did.

Q.   Did you read the Attachment B describing the limited aspects of what you were to be searching for?

A.   Yes, I did.

Q.   All right.  On approximately March 29th, 2012, did you receive a hard drive in the mail?

A.   Yes, I did.

Q.   Did that hard drive contain three images of laptops?

A.   Yes, it did.

Q.   Was that the images of the three laptops that you were assigned to review?

A.   Yes, it was.

Q.   And at some point did you begin reviewing and analyzing

those three laptops?

A.   Yes, I did.

Q.   And prior to analyzing those laptops, did you construct a protocol and search terms for how you would analyze the laptops?

A.   Yes.  A key word list was developed.

Q.   How did you go about developing that key word list?

A.   A memorandum had been e-mailed to the forensics specialists handling these computers that were seized.  I drew key words from that list, and that is where I started the key word searching of these computers.

     I then went through the search warrant and verified the key words, matched that with what the warrant was, pulled anything else that appeared to be of interest.  And as it processed from the results I was gathering, I would search and find more key words, and the Special Agent over the case, Rebecca Phenicie, also provided additional key words.

Q.   Did you limit your search to the parameters of the search warrant?

A.   Yes, I did.

Q.   Did you limit your search to a particular date range?

A.   Yes, I did.

Q.   What was that date range?

A.   2004 through the date of the warrant.

Q.   Why did you choose that date range?

A.   That is what was in the warrant.

Q.   Throughout your search did you take time to extract data from the original images you were provided into a separate file of what was considered relevant or responsive to the search warrant?

A.   Yes, I did.

Q.   At some point did you leave on vacation?

A.   Yes, I did.

Q.   What day approximately did you leave on vacation?

A.   June 22nd, 2012.

Q.   Prior to leaving on vacation had you completed your extraction work of the Dell?

A.   Yes, I did.

Q.   Prior to leaving had you completed your work on the Sony Vaio?

A.   I do not believe that I had completed that, no.

Q.   Did another individual take over and complete that work for you while you were on vacation?

A.   Yes.

Q.   You completed your work on the Compaq?

A.   Yes.

Q.   Was it determined that you would do a full analysis of that laptop or was another decision made?

A.   On the Compaq?

Q.   Yes.

A.   The examination on the Compaq was stopped.

Q.   Why was it stopped?

A.   Because all evidence indicated that the Compaq belonged to Mr. Bonner's son.

Q.   So a determination was made that it was not being used by Mr. Bonner?

A.   Correct.

Q.   So the search was stopped?

A.   Yes.

Q.   How long were you on vacation for?

A.   June 22nd is the day I left for vacation, and I returned on or about July 18th.

Q.   When you returned on July 18th, did you re-access the original image for the Dell?

A.   The image was opened as a part of the EnCase software. That is how it handles it.  I opened it for the purpose of generating a software driven report which provides verification information.

Q.   Was that on July 20th, 2012?

A.   Yes.

Q.   So for the purpose of re-accessing it was to just generate a report?

A.   Yes.

Q.   Did you also re-access it on July 31st, 2012?

A.   Yes, I did.

Q.   What was the purpose of re-accessing it on that date?

A.   I was requested to go in and pull registry information to determine if certain external hard drives had been attached to the commuter at any given time.

Q.   So upon your return from vacation you re-accessed the Dell on two days, one to run an EnCase report?

A.   Yes.

Q.   Which basically pulls the auto-generated serial numbers and things like that?

A.   Yes.

Q.   And once to determine whether or not external hard drives had ever been attached to that Dell computer?

A.   Yes.

Q.   At any point after your vacation did you extract additional data or pull additional information that would have been responsive to the search warrant?

A.   No.

Q.   You completed that before you left on June 22nd?

A.   Yes.

Q.   With regards to the Sony Vaio, on July 31st, similar to the Dell, did you re-access that image to determine the registry information?

A.   Yes.

Q.   Solely for the purpose of determining whether or not it had been hooked up to the laptop?

A.   If external hard drives had been hooked up to that laptop, yes.

Q.   Thank you.  In regards to the Compaq, did you re-access it on July 20th, 2012?

A.   Yes.

Q.   Was that for the purpose of checking the Internet history?

A.   Yes, it was.

Q.   So to be clear, upon your return from vacation did you re-access any of the original images for those three laptops for the purpose of extracting additional data?

A.   Not for the purpose of extracting additional data, no.

Q.   When did you become aware of the fact that there had been a violation in this case of the 120-day period for extraction of data?

A.   In March of this year.

Q.   March of 2013?

A.   Yes.

Q.   And how did you become aware?

A.   Agent Phenicie e-mailed and requested that I call her, and at that time she explained it to me.

Q.   All right.  Was that in preparation because there was a hearing set regarding the 120-day violation?

A.   Yes.

Q.   All right.  And prior to that time had you been aware that you were limited to 120 days to access the original image?

A.   No.

Q.   But yet you had reviewed the search warrant; is that correct?

A.   Yes.

Q.   You had reviewed the protocol section?

A.   Yes.

Q.   Do you practice in the Ninth Circuit generally?

A.   No.

Q.   And the circuit that you practice in is there a similar 120-day time period to complete extraction of data?

A.   No.

Q.   Had you been aware of the 120-day period and that it expired on July 7th, 2012, would you have re-accessed the original images after your returned from vacation?

A.   No.

Q.   Why not?

A.   Because that would have been in violation of the warrant.

       MR. CONOVER:  Thank you.

       THE COURT:  All right.  Mr. Iredale.

       MR. IREDALE:  Thank you, Your Honor.

       May I, with the Court's permission, re-mark the search warrant and the application for the search warrant?

       THE COURT:  Yes.

       MR. IREDALE:  And may I just -- we'll mark those as F and G respectively.

And with the Court's leave, may I approach?

THE COURT:  Yes.

CROSS EXAMINATION

BY MR. IREDALE:

Q.  Ms. Eberle, you have before you a couple of documents.  One is marked F, and the second is marked G.  F is a copy of the search warrant.  That is the document that you reviewed?

A.  Yes, it is.

Q.  Now, that document called for certain discrete information to be searched for a period from January 1st, 2004, to the present according to the warrant; am I correct?

A.  Yes.

Q.  And the specifics of the documents included bank and financial records?

A.  Yes.

Q.  Business and personal expense records?

A.  Yes.

Q.  Records relating to activities and whereabouts?

A.  Yes.

Q.  Including diaries, date planners, calendars, appointment books, phone and call records, and correspondence?

A.  Yes.

Q.  Documents to identify dominion and control of the computer or the place where the computers were seized from?

A.  Yes.

Q.   And then correspondence between various persons?

A.   Yes.

Q.   And finally cash and documents related to cash?

A.   Yes.

Q.   And those were the specific items that were permitted to be searched for in the search warrant that you reviewed?

A.   In addition to below where it includes electronic media, yes.

Q.   Nowhere in there does it include in there pornographic image; am I correct?

A.   No, you are not.

Q.   Would you point out to me where it says included in the search warrant are pornographic images?

A.   On page two of Attachment B, line item number three, "stored photographs, videos, and text messages."  Pornographic images are stored photographs and videos.

Q.   Forgive me, ma'am, but that refers, does it not, to the cellular telephone and other storage devices, such as SIM card and flash memory devices?

A.   Other storage devices would include any form of electronic storage media, which does include computer hard drives.

Q.   So you read "stored photographs" to involve pornographic images?

A.   Images are photographs and videos, yes.

Q.   And so as you read the warrant you were permitted to search

for any photograph of any kind in any of the computers that you analyzed?

A.  Within the date period specified.

Q.  Yes.  All right.  Now, you also told us that you reviewed the application and the affidavit for the search warrant, which is before you as Exhibit G; is that correct?

A.  I will verify that this is the same document.

This does appear to be the document that I reviewed.

Q.  Let me refer you, if I could, to page 14.  Did you read page 14?

A.  Yes, I did.

Q.  And on page 14 it notes that the personnel conducting the identification and extraction of data will complete the analysis within 120 days from the date of seizure pursuant to this warrant absent further application to this Court.

A.  Yes.

Q.  Did you read that at the time?

A.  Yes.

Q.  And were you aware of that 120-day deadline?

A.  If I read it, I was aware of it, and I read it.

Q.  Now, in fact, after you were asked to assist with the analysis, at some point in April you were requested to look for pornography; am I correct?

A.  Yes.

Q.  And that was on the 17th of April of 2012?

A.   I don't recall the exact date.

Q.   Let me ask you this, in preparation for today's testimony did you prepare a chronology to refresh your recollection concerning certain events?

A.   Yes, I did.

Q.   Do you have that with you?

A.   No, I do not.

Q.   Would it refresh your recollection to review that?

A.   Certainly.

Q.   And may I ask, when did you prepare your chronology?

A.   Sometime in the month prior to April 14th.

Q.   Before April 14th?

A.   Yes.

Q.   Of this year?

A.   Of this year.

        MR. IREDALE:  May I approach, Your Honor?

        THE COURT:  Yes.  Is that marked?

        MR. IREDALE:  Yes.  I am marking as H, a two-page document.

BY MR. IREDALE:

Q.   Is that a copy of the chronology that you prepared?

A.   Yes, it is.

Q.   And when you prepared it, I take it you were trying to prepare an accurate chronology?

A.   Yes.

Q.   With a truthful rendition of the events so that you would be able to use it to refresh your recollection?

A.   Yes.

Q.   Now, on the 17th of April of 2012 you were requested to look for pornography; am I correct?

A.   Yes.

Q.   And that request was made to you by Leonard Platt?

A.   No.

Q.   Len -- it says, "Len explained."  Who is Len?

A.   Leonard Platt and I were discussing it.  He did not make the request.

Q.   Who made the request?

A.   I don't recall.  I would have to speculate.

Q.   Well, I don't want you to speculate.  Who had you discussed the computer search with other than Leonard Platt up to that point?

A.   With a number of agents.

Q.   And who are they?

A.   That would be Special Agent Sidney Younger, Special Agent William Townsend, Special Agent Charles Porth, Special Agent Rebecca Phenicie, and that is what I can remember off the top of my head.

Q.   And you don't remember which one of those agents asked you to look for pornography?

A.   It would be speculation.  I don't recall the exact -- I

know who I would believe it to be, but again, that is speculation.  That is not fact.

Q.  Well, I don't want you to speculate.  I am sure that we don't want that.  But do you recall Special Agent Phenicie asking you to do that?

A.  And that would be speculation.  I don't recall exactly who it was.

Q.  Now, when you were requested to look for pornography, were there any other specifications of the pornography that you were to look for?

A.  Could you clarify your question?

Q.  Yes.  Were you just asked, Would you look for pornography?  What was the request that was made of you?

A.  It would be to look for pornographic images as the pornographic images would have shown what Mr. Bonner was doing on his computer at that given hour.

Q.  And you don't remember who -- well, I won't press that.

Now, were you given any written instructions in that regard?

A.  I don't recall.

Q.  Now, you wrote on your chronology the following, "Len explained how -- explained how we had limited the scope of our initial investigation to the, quote, items to be searched part of the warrant, and explained that there was no way these additional searches could be done in the 90 days required."

Is that what you wrote in your chronology that you prepared?

A.   It was a copy paste, and yes, it is what I put in my chronology.

Q.   I'm sorry.  You said it was a "copy paste"?

A.   Yes.

Q.   From where did you copy and paste that insertion?

A.   From an e-mail that Special Agent Platt sent to me.

Q.   So he sent you something that said we have up to now limited our search to the items to be searched for that are set forth in the search warrant or words to that effect; correct?

A.   Yes.

Q.   And now he wanted you to go beyond the items to be searched part of the warrant and do another search; correct?

A.   No.

Q.   Well, did he say to you that those additional searches were searches which could not be done in the 90 days required?

A.   That is what he wrote, yes.

Q.   And did you agree with that?

A.   No.

Q.   You felt it could be done within the 90 days?

A.   I was not as concerned about the time frame as the fact that it was part of the warrant and it was covered.

At that time we had been focusing more on the documents that were created than on the images that were stored, and that

is where the focus had been.

Q.   All right.  So your concern was that pornographic images might not be within the scope of the warrant.  Is that what I detect from your answer, ma'am?

A.   No, not at all.

Q.   Well, did you -- did you write in your chronology, "I also explained that if they wanted to expand the warrant to include this kind of a search, they would have to get the judge to authorize more time."  Did you say that in your chronology?

A.   That is part of my cut and paste.  That is what Len wrote.

Q.   That is what Len wrote?

A.   Yes.

Q.   So did you just say in response to counsel that you were completely unaware that there was a time limitation on the forensic search that was to be done in this case?

A.   The only time limitation was that I was working under was that they wanted to have an indictment in July.  They wanted everything done.  I missed the 120-day.  I readily acknowledge that I missed it, and in missing it I made a mistake.  I cannot go back go back and correct a mistake and has already been made.

Q.   Ma'am, I am not attempting to rebuke you at all.  I am just asking the question.

The question is, Did you say in response to counsel's questions that you were not aware that there was a time

limitation set forth in the warrant and the application for your search?  That is all.

Do you understand the question?

A.  I do.  And my answer stays constant.  When I did the exam, I was not aware of the 120-day limitation to have everything -- to have the identification and extraction of data completed.

Q.  All right.  And that answer you said remains constant?

A.  Yes.

Q.  Remains the same, yes?

A.  Yes.

Q.  Remains constant even though you tell us that you read the search warrant application which said that the personnel conducting the extraction of data will complete the analysis within 120 days from the date of the seizure pursuant to this warrant absent further application to the Court; correct?

A.  Yes.

Q.  Your answer that you did not know of the deadline remains constant even though you are cutting and pasting from Leonard says that it was explained that there was no way these additional searches could be done in the 90 days required; correct?

A.  It was his opinion, yes.

Q.  Well, I am not focusing on his opinion.  I am focusing on the issue of the deadline, ma'am.  Despite the fact that he said that we will have to get a judge to authorize more time,

you are telling us that you were not aware that there was a deadline within which you must do your analysis?

A.   You keep reading a cut and paste from Len's e-mail, which is Len's opinion, not mine.

Q.   Yes, ma'am.  I was just asking whether you were aware of Len's opinion that there would be a necessity to get a judge to authorize more time in April whether that influenced your understanding that there was, in fact, a deadline within which you had to work?

A.   No.  His opinion did not influence my understanding at all.

Q.   All right.  Well, when he e-mailed to you that if, quote, "If they wanted to expand the warrant to include this kind of a search, they would have to get the judge to authorize more time."

When you read that, did you ask Mr. Platt what in the world he was talking about?

A.   I don't recall what my response was to Len's e-mail.

Q.   Did you e-mail him back in response to his e-mail?

A.   I may well have.

Q.   Now, according to your chronology does -- some more on the entry for the 17th of April, it says in your chronology, "Rebecca stated I am working with the AUSAs to ask for an extension on the SW, return of the digital electronics, and will let everyone know as soon as possible."

That is also in your chronology that you wrote in

preparation for your testimony; correct?

A.   Again, I copied and pasted, but yes, it is in my chronology.

Q.   So your answer that you were unaware of any deadline remains constant even though Rebecca stated that she was working with the assistant US Attorneys to ask for an extension on the search warrant?

A.   The request for extension on the search warrant covered requesting additional 60 days for imaging of hard drives.

Q.   And you are saying that you were unaware that there was a deadline for the analysis, ma'am?

A.   My answer has not changed.  The extension for the search warrant dealt with imaging of hardware, not on analysis.

Q.   Did you ever review the search warrant after that first review when the search warrant and application were e-mailed to you?

A.   Yes.

Q.   And did you ever re-review the language concerning the 120-day deadline?

A.   Yes.

Q.   How many times did you review the language concerning the 120-day deadline for the identification and extraction of data after you first received the warrant?

A.   Once about three months ago and once in the past week.

Q.   Now, let's go, if we could, to your entry for 6/22/12.

A.   Yes.

Q.   It says, "Spoke with Rebecca."  That means you spoke with Rebecca Phenicie?

A.   Yes.

Q.   "The deadline is to return the originals, not to have the exams done."  Is that what you wrote?

A.   Yes.

Q.   Now, let's go, if we could, to the entry of July the 20th of 2012.  It says, "Rebecca," and then dash, "in order to execute the search warrant in the Southern District of California and to let the HSI agent work this aspect of the investigation, I need to have the images that will be searched once the search warrant is signed here in this area."

     Let me ask you first, did I accurately read from your chronology?

A.   It appears to be so, yes.

Q.   Are you summarizing something that Rebecca Phenicie said to you in July of last year?

A.   That is, again, a copy paste from an e-mail.  That would be a quote.

Q.   From her to you?

A.   Yes.

Q.   So she was talking about executing a warrant in the Southern District of California.  This was an additional warrant in addition to the warrant that you had been shown?

A.   Yes.

Q.   Were you ever given a copy of that additional proposed warrant?

A.   There was no need for me to have it, so I did not receive it.

Q.   Was there an additional warrant that was signed?

A.   I do not know.

Q.   Now, let me ask you, ma'am, between the time that you began your analysis and the date of July the 20th of 2012, did you examine images of pornography?

A.   I saw that they existed on the computers, and I extracted them.

Q.   How many did you examine yourself?

A.   How many images did I find?

Q.   Yes.

A.   I would estimate thousands.

Q.   And did you yourself examine the images one by one at any point?

A.   Did I look at them?  Yes.

Q.   Yes.  How many hours did you spend in looking at pornographic images that you extracted from the computer?

A.   I have no idea how many hours it would have been.

Q.   Would it have been more than 20?

A.   It may have been.

Q.   Would it have been more than 40, more than a week's time?

A.   I didn't keep track on the hours spent looking at the pornography on that computer.

Q.   Could it have been as many as three or four weeks of your time that you spent looking at pornographic images, ma'am?

A.   No.

Q.   So more than one week less than three weeks, would that be a fair estimate?

A.   I would not be able to give an estimate.

Q.   That would be speculation you feel?

A.   I didn't keep track on the amount of time I spent looking at the images.  I simply identified them, marked them, and exported them.

Q.   And you viewed them as well?

A.   Yes.

Q.   And what were you viewing them for, ma'am?

A.   They were images on the computer.  They were stored photographs, stored images, stored video files.  I looked at them because the warrant said I should.

Q.   Well, the warrant mentions pornography nowhere, does it, ma'am?

A.   It mentions images.

Q.   It mentions images.  Were there other photographs of Mr. Bonner with his family on picnics that you examined?

A.   There were family photos.  I don't know if they were on picnics.

Q.   Did you extract those?

A.   They were not relevant to the case.

Q.   I see.  Well, as you read the warrant you could have extracted any photograph at all on the computers within the scope of the warrant as you read it; right?

A.   Yes.

Q.   Now, by the way, let me just ask if I can refer you, again, to that warrant itself, the Attachment B, items to be seized, and I don't want to press you on the semantic point, ma'am, but let me ask you if, in fact, the language on page two that we were looking at refers to cellular telephone devices and any storage devices such as SIM cards or flash memory devices attached to, inserted in, or seized with the device as being the devices which referred to stored photographs.

Do you understand my question?

A.   I understand what you read from the warrant.  I don't understand that you made a question in there.

Q.   Oh, well, I hope you'll forgive me.  Let me see if I can frame it better, more to your liking.

The paragraph refers to a search that may be done on a cellular phone or a device associated with a cellular phone; correct?

A.   It says with any storage devices.

Q.   "Cellular telephone device and any storage devices such as SIM cards and flash memory devices attached to, inserted in, or

seized with the device."  Did I read properly?

A.   It reads such as and gives two examples.  It does not say exclusive to.

Q.   All right.  Did you have a discussion or a debate with anyone about whether these pornographic images that you spent some time, you don't remember exactly how much, reviewing were within the scope of the warrant?  Did you ever raise that issue with anyone?

A.   No.

Q.   Now, by the way, with respect to this additional reference to a search warrant in the Southern District of California in July, was there ever a second search warrant signed that would permit a search for pornographic images of any kind, to your knowledge?

A.   I don't know what happened on that one.

Q.   I'm sorry?

A.   I don't know what happened on that one.

Q.   How many hours after the 7th of July did you spend working on this case?

A.   I don't keep track of cases by hours.

Q.   Well, I understand that, but let me see if I could just ask you for an estimate.  Would it be more or less than 100 hours that you spent after the 7th of July doing work on this case?

A.   I don't know.

Q.   Could it have been as much as 200 hours of time that you

spent after the 7th of July?

A.   200 hours would have been quite a few weeks of direct work on that with no work on anything else, and I would say that is excessive.

Q.   All right.  Then let me press your memory to this extent, how many hours, best estimate, did you work on the analysis in this case after the date of the 7th of July 2012, just your best estimate, ma'am?

A.   I can't give you a best estimate because I do not track that kind of data.

Q.   Well, but you have no -- even no vague recollection as to whether it would be more or less than two weeks?

A.   Well, do you mean two weeks of continual 40-hour-work, 50-hour-work weeks?

Q.   Yes, ma'am?

A.   I would not have been working exclusively on this for any two-week period.

Q.   I appreciate that, ma'am, but all tolled, all tolled, can you give me an estimate at least as between 80 hours to 100 hours to 200 hours?

A.   No, I can't.  In good faith I cannot.

Q.   In good faith you cannot?

A.   No.

Q.   Well, forgive me, you didn't mean to leave the impression that the work that you did in forensic analysis on this matter

96

was merely de minimis after the 7th of July of 2012, did you?

A.   De minimis, no.   I gave it the attention I needed to give it, and I continued doing other jobs at the same time.

Q.   And you prepared reports after that time?

A.   Yes.

Q.   And you -- what other work did you do on the case, after the 7th of July of 2012?

A.   Verified some Internet history, pulled some registry information, and wrote the report on the Dell.

Q.   And in writing the report, did you refer back to the extracted data or go back into the media to make sure you were accurate?

A.   When I export files, I also export at that time all relevant data, metadata related to the file, so I would not have gone back in to look at the files that were extracted.

     The one time I went back to go into the computer, I went to pull an EnCase report which provides hard drive, make, model, serial number, operating system, hash information for verification on the image.

Q.   And when did you complete your analysis, ma'am?

A.   The analysis insofar as the extraction and the thorough review was done on the Dell before I left for vacation.

Q.   On the Dell.   And then on the Vaio?

A.   The Vaio was completed by Special Agent Porth.

Q.   And do you know whether or not that was completed before or

after the 7th of July?

A.   I do not know.

Q.   And the other computer, the Compaq computer, that belonged you said you believed to Mr. Bonner's son?

A.   Yes.

Q.   And when did you first make that observation that the Compaq belonged to his son?

A.   I don't recall the date.

Q.   Can you give me an estimate as to the month?

A.   Sometime between April and June.

Q.   And how long had you been working in the computer before you came to that determination?

A.   I don't recall.

Q.   Well, would it have been more or less than ten hours for instance?

A.   I truly don't recall, so I would not be able to answer the question.

Q.   And you don't keep track of your work by hours?

A.   No.

        Mr. IREDALE:  Well, I won't tax your memory any further.  Thank you so much, ma'am.

        THE COURT:  Mr. Conover.

                    REDIRECT EXAMINATION

BY MR. CONOVER:

Q.   Ms. Eberle, the deadline that was referenced in the e-mail

that you created in you timeline, did you understand that deadline to be the deadline for imaging and returning of the devices?

A.   I had no idea what he was referring to with that 90-day deadline.

Q.   All right.  With regards to the deadline that Ms. -- you said that Ms. Phenicie mentioned to you, you stated the deadline is to return the originals.  By "originals" did you believe that was the original hard drive devices?

A.   Yes, the original media.

Q.   In fact, was there an extension granted that allowed more time to access and image the originals?

A.   I know that the application for a warrant was in process. I don't know that it was ever completed because the original -- the imaging of the original devices had been completed in my opinion.

MR. CONOVER:  Thank you.  Nothing further, Your Honor.

THE COURT:  Any other questions, Mr. Iredale?

MR. IREDALE:  Your Honor, may I just have a moment? Would it be inappropriate for me to ask for a brief recess just for five minutes so that I could make sure that I've reviewed my notes, and I apologize.

THE COURT:  All right.  We'll be in recess for five minutes.  Thank you.

(Recess ensued from 10:47 a.m. to 10:50 a.m.)

THE COURT:  Any additional questions, Mr. Iredale?

MR. IREDALE:  Yes, Your Honor.

RECROSS EXAMINATION

BY MR. IREDALE:

Q.  Ms. Eberle, after the 20th of July of 2012, did you do some work in order to verify a serial number of the Eudora HD and registry file of a laptop?

MR. CONOVER:  Objection, beyond the scope of redirect, Your Honor.

MR. IREDALE:  Actually, counsel is quite right.  May I have leave to open up this additional inquiry?

THE COURT:  I'll allow the inquiry.  It is beyond the scope, but I'll allow it for the purposes of this hearing.

BY MR. IREDALE:

Q.  Ma'am.

A.  Would you restate the question?

Q.  There is something called a Eudora external hard drive.

A.  There was a hard drive referenced as that, yes.

Q.  And did you do work on that after July the 20th in response to a request from Ms. Phenicie?

A.  I did re-access the drive to work regarding that hard drive.

Q.  What did you do in that regard?

A.  I accessed the registry files windows for the Sony Vaio and for the Dell to confirm if the Eudora hard drive had been

attached to either of those laptops at any time in the past.

Q.   Did you find whether it had been, in fact, attached to those -- to that hard drive?

A.   I don't recall which hard drive if it was the Eudora hard drive at the moment.  I usually go by make and model.  "Eudora" is how it was referenced, but the work was done to identify what hard drives had been attached.

Q.   Do you recall Ms. Phenicie telling you in an e-mail of July the 20th, "We would like to get the warrant signed as soon as possible"?

A.   I don't remember that e-mail off the top of my head.

        MR. IREDALE:  All right.  I believe the next exhibit is I, and let me just show this to counsel.

        Your Honor, I promise not to remain up here.  May I have leave to come and go?

        THE COURT:  Yes, yes.  Just don't question the witness from there.

        MR. IREDALE:  I will not.

BY MR. IREDALE:

Q.   Do you recognize Exhibit I, ma'am?

A.   I recognize it as an e-mail.

Q.   Yes.  Do you recognize it as an e-mail that you received from Ms. Phenicie?

A.   I am the addressee of it.  I am reading the context -- content.  Yes, I do remember this e-mail.

Q.   All right.  And there is a reference there that she wants to get the warrant as soon as possible; correct?

A.   Yes.

Q.   And did she discuss that warrant with you at any point?

A.   No.  There was no need to discuss it with me.  This warrant would have been handled by an HSI Special Agent as the warrant would have applied to child pornography.

Q.   And was such a warrant ever obtained, ma'am?

A.   I did not have any further involvement in it, so I do not know if a warrant was ever obtained for child pornography.

Q.   Now, were you looking for images of child pornography when you did your examination of the pornographic images on the computer, ma'am?

A.   I was not.

Q.   Were you extracting data concerning the time and date of the download or accessing of the images that you were reviewing, ma'am?

A.   Did I stay within the confines of the search warrant, yes, I did.

Q.   No.  That wasn't my question, ma'am.  Did you access time and date for the images that you reviewed?

A.   If you --

Q.   Do you understand the question?

A.   If you would clarify your question.

Q.   I'm sorry?

A.   Would you clarify exactly where you are trying to go with this question?

Q.   Yes.  You told us that you saw thousands of pornographic images; is that correct?

A.   Yes.

Q.   And my question to you is, Did you when you were doing that review download the information regarding time and date of the access that had been in the computer for those images?

A.   As it was available in the computer, the information was pulled, yes.

Q.   For each image?

A.   Yes.

Q.   Now, ma'am, let me ask you, Were there various hard drives that were retained for imaging which contained pornography as of July the 7th of 2012?

A.   The only hard drives that were retained at that date that I am aware of are the ones that were seized during the execution of the search warrant in March.

Q.   And do you know when those hard drives were, in fact, imaged?

A.   In March.

Q.   Now, did you also do further work in response to a request from Sidney Younger on the 30th of July?

A.   That was the registry work that was done regarding associated USB connection external devices.

Q.   And to whom did you provide the information that you derived from that analysis?

A.   To Special Agent Younger.

Q.   Was that provided to him via e-mail?

A.   Yes.

MR. IREDALE:  All right.  Thank you so much.

Your Honor, that's all I have.

THE COURT:  Mr. Conover.

MR. CONOVER:  Nothing further, Your Honor.

THE COURT:  All right.  You may be excused.

Any additional witnesses on this issue?

MR. CONOVER:  No, Your Honor.

THE COURT:  Mr. Iredale.

MR. IREDALE:  No, Your Honor.

THE COURT:  All right.  And so then in your view, Mr. Iredale, the proof is complete with respect to this, the past the 120 days issue?

MR. IREDALE:  Yes, Your Honor, I believe it is.  The rest of it does not require an evidentiary hearing, but it would have to do with the briefing that has been thus far submitted which shows that there were additional search warrants obtained as a result of work that was done thereafter.

THE COURT:  All right.  With respect to the -- do you wish to have argument on this motion at this time?

MR. IREDALE:  Yes, Your Honor.

THE COURT:  All right.

MR. IREDALE:  In this regard, Your Honor, we have submitted to the Court some additional information that was provided to us.  We found that there were additional search warrants that were later obtained, and there was a later analysis that occurred as a result of the information that was obtained by the three persons who analyzed the computers after the 120-day time period.

Now, I don't know that the Government is arguing that there was good faith, but with all due respect, I suggest that given the explicit nature of the warrant, the clear language of the warrant, and the fact that these witnesses all reviewed the deadline, they cannot say that they were acting in good faith reliance on a search warrant whose precise terms they were violating after having reviewed the warrant.

And so I think that the Government is not contesting that anything that was done after the 120 days is subject to suppression.  The issue is, What is the scope of that suppression?

And we believe that, as we've previously provided in submission to the Court, that the subsequent search warrants that were done and the evidence that was obtained thereafter, including the apparent analysis that is on-going, because -- we did not submit it to the Court, but there was apparently a request to the magistrate to permit an extension because even

though the Government had said they wanted a trial date several months ago, apparently the computer analysis is not yet complete.

And so the warrants that were subsequent to this were, we believe, the result of the exploitation of the information that was obtained through the analysis, the work that was done when it was clearly beyond the scope of the warrant.

Now, the other thing that is, I submit, something that should be troubling to the Court is that the magistrate's requirement was not an outrageous or unreasonable one. As a matter of fact, it was one that was suggested by the Government in the application for the search warrant.

Ms. Phenicie said, Here's the protocol that we suggest that the Court adopt, and we will follow the protocol that Your Honor sets, and here's what we're asking for. It was very simple.

The magistrate judge did not in an excessive zeal or in some desire to be hyper-technical say, I am imposing this requirement on you. He simply adopted verbatim the manner of execution that the Government itself proposed to him.

So I don't think that it is stretching or straining to say that when the agent herself and the Government make the specific statement to the magistrate judge, Here's a protocol, we've designed it to be reasonable, we will abide by it, and we ask you to adopt it as part of the order for the search

warrant.

And then they come in to court and in talking to the agents, with all due respect, it is as though they were confused or stymied by something that the Government itself in its application had suggested that the magistrate judge adopt, and he simply went along with the Government's suggestion.

I don't think it is inappropriate to say that when one party proposes something specifically that the magistrate judge adopts in order to make sure that the search warrant is executed in a reasonable manner, because the idea is, at least, behind these deadlines, that there should be the execution of a search warrant in a reasonable time and within a limited time period, taking into account all of the facts relevant to the complexity of the analysis and computer forensics and so on.

But even then the Government also had the ability to go right back to the magistrate judge and say we haven't completed it; we want an extension; please give us an extension.  And thus far, as far as I can tell, in this case no request for extension has ever been denied them.

And so what is the reason why they could not comply with this very simple requirement that is designed to implement the Fourth Amendment's reasonableness requirement, that they themselves proposed and that they then ignored so grievously?

I believe that the subsequent search warrant applications that the Government has obtained to do further

analysis, to do further work, can only be seen as the fruit of this violation, as well as the other violations that we've alleged.

Let me also say this --

THE COURT:  Excuse me for interrupting.  Is that without regard to what work was done after the 120 days?

MR. IREDALE:  No.  In other words, what I am saying is, the work that is done after the 120 days is tainted.

THE COURT:  Right.

MR. IREDALE:  And that the later applications for the warrant which were submitted to the Court were, in fact, the fruit of that subsequent examination.

THE COURT:  And does it require some detailed analysis of what exactly was done past 120 days to determine whether or not the other warrants -- the subsequent warrants have been tainted, or is your argument more general that anything -- because they didn't comply with the 120-day deadline that the warrants that followed must necessarily be tainted?

MR. IREDALE:  No.  I think that it cannot be the latter.  I think it has to be the former.

In other words, if it had just been that they did something de minimis that had nothing really to do with the subsequent desire to get a later warrant, no, I don't think that suppression would be required, but they did substantial analysis.

In that regard, though, there is another aspect of this motion that I would like to talk to the Court about, and I don't know if this is the proper time or not because we have been separating out certain conceptual categories, and I think it is related to it, but I won't argue it if the Court feels that it should be deferred to a later time or addressed in another manner, and that is the issue of the gross overbreadth of the search especially with regard to adult pornography.

And the Court has before Your Honor the warrant.  The Government before and after the deadline that they violated went through, analyzed, downloaded many thousands of images of adult pornography, and that is not legitimately within the scope of the warrant.

I understand they tricked up some argument, well, we want to use this because we believe we can prove that if it was downloaded at a particular time that he claims that he was working on some business related to the union activities that that is probative and therefore within the ambit of the warrant.

But with all due respect, first of all, the fact that something is downloaded doesn't preclude the fact that somebody can still be doing work that is completely unrelated.  That is the whole purpose for having multiple screens on a computer.

The second thing is that really under a fair reading of the warrant and the common understanding which these agents

evinced, there was a question about whether the massive review of pornographic images was within the scope of the warrant.

And apparently there is a great deal of discussion back and forth about getting a new warrant.  If there was such a new warrant, we have not been given it.  And so they had the ability under the scope of this warrant to seize 20 computers and to do a tremendous analysis, and yet they did not think to go back and say, well, look, we want to review adult pornographic images, and here's what we want to do.

I think that a fair reading, a fair commonsense reading of that warrant says that no way was that scope authorized by the magistrate judge's initial determination.

Also let me -- specifically because Your Honor's question, I think, goes to the heart of the matter, which is, well, just because they did the analysis after the 120 days, does that mean ipso facto that the later warrant applications are tainted by the work they did?

And my answer to that has to be no.  It has to do with the particulars of the case, but I need to address the Court, and I realize it has been some time, but the later application for a search warrant which is before the Court said, essentially, we want to expand the scope of the search that we have beyond the 2004 time period, and we want to go back to 1991.

That itself, I think, the only reasonable inference

from the evidence that we have is that Mr. Porth's analysis which involved no limitations whatsoever of any time led to that application, because Porth went back -- if Your Honor will recall, Porth went back and extracted all of the documents from way back.

And if you look at the substance of that application where they say we want to go back to 1990, it is clear that the motivation for doing that is because they have already reviewed the materials because Mr. Porth was not constrained in any way by the scope of the warrant, and to his credit he candidly admitted that.

There is one other matter, which is the application to the magistrate judge for the subsequent warrants also says, oh, and we want to view pornographic images and do this analysis, but that was the fruit of the previous download and massive review that had already occurred which was beyond the scope of this.

And by no means could the deliberate and intensive analysis be called some inadvertent discovery under the plain view doctrine.  This was -- they went through and without legitimately being within the scope of the warrant they went through this analysis of pornographic images, and I think inferentially if you read these e-mails, you thought, oh, there must be some child pornography in here somewhere, and so that is probably what motivated them.

And of course, there's been no subsequent warrant that they've told us about and no subsequent charge and none of that, but the entire endeavor, I suggest to the Court, was done in violation of the scope of the first warrant, and then they go back to the magistrate judge and ask for permission to do what they've already done.

And as a result of their violation of the scope, they say, oh, by the way, we believe there is A, B, and C because we've already seen it, so we want to search for it. And so I believe that the appropriate remedy is not merely the palliative that the Government suggests, which is, oh, we won't use any of the analysis or forensic work or evidence that was discovered after the 7th of July and up to the date -- I believe it was the 13th of September of 2012.

But that doesn't mean that we can't just redo the same analysis and use it later on, and that doesn't mean that we can't just go get another warrant and then do what we should have done before now and insulate the evidence from the sanction of suppression.

I believe that the motion for suppression requires that the remedy correspond to the nature of the offense or the violation, and in this case we had, at least with Mr. Porth -- and we, of course, only got Porth because we had an evidentiary hearing on the issue of the time period, that violation of the scope -- but there are other analysts, and we'll have to wait

and see, but I suggest that his analysis probably is not unique.

He said, No, I didn't have any regard for any time period limitations; we seized everything; we got everything, and then they used that to get another warrant and then the massive review of pornographic images that are not fairly within the scope of this warrant.

And so those were violations that occurred, three, I believe, significant violations, a violation of the scope of the warrant with respect to no limitation as to time for Mr. Porth, which resulted in a later request by the Government for permission to get a warrant to do an analysis with no limitation to time back to 1990.

Second, the review of pornographic images which under any fair, commonsense reading of this warrant was not authorized by the magistrate, and that results in a later application for a warrant to review the very same thing.

And then, finally, the violation of the time period during which they do analysis that I believe gives them the motivation to do the subsequent requests, and it is not a sufficient sanction to say, okay, well, the only sanction you are going to have is you are going to have to do it all over again, when the reason why they make those subsequent applications for the warrant and the reason why they say, well, we're going to -- we'll do the same analysis again, is because

they ignored the legitimate scope violations of the warrant in the first instance.

And what is troubling also is that this was not really necessary. All they had to do with respect to any of these things was to go back to the magistrate and say we need more time, or we have an application for another warrant; we want to do this.

And instead of doing that. They did nothing. They ignored the scope of the warrant and treated it as though it had no importance, none.

They seized the son's computer, and the agent here who has a difficult time remembering how many hours she spent on this or that can't tell us how many hours she spent going into the son's computer, when clearly that is not within the scope of the warrant. I realize they seized it, but they were looking for Mr. Bonner's computers not his sons.

And they seized literally everything in this man's life and were able to subject it to scrutiny. And at least the minor limitations they treated not as real limitations on their ability to do this total review, this complete surveillance, but just as an inconvenience that they would slap aside.

I think the warrant means more than that. I think respect for the warrant process requires more than that, and I am asking the Court to suppress all of the evidence, included evidence seized as a result of the subsequent search warrants

and later analyses that were done.

Thank you so much, and if Your Honor has any questions, I'll be glad to respond.

THE COURT:  Not at this time.  Counsel.

MR. CONOVER:  Thank you, Your Honor.  The evidence that was obtained past the 120 days is de minimis.  We just heard Agent Eberle testify that before leaving on vacation, which was before the time period had expended.

She left on vacation on June.  It was July 7th when the 120 days elapsed -- prior to that she completed her entire analysis for extraction for the Dell computer, the only computer that she analyzed.  She did not finish the Vaio.  She did not analyze the Compaq because it looked like it had been used by Mr. Bonner's son.

When she returned all she did was access it on two occasions, on the 31st of July, three weeks after the deadline, and on the 20th of July, two weeks after the deadline.  The reason for that was, one, to obtain the registry information.

That information related to a new warrant, whether or not not only the Dell but the devices that had been connected to the new warrant would be part of that new warrant.  It was determined they hadn't been connected and they are not part of the new warrant.

That new warrant was for one purpose only.  It was a child pornography warrant because in searching Mr. Bonner's

computers they found an image that they determined they needed to change the search protocol and they needed to search for child pornography based on what they had already found on Mr. Bonner's computer.

Now, that is the new search warrant that is being discussed. It is not a new search warrant that relates to additional evidence in this case related to whether or not Mr. Bonner is guilty of the charges in the indictment.

THE COURT: Excuse me. In your view did adult pornography fall within the description of the warrant?

MR. CONOVER: Absolutely, Your Honor.

THE COURT: Although, do you think the magistrate really thought that they were authorizing for adult pornography? The term wasn't even used in the warrant.

MR. CONOVER: It is not used in the warrant, Your Honor. I believe, though, what the magistrate thought that they were authorizing was the things that are within the scope of the warrant in Attachment.

B, and this is why adult pornography falls within the scope of that warrant, it not because adult pornography typically would be of any relevance at all in any case that we deal with because it shouldn't be.

Adult pornography in this case is relevant because this case is about whether or not Mr. Bonner was making false statements when he said he was working from 6:00 PM to midnight

most nights.

THE COURT:  So at the time that the warrant was sought was it the intent that you were aware and the Government was looking for adult pornography but they elected not to use the term?

MR. CONOVER:  No, Your Honor.  We were not aware of Mr. Bonner's compulsion and the thousands of hours he spent on adult pornography before we signed the search warrant.

What we knew is we needed to find out what Mr. Bonner was doing with his time when he was claiming he was doing union business, and the search warrant made it clear that that was the goal of the warrant was to determine where he was spending union funds and how he was spending time that he claimed he was on union business.

THE COURT:  So would that have included almost literally anything?  For argument sake, is it your position that you could have looked at any photo, any video, anything that had any picture, any video on the computer without regard to what it was -- what it characterized?

Was there any limitations?  Let's try it this way, Is there any type of photo or video that in your view you couldn't look at?

MR. CONOVER:  I believe, Your Honor, there is a photo and video that has a date and time stamp on it that you -- from that date and time stamp you can determine what Mr. Bonner was

doing during that time, that it would have been relevant and fall within the scope of the warrant.

THE COURT:  So is it the case then that any Internet search he did or anything he ever looked at, you could look at?

MR. CONOVER:  Your Honor, yes, I believe that if there is an Internet search that occurred and on that computer it showed the time that he was doing that search, then it is relevant to determine whether or not when he is claiming overtime hours during -- say it is done at 9:00 at night --

THE COURT:  I understand the theory, but what I am trying to get at, Is there any limit to that?  Was it your understanding that when you went to the magistrate that what we're looking to search -- look, he has a computer --

MR. CONOVER:  Yes.

THE COURT:  -- and we want to look for anything that he has ever put on the computer, anything that he's -- any Internet search he's ever done, any video that is on there, any picture that is on there, and any search that he's ever done at any time during the period of the time that we're seeking the warrant.

And so during that period of time that we've asked for we get to look at however he's used the computer, no matter -- without limitation to how he's downloaded anything, so there is no -- we get to look at literally everything that is on the computer.  Were there any limits?

Because -- I understand your argument to say, look, we have this fraud case and, you know, if he is supposed to be working, for argument sake, nine to five on Tuesdays, we want to see what he was doing nine to five -- during this period of time.

And so, you know, if we have -- for argument sake, if we have a ten-year period, we have to look at literally everything; we have to look at every photo; we have to look at every video; we have to look at every Internet search, because conceivably if he was at work and he is searching the Internet and looking to buy sport tickets, whatever it is, well, hey, you are on the internet looking for baseball tickets and you are not working.

I guess I don't -- with that analysis for your argument, it seems that there isn't anything that you couldn't look at.

MR. CONOVER:  Let me be clear, that the scope of the warrant was limited with not only a date range, which was a reasonable date range.  We came in using prosecutorial discretion to limit it to 2004 and on.

Not only that, we limited it to the items that we were looking for, things that related to how he was spending union money, so, yes, documents related to spending union money, that would be relevant.  How he was spending his time during union claimed hours, that would be relevant.

Now, yes, that does -- could include a very broad range of --

THE COURT:  Is there anything it does not include?  Is there anything that you could think of that he could have done or looked at during the 2004 date -- in 2004 to the date of the warrant that you would say, well, that is -- that is outside the warrant; you can't -- if you find those files, you can't look at those.  Anything come to mind that is not -- that you could not look at?

MR. CONOVER:  Anything that has a date and a time stamp that showed what he was doing at the times he claimed to have been working, so during that time period at the times he had claimed to be doing union business would have been relevant and responsive to that warrant, Your Honor.

THE COURT:  I guess -- is there anything that you couldn't have looked -- obviously the time of 2004, but anything between 2004 and the date of the warrant, is there anything, any type of file, video, picture, Internet search, anything that in your view -- or the Government's view did not fall within the warrant?

MR. CONOVER:  Things that would have been not covered by Attachment B and that would have not been during the time he claimed to have been working during union hours.  I don't have a specific example of anything that would have been.

THE COURT:  Anything -- well, because isn't it that

the argument is, look, he -- because to -- anyone, when they looked for the warrant and when they did the search, did anybody have sort of a chart and say, okay, here's all the hours and the dates and the times that he says he was working, so let's go through and see is this that day or that, does it match up?

Or was it -- I mean, Mr. Iredale's argument seems to be, look, this was an unlimited search.  They literally -- under this argument, which is the argument for the pornography, well, we had to look at the pornography because if you are looking at the pornography 1:00 on Tuesday on a workday and you say you were doing union business, but we don't think you were doing union business if this is what your search was.

But under the analysis or that argument, it seems then that you really do get to look at literally every picture every file on the computer without limitation because the same argument would apply, would it not?

MR. CONOVER:  I believe the same argument would apply, Your Honor, as long as the images and the items that a date and time stamp and were within the scope of the 2004 on.

THE COURT:  And so -- and I don't know, certainly -- is it the case then that at any time that somebody, you know, searches the Internet, so somebody is on their computer and they are supposed to be working and it is 3:00 in the afternoon and they say, well, let me go on and I want to -- I am going to

look at a sport's website, so I am going to ESPN, and so at 3:00, that time, they log on and see the ESPN website.

During this forensic search would you be able to say on such and such a day he went to look at the ESPN website?

MR. CONOVER:  Yes.

THE COURT:  You would be able to tell that?

MR. CONOVER:  If there was a date and time stamp, yes, we would be able to tell that.

THE COURT:  So your search in your view included every, in essence, Internet search ever done during the 2004 to the date of the warrant date.

MR. CONOVER:  The agents did not look at every search that was ever done.

THE COURT:  But they could have?

MR. CONOVER:  They could have looked at his Internet activity during time period.

THE COURT:  Any time, 2004 to the date of the warrant, they could have?

MR. CONOVER:  They could have.

THE COURT:  And had they wanted to they could have looked at every file folder.  So even if there were photos that said, okay, photos of Lake Tahoe vacation, and they open up that file and they look a little bit, and they say, okay, here's, you know, people waterskiing --

MR. CONOVER:  Yes.

THE COURT:  -- they could have gone through and looked at the entire file to see, well, here's a photo -- we got to look at the dates of every one of these photos to see when they were taken because maybe one of these skiing vacations -- one of the photos of waterskiing or something was taken on a Tuesday, we think he was supposed to be working, we get to look at those too.

MR. CONOVER:  In fact, Your Honor, that becomes very relevant because there is things such as the wedding of Mr. Bonner's son, he claimed to be working the entire evening of that wedding and the day of the wedding, things along those lines, so, yes, Your Honor, those things are very relevant.

THE COURT:  Right.  I guess it is not so much relevancy, but is it getting to your understanding of the warrant that the magistrate approved, that the magistrate approved a warrant that said, in essence, we get to look at every internet search he's done from 2004 to the date of the warrant, we get to look at every file that is on the computer, and we get to look at every picture and video on the file without regard to the subject matter because it could relate to when he was working.

MR. CONOVER:  The subject matter was laid out in Attachment B.

THE COURT:  Right.

MR. CONOVER:  It was not only just 2004 on, but there

were specific items, and I guess the --

THE COURT:  I understand that because you do have some very specific items on the attachment.

MR. CONOVER:  Yes, sir.

THE COURT:  I guess what is the point of the specific items if the interpretation is, It doesn't matter.  We'll give you some specifics, but the specifics, were they given by way of example or were the specifics, look, we get to look at everything, and so we'll give you some specifics here.

But I mean, could it have been, for argument sake, here's our request, this is what we get the to search for: Every Internet search from 2004 to the present; every file, every picture, every video that is on the computer, and we get to look at it to see when it was taken or when it was entered, so we really have to look at everything in order to know whether it was between 2004 and the present, and so our request is to look at everything between 2004 and the present?

I mean that is -- isn't that -- is that what your understanding was of what you were requesting?

MR. CONOVER:  No, Your Honor.  Our understanding was that we were requesting to be able to look at documents that were relevant to the crimes that were alleged.  The crimes that were alleged here was wire fraud and the wire fraud related to making false statements as to what he was spending his time doing.

He claimed he was working every holiday, and so if there were pictures taken on holidays, well then, if those pictures were work related, then it would have made sense that those would have been showing evidence that he was doing work items.

If those pictures were nonwork related, if they were showing, say, a vacation in Tahoe when he was claiming to have been working claiming overtime hours, well, then yes.

So what the warrant requested and what the magistrate granted was to allow us to search for those specific items as well as to prove what he was doing with his time, and that comes back to why the adult pornography is within the scope of the warrant.

THE COURT:  But -- I understand the adult pornography argument, but it would seem, though, the same argument -- the same argument that you apply to adult pornography really applies to literally everything, that between 2004 and the date of the warrant, I guess -- I am trying to think under that analysis is there anything that an agent, when they look at the computer and say, okay, here take a look at this, is there anything that they would think I can't look at?

You know, is there any title, you know, personal photographs, videos, I can look at all those; pornography, I can look at all those; I can look at all that; obviously, the work related stuff I can look at.

But if there is a whole lot of personal things, you know, like somebody is remodeling their house or they have files of, you know, bills they spent and contracts they signed, but all of that stuff could have been done during the work hours, so you could conceivably -- you could look at that under the same pornography analysis, right?

MR. CONOVER:  Conceivably, Your Honor.

THE COURT:  So is it the case then that -- when you talk about Mr. Iredale's argument about the pornography, your argument is, hey, we can look at all the pornography, the pornography fell within the argument, and literally we could look at every photo and we could look at every video, and we could have look at every piece of paper.  They may have engaged in some transaction or activity during the time that he said he was working.

MR. CONOVER:  I think many of the times the paper documents would have a date and time stamp to show what time it was he was engaged in that activity, so certainly many of those documents that were clearly not responsive to the categories of Attachment B would not have been within the scope of the warrant.

THE COURT:  For example, can you give me any idea of what wouldn't be?

MR. CONOVER:  Sure.  Anything that falls before 2004.

THE COURT:  Anything after 2004?  What about a

document or something that reflected it was post 2004?

MR. CONOVER: Sure. You mentioned a remodeling of the home, that would not have been within the scope of the warrant. Family vacations would not have been within the scope of the warrant?

THE COURT: But wouldn't you be looking at the pictures to determine if they were done during the time of the working? How is it different than the child pornography -- excuse me. How is it different than the pornography?

You say, hey, look, he has a thousand images of pornography and we think he is downloading these things and looking at these things when he is working, and part of our theory is he is putting in these claims and he is not really working.

MR. CONOVER: The millions of images of adult pornography are date and time stamped. Whereas paper documents would not have a date and time stamp. It is not that the adult pornography in and of itself has any relevance at all.

THE COURT: What about the family photographs?

MR. CONOVER: The family photographs that are physical, they wouldn't have a date and time stamp necessarily either, so they wouldn't be relevant. The family photos that show Mr. Bonner was engaged in at a particular time when he had claimed he was to be working are relevant and within the scope of the warrant.

And so it depends on the date and time stamp.  It is not so much the actual document as such as the proof of the activity at the time.

Why the adult pornography is so important here to the defense and to the Government to some degree, it isn't a passing thing of an hour here and hour there, hundreds and hundreds of hours, and that is important because the hundreds and hundreds of hours were being paid for by the union as if they were work related.

THE COURT:  In the attachment is there any language, in your view, clearly spells out that the theory is, We get to look for anything that would demonstrate what he was doing when he claimed he was at work?

You know, that relates to, you know, your argument on the pornography.  Is there anything that describes sort of the category of documents that says --

MR. CONOVER:  Yes.

THE COURT:  -- that says - or pictures, that say, look, he claimed he was working, and we want to look at anything that would prove he wasn't doing what he said he was doing.

MR. CONOVER:  If I could refer the Court to Attachment B, page one, category number three, records related to activities and whereabouts:  All records or data related to Terence Bonner's day-to-day activities and whereabouts

including without limitation diaries, day planners, calendars, appointment books, phone and call records, and correspondence.

That is the category that I think is most indicative of -- we're trying to figure out what he was doing, records related to his activities and whereabouts.  Where was he and what was he doing?

Was he spending time in Chicago an average of 20 times a year?  Yes.  Was there any business reason to be in Chicago?  No.  Sole purpose of that was to be with the mistress.  So when he is in Chicago, it is important for us to be able to determine that he was there and what he was doing there.

THE COURT:  Well, I certainly understand that.  I guess -- all right.  Anything else that you want to add in response to Mr. Iredale's comments?

MR. CONOVER:  Yes, Your Honor, yes.  The agents' work beyond the 120 days was de minimis, and it did not lead to the new search warrants whatsoever, other than the child pornography search warrant.  That is what Ms. Eberle looked at to determine the registry information.

THE COURT:  Excuse me for interrupting.  When you say it is "de minimis," in the record is that reflected in the testimony of the three witnesses who testified?

MR. CONOVER:  I believe so, Your Honor.  I believe what they looked at -- now, when we talk about Ms. Eberle, you have that fresh in your mind.  It was the two occasions on the

Dell.

With the other agents, one time they had come back in September, months after it had expired, and they looked at it to run a new software program. Agent Porth didn't complete his work entirely until a little while after.

But when it came to extraction of data, actually pulling what mattered and pulling it into a file and analyzing it, there was very, very little if any done. And the Government at this point has disavowed that and said we will not rely on it for any way; we will not rely on it for a new search warrant; we won't rely on it in any way at trial.

We made a mistake. We recognize that mistake. In fact, Government counsel should have been more fervent in reminding them of the 120 days and being sure that the work was completed. We did give them a copy of the warrant. Each and every one of them had said they received the warrant, had read the warrant, and just didn't understand fully the deadline for the 120 days.

THE COURT: But you are seeking to use materials from subsequent warrants, correct?

MR. CONOVER: Could you rephrase that, Your Honor? I'm sorry.

THE COURT: Mr. Iredale, he is asking for suppression of everything past the 120 days and anything that was derived from that material.

MR. CONOVER:  We're not seeking to use anything that was found or obtained past the 120 days or anything derived from information that was found or obtained past the 120 days.

We don't believe that -- we will disavow completely not only the information that was gained by them but anything that they could have obtained from that information.

So we don't believe that the new search warrant in any way -- we don't plan on relying on the child pornography search warrant in any way.  We can put it aside.

The additional search warrant going back to 1993 was not in response to Agent Porth's search.  It was in response to the paper, hard copy documents that were received in the search warrant, that showed here is a file and showed the date range of many of the documents that were important going back beyond that time period, where the case agent realized Mr. Bonner had been engaging in the same conduct not just since 2004, which were the records we had, but going back years before that.

And that was the purpose of the new search warrant expansion was based on the paper documents received in large part from the search warrant.

THE COURT:  For argument sake, if the -- hypothetically, in a case with facts similar to this, if the Government gets a search warrant and they are supposed to do it within 120 days and then they go beyond the 120 days, so suppose maybe like at day 160 the Government finds some

information and they find that it is particularly helpful and they say, you know, based on this information that we got on day 160, we need to get another warrant, and so they go and they get another warrant.  They get another warrant, and they find some helpful information.

In that context, where the Government finds information that they rely on on day 160 to get the new warrant, would the Court then -- would the -- would the appropriate sanction be in that hypothetical to suppress what the Government got in the new warrant that they learned -- where they got the information, you know, to get it on day 160, well past the 120?

MR. CONOVER:  Your Honor, the Ninth Circuit and the Supreme Court have said that suppression is an extreme remedy that is left as a last resort.  If there was bad faith, if it had been shown that the agents or the Government in some way in bad faith declined or refused to comply with the warrant, I believe suppression would be an appropriate remedy.

If, in fact, the Government could have simply asked for an extension from the magistrate, it would have been received, and there has been no prejudice to the defendant because this is a truth-seeking purpose is to find actual evidence.

If they could have in good faith got the extension, it was simply a calendaring error, I believe that suppression in

that instance would be inappropriate as well because there is no prejudice to the defendant.

That information was there.  It was accessible.  It had not been in the Government's possession improperly.  It was simply a mistake in calendaring and not getting the extension.

I believe that there are many instances where suppression wouldn't be appropriate and maybe the remedy would be something like much less severe.

THE COURT:  Like what?

MR. CONOVER:  It could be taking away some of the Government's strikes in jury selection.  It could be limiting how they could use some of the evidence.  It could be -- many other things less than suppression.

THE COURT:  How would you limit how they could use it?

MR. CONOVER:  I think that would be a very case-specific analysis, Your Honor, and it would be dependent on the facts of the case.

But what the Government believes is that suppression should be limited to instances where there has been some bad faith on the part of the Government or prejudice of the defendant.

And in this case and in the hypothetical that you mentioned there has been no showing of bad faith, just the opposite.  There's been a showing that the agents all received the search warrant.  They were instructed on it, that they just

didn't know and understand it.  That is not bad faith.

And there's been no prejudice, that we're saying we will not rely at all in any way on the information obtained after the 120 days.  We won't rely on that information or any anything that we obtained based upon that information.

THE COURT:  Although, how would one -- this gets back to the first question, that as I understand your position, I think, is that, look, with the later warrant -- at the original search, search of the house, we found some documents --

MR. CONOVER:  Yes, Your Honor.

THE COURT:  -- and we took some documents that were pre-2004, and so we got those documents, and we looked through the documents, and we said, looks like we need to go back earlier, we need to go back to an earlier time, and so I assume your position is -- I think your position is, look, the later warrant, we weren't relying on anything that we -- any search we did past 120 days to get that warrant.

MR. CONOVER:  Absolutely, Your Honor.

THE COURT:  We were relying on the things we got on the paper documents we saw earlier.

How would one -- and I think Mr. Iredale makes a different argument saying -- his argument is different saying, hey, look, one of the agents clearly didn't adhere to any time limitations and so was clearly looking at things that were well in advance of 2004, and that is what prompted to get the second

warrant, and when they say they are not relying on it, really they are because inferentially that other agent -- I forgot the gentleman's name -- but who indicated -- it is clearly in the record -- he indicated that the time limits, he didn't really adhere strictly to the 2004 time limits.

MR. CONOVER:  Yes, Your Honor.  That is Agent Porth, and he testified he did not take the 2004 limitation into consideration when he was doing his key word search.

THE COURT:  Do I have to determine and how will I determine whether or not with respect to the latter warrant, look, the Government is not relying on it anyway because they -- they are relying -- to get that latter warrant they relied on the paper documents at the search of the house, and so that is what prompted them to get the latter warrant, not any search past 120 days.

And Mr. Iredale's argument is really the opposite -- not the opposite but different.  He is saying we think that they relied on the agent to get it.  How would I know -- do I have to make that factual finding, and if I do have to make it, how would I make it?

MR. CONOVER:  First, we had an evidentiary hearing where Agent Porth testified for what it was he did past the 120 days.  We have it in the record.  It is very limited in nature.  But he did also search without a time frame in mind.

Now, we can look back at his report to see what it was

that he generated and see if the documents that he generated were, in fact, an impetus, and we've taken -- and we had the case agent take the stand as well, and I believe she was asked questions along the line of what was the reason for the subsequent search warrant.

So we have evidence in front of the Court as to why the subsequent search warrant was obtained, and it was obtained for two reasons, one, to make sure that there was an understanding and a fix to the 120 days because that was disclosed to the Court that we had gone beyond the 120 days, but rather than seeking a new extension to go back to that time frame, we wanted to seek a new warrant to continue our analysis.

And because we had more information now about some documents that we had received going back to 1993 we wanted to expand the scope. So that information is before the Court from the case agent, from Mr. Porth, and from these other agents.

But the Court doesn't have to make a determination as to whether or not factually what exactly was the impetus for the new search warrant. The new search warrant can stand on its face. It was given with -- there is nothing to say that the facts in the search warrant itself were not proper. Nothing to say that they didn't have probable cause. There is nothing to say that we shouldn't have had the electronic data in our possession at that time.

The new search warrant itself should stand on its own, the four corners, even if the impetus for it was gained in some way going beyond the 120 days, because that search warrant is proper.  It has proper probable cause in and of itself.

THE COURT:  Thank you, sir.  I'm sorry.

MR. CONOVER:  Yes, and just finally, Your Honor, with regards to the suppression remedy, it should be left as a final resort, a time when there has been bad faith or there has been prejudice.

There has been no showing of prejudice here whatsoever.  This information was all properly in the Government's possession, was analyzed properly, other than the few instances of going behind the 120 days, and that's been disavowed.

THE COURT:  All right.  Mr. Iredale, any response?  And actually, Mr. Iredale, when I asked whether you had any witnesses, I was aware that there was a request to have Mr. Younger and Mr. Platt testify, but I am assuming that -- I never ruled on it, but I am assuming that you didn't -- that you didn't need those individuals for this argument.

Is that fair to say?  I didn't think you forgot about it.

MR. IREDALE:  No, I did not, Your Honor.  I looked again at our submission, and I felt that while we had an argument, it was basically an inferential one and that they

were not necessarily direct participants, but I am satisfied with the record as it is.

THE COURT: All right. So your view is you don't need Younger and Platt for the argument that you are making now.

MR. IREDALE: Correct.

THE COURT: Okay. Any response to Mr. Conover?

MR. IREDALE: Yes, Your Honor. If I could, three basic points, the first is that I think Your Honor's colloquy with counsel hit the nail right on the head. The whole purpose for a warrant is to limit the scope of the search so that it specifically delineates the things to be seized.

The Government's reading of this is, I think, precisely what Your Honor was asking counsel. The records relating to activities and whereabouts, I think that is a common category in warrants.

And so when the magistrate signs this, and he sees diaries, day planners, calendars, appointment books, phone and call records, and correspondence, that is broad to be sure, but it is legitimate, and it limits the scope.

But when the Government now says, no, we have the right to find out where he was and what he was doing for every minute of that time because he made certain claims, not for every minute -- actually, what they are saying is we have the right to look at everything to see where he was and what he was doing.

Because if the evidence shows where he was and what he was doing matches up or contradicts something else, then we have the right to look at it, but that would include not only photographs, et cetera, it would include exactly what Your Honor said. Every time somebody gets on a computer, what they download, what they say, how long it took, they get to do all of that.

Now, I am not arguing for purposes of this argument that that itself would be a proscribed general warrant, although it sounds -- it sounded to me that when Your Honor was pressing counsel that that sounded an awful lot like a general warrant, but at least there has to be a common sense reading of these things.

The magistrate had to have been put on notice in some way that he is making a determination not simply, oh, you can look at his calendars, his agendas, his itineraries, but, no, you can look at literally anything, because you can say he downloaded it at this time or that time or he was on the computer at this time or that time. Everything on that computer, millions and millions of pieces of data you may examine. There is no limitation because you have a rationale for it.

They didn't express that. What happened is they started going into the search, they realized they were beyond the scope of the warrant, and then they came up with a

rationale ex post facto to try to justify it.

But no legitimate reading of this can -- of Category 3 can justify that position that the Government is -- took.  And I think that we are there were essentially concessions in response to the Court's questioning that, yes, we could look at anything having to do with time and place for that period of time from 2004 onward, and I don't think it -- that a magistrate judge was fairly confronted with that issue or that question.

The second thing is, with respect to the issue of whether the searches that were beyond the scope of the warrant or the searches that were beyond the temporal limitation of the warrant provided an impetus to or a motivation for the later applications for the warrant.

Counsel says, no, you look to the warrant itself within its four corners and whether it motivated or provided an impetus for us to get the warrant is not relevant.  That is directly in contradiction to the controlling Supreme Court law. I believe the case is Murray vs United States.

And Murray vs United States says two things.  If they include the tainted information in the subsequent warrant affidavit, or if the forbidden search provided the motivation for or the impetus to the subsequent application for the search warrant suppression is required.

And may I just have leave to submit the citation to

Your Honor?

THE COURT:  Certainly.

MR. IREDALE:  And then third and finally with respect to the factual issues, I think counsel is not quite being fair to the facts.  Now, I realize that our last evidentiary hearing was sometime ago, but Porth -- for instance, Porth did not even start doing his computer analysis until the 12th of July which was five days after the deadline.  He didn't even start until then.

So I think that it is not simply that these were de minimis or minor violations of the warrant, these were major violations of the very purpose of the warrant, which is to provide some limitation, to provide some limiting principle on the degree of the search.

And certainly when the Government seizes 20 computers and subjects somebody's life to this high-powered analysis, that is a substantial intrusion, but when the Government says not only that, but we have nothing that limits us, then I think that they are contravening the essential purpose of the Fourth Amendment.

THE COURT:  All right.  Thank you.  All right.

Any final comments, Mr. Conover, on that point?

MR. CONOVER:  No, Your Honor.

THE COURT:  Okay.  We do have the one issue that you did -- you each filed briefs.  It is Documents 49 and 50 that

were filed on April 26th that deal with the issue of the authority of CBP Internal Affairs to conduct a criminal investigation.

I'll set it for oral argument.  What I'll do, though, is give you each an opportunity to respond to each other's pleadings.  There may be some argument, that I think Mr. Iredale may have attached some documents that I think were new to his arguments, and there may be some arguments that had not previously been made.

And I want to give each side an opportunity to respond to arguments that may not have been made before, and so it is important that you respond to these arguments because, you know, if you don't, then I would really consider them waived.

So I know we had some briefing on this before, and so I just want to be clear for each side that I am going to give you an opportunity to respond -- this was simultaneous briefing.  I'll give you each opportunity to respond to each other's brief, and we'll set it for oral argument.

How about each respond by -- each respond by Friday July 12th, and we'll set it for oral argument for the July 26th at 1:30.  Does that work for both sides?

MR. HUIE:  Yes, Your Honor.

MR. IREDALE:  Yes, Your Honor.  It does.

THE COURT:  All right.  Thank you.  All right.

Counsel, thank you for your briefing and your

presentations, and I'll look forward to additional briefing. We'll see you back on July 26th at 1:30 PM.

MR. CONOVER:  Thank you, Your Honor.

MR. IREDALE:  Thank you.

MR. HUIE:  Thank you.

(Proceedings concluded at 11:55 a.m.)

---oOo---

C-E-R-T-I-F-I-C-A-T-I-O-N

I hereby certify that I am a duly appointed, qualified and acting official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

DATED:   July 2, 2013, at San Diego, California.

/s/ Melinda S. Setterman

_____
Melinda S. Setterman,
Registered Professional Reporter
Certified Realtime Reporter